UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| STEPHEN H. CLEVETT, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 05-40020 FDS |
| NORESCO, LLC, | ) | |
| EQUITABLE RESOURCES, INC., and | ) | |
| JOSEPH E. O'BRIEN | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, Stephen H. Clevett ("Clevett"), files this Amended Complaint and Jury

Demand[1] against Defendants, NORESCO, LLC ("NORESCO"), Equitable Resources, Inc.

("EQT"), and Joseph E. O'Brien ("O'Brien"), alleging as follows:

### Introduction

1.    This is a civil action arising out of NORESCO's unlawful termination of Clevett's

employment, after fraudulently inducing Clevett to accept such employment, and without

"cause" as defined by the parties' agreement; and NORESCO's subsequent refusal to pay Clevett

severance and other monies owed to him pursuant to the parties' agreement.

---

[1]    On November 30, 2004, Clevett commenced a civil action in Worcester Superior Court styled
Stephen H. Clevett v. Equitable Resources, Inc. and Joseph E. O'Brien, Civil Action No. 2004-02334-B,
by filing a Complaint and Jury Demand (the "Complaint"). On January 31, 2005, defendants Equitable
Resources, Inc. and Joseph E. O'Brien filed a Notice of Removal, removing the instant action to federal
court. Although Clevett has moved to remand the Complaint to state court, Clevett's motion has not been
acted on as of the date of the filing of the instant Amended Complaint, and, as such, this action remains in
federal court. Defendants have not filed a responsive pleading to the Complaint. Accordingly, Clevett
files the instant Amended Complaint as of right pursuant to Fed. R. Civ. P. 15(a).

## Parties

2.     The plaintiff, Stephen H. Clevett, is domiciled in Ashland, Massachusetts, and was an employee of NORESCO's from August of 2001 to December 15, 2003. From March of 2002 until December 2003, Clevett worked as the Senior Vice President of Energy Infrastructure for NORESCO.

3.     The defendant, NORESCO, LLC, is a limited liability company organized under the laws of Delaware, with a principal place of business at One Research Drive, Westborough, Massachusetts 01581.   NORESCO is an energy services company that provides institutional clients integrated energy solutions from design/build commissioning strategies, to financing and asset management services.  NORESCO is a wholly owned subsidiary of EQT.

4.     The defendant, Equitable Resources, Inc., is a corporation organized under the laws of Delaware, with its primary place of business in Pittsburgh, Pennsylvania.  EQT is an integrated energy company that offers natural gas products and energy services to wholesale and retail customers through three business segments: Equitable Utilities, Equitable Production, and NORESCO.  EQT is NORESCO's parent company.

5.     The defendant, Joseph E. O'Brien, is the president of NORESCO and a vice president of EQT.

## Jurisdiction and Venue

6.     The Superior Court of Worcester County has personal jurisdiction over the defendants pursuant to Mass. Gen. Laws ch. 223A, § 3, and subject matter jurisdiction over this matter pursuant to Mass. Gen. Laws ch. 218, § 19.

7.     Venue is proper in the Superior Court of Worcester County pursuant to Mass. Gen. Laws ch. 223, §§ 2 and 8.

## Factual Background

8.      In August of 2001, NORESCO hired Clevett to work as a Vice President of Business Development out of NORESCO's branch office in Vienna, Virginia.

9.      As a condition of Clevett's employment, O'Brien, who was Clevett's supervisor, orally promised Clevett that he would be promoted to Senior Vice President of the Energy Infrastructure Division (the "EI Division"), by the end of December 2001.

10.     O'Brien informed Clevett that this proposed promotion would require Clevett to permanently move from Maryland to Massachusetts, and reassured Clevett that the EI Division was, and would continue to be, a valued part of NORESCO's business.

11.     Despite his promises, O'Brien and NORESCO did not formally offer Clevett the promised promotion until February 22, 2002.

12.     As a result of O'Brien's delay in effecting the promotion, in January 2002 Clevett was forced to re-enroll his daughter in school in Maryland in order to reserve a placement for the 2002-2003 school year.

13.     In reliance on O'Brien's promise of promotion and continued assurances that the EI Division was a valued part of the NORESCO's business, Clevett: (i) commuted between Maryland and Massachusetts on weekly basis from February 2002 to September 2003, (ii) made a significant deposit to have a new home constructed in Ashland, Massachusetts in February 2003; (iii) moved his family to Ashland in September 2003.

14.     Clevett was made aware of the promotion by way of a letter dated February 22, 2002, signed by the Director of Human Resources for NORESCO, Anne M. Naqi, a true and accurate copy of which is attached hereto as Exhibit A. In this letter, NORESCO offered Clevett

a promotion to Senior Vice President of the EI Division. Clevett accepted the promotion, and signed and returned the letter to Ms. Naqi.

15.    The February 22, 2002 letter outlined the terms and benefits of Clevett's promotion and stated, inter alia, that Clevett would be reporting to NORESCO's President, O'Brien; and that he would be responsible for identifying, developing, and closing projects from the company's office in Westborough Massachusetts. Further, the letter provided that Clevett would receive: (i) $195,000 per year; (ii) twenty (20) days of vacation per year; (iii) the right to participate in EQT's short-term and long-term incentive plans including stock options; (iv) $500 monthly automobile stipend; (v) financial planning benefits of $2000 per year; (vi) a club membership stipend of $2000 per year; (vii) one additional year of base salary life insurance and enhanced long-term disability; and (viii) relocation assistance.

16.    In June of 2002 and May of 2003 Clevett received letters detailing his award of EQT stock options. Clevett signed the letters and agreed to participate in the EQT stock option plan.

17.    On October 19, 2002, Clevett entered into a contract entitled "Noncompete Agreement" with the "Company," which was defined therein to include EQT and its subsidiaries, including NORESCO. The Noncompete Agreement contained a limited covenant not to compete and provided that if the Company terminated Clevett for any reason other than "cause," as defined in the Noncompete Agreement, or if Clevett terminated his employment for "Good Reason," as defined in the Noncompete Agreement, then the Company would be obligated to provide Clevett with the following: (i) any payments he is entitled to under the Company's severance plan; (ii) 12 months salary at the salary level in effect at the time of termination payable in one lump sum within 30 days of termination; (iii) 12 months of continued health

benefits; and (iv) up to 12 months of outplacement assistance as needed. A true and accurate copy of the Noncompete Agreement is attached hereto as Exhibit B.

18.     In August 2003, O'Brien notified Clevett that, in the future, he and Clevett would "jointly manage" the EI Division as the group was not meeting its goals for the year. In the reorganization of the group, Clevett was to manage business development duties only, while O'Brien would manage all construction activities. O'Brien stated at the meeting that the group's operations and maintenance function "basically ran itself." Prior to this date, Clevett had spent a significant amount of his time managing both construction and operations and maintenance activities because each area was critical to NORESCO. Specifically, a major project in construction was experiencing difficulties and Clevett was managing the sales process of a significant troubled international assets held by NORESCO. In sum, O'Brien's activities amounted to a diminution of Clevett's duties, and therefore provided Clevett with the opportunity to terminate the Noncompete Agreement for "Good Reason."

19.     In August 2003, O'Brien also notified Clevett that NORESCO had decided that the EI Division required only two sales personnel to meet its goals of $50 million in construction revenues for 2003. This staffing strategy was formulated without any input or guidance from Clevett and was in contradiction to the business plan that Clevett had prepared and presented to O'Brien in March 2003.

20.     In November of 2003, O'Brien informed Clevett that he and NORESCO and/or EQT were seriously considering terminating what O'Brien, quoting David Porges – EQT's Chief Financial Officer –referred to for the first time as the "EI experiment." Later that month O'Brien informed Clevett that he, NORESCO, and EQT had decided to terminate all business development activities associated with the EI Division.

- 5 -

21.    On December 3, 2003, O'Brien ordered Clevett to terminate the employment of all of the EI Division's business development personnel and informed Clevett that he would be employed until the end of January as part of the transition group.

22.    On December 9, 2003, less than two months before Clevett was scheduled to be terminated with full severance pay and benefits, O'Brien called Clevett into a conference room and told him to pack his things and leave the building.

23.    On December 15, 2003, O'Brien sent a termination letter to Clevett (the "termination letter"), which provided in pertinent part as follows:

> As you know, your position with NORESCO was going to be eliminated in the near future, which would have resulted in the termination of your employment at that time. In the meantime, however, we have learned that you have been engaging in misconduct, which among other things, violates material provisions of the Noncompete Agreement between you and Equitable Resources, Inc. and also breaches the duty of loyalty owed to the Company. Hence, be advised that your employment with NORESCO is being terminated for cause as defined in paragraph 1 of the Noncompete Agreement, effective today.

A true and accurate copy of the termination letter is attached hereto as Exhibit C.

24.    The termination letter failed to explain what actions constituted Clevett's supposed "misconduct" or what actions amounted to "cause' as defined by the Noncompete Agreement. As of today, neither O'Brien, nor NORESCO, nor EQT have clarified the specific reasons for Clevett's termination.

25.    On December 19, 2003, or less than one week after the termination letter was sent to Clevett, O'Brien requested that Clevett meet with O'Brien and representatives of the City of Colton, California ("Colton"), to discuss an ongoing project that NORESCO was performing for Colton (the "Colton project").

26.    On December 24, 2003, O'Brien and Clevett met to discuss the possibility of NORESCO retaining Clevett as a consultant for the Colton project. At this meeting O'Brien proposed that Clevett enter into a consulting agreement to work on the Colton project through May or June of 2004. Clevett responded that he would be willing to enter into such an agreement but requested that NORESCO resolve the issues related to his severance pay due under the Noncompete Agreement. In response, O'Brien replied that "everything was on the table."

27.    On Tuesday, January 20, 2004, at approximately noon, Clevett received an e-mail from O'Brien that failed to mention the issue of Clevett's severance pay, and stated NORESCO would not enter into a long-term consulting agreement at that time. O'Brien offered, however, to pay Clevett's expenses and an hourly wage if Clevett would attend meetings in Colton on January 21 – 23, 2004 that O'Brien could not attend.

28.    At approximately 6:00 p.m. on the same day, Clevett responded by e-mail and agreed to participate in the meetings, without a long-term consulting agreement or resolution of his severance pay, subject to the conditions that (i) his participation at the meeting did not waive any of his rights to seek severance; and (ii) that NORESCO pay him expenses plus $2,500 per diem for the two and one-half-day trip.

29.    O'Brien did not respond to Clevett until approximately 7:30 p.m. on January 21, which was after Clevett had already departed for California in order to arrive for the initial meeting with representatives of Colton at mid-day on January 21, 2004. O'Brien's e-mail stated that he did not agree to Clevett's terms and that Clevett would not be receiving any compensation or expense recovery for his trip, nor could Clevett represent NORESCO at the meeting.

- 7 -

30.     On January 30, 2004, despite his rejection of Clevett's terms, O'Brien e-mailed Clevett asking for details regarding the meeting with Colton. Clevett responded to O'Brien's e-mail with a lengthy description of the meeting, including a detailed overview, a "capital rack-up," and a report on the analysis methodology employed by the City of Colton's partner on the Colton project.

31.     As of February 25, Clevett had not received a reply from O'Brien, so Clevett sent an invoice for $8,104.49 which included all of his expenses from the trip to Colton plus $2,500 per diem.

32.     To date, Clevett has not been paid for his meetings with Colton and has not been paid any severance or stock options owed by EQT and/or NORESCO.

## COUNT I

(Breach of Contract – NORESCO/EQT)

33.     Clevett hereby reasserts and incorporates by reference the allegations contained in paragraphs 1 through 32 above, as if each were fully set forth here in its entirety.

34.     Clevett entered into a contract with NORESCO and EQT as described above, and Clevett fully performed his obligations under this contract.

35.     NORESCO and EQT by their actions as described above, breached their contract with Clevett by terminating Clevett's employment without cause, and failing to pay Clevett the compensation he is owed for termination without cause under the contract.

36.     As a result of NORESCO's and EQT's breach of their contractual obligations, Clevett has suffered substantial damages in an amount to be determined by the Court in these proceedings.

- 8 -

## COUNT II

(Breach of Covenant of Good Faith and Fair Dealing – NORESCO/EQT)

37.     Clevett hereby reasserts and incorporates by reference the allegations contained in paragraphs 1 through 36, above, as if each were fully set forth here in its entirety.

38.     Clevett entered into a contract with NORESCO and EQT as described above, and Clevett fully performed his obligations under that contract in good faith.

39.     NORESCO and EQT owed Clevett a duty of good faith and fair dealing in the performance of the contract.

40.     NORESCO and EQT, by their actions described above, breached the covenant of good faith and fair dealing with Clevett, by terminating Clevett's employment without cause, asserting in bad faith a pretextual basis for Clevett's termination, and refusing to pay Clevett the compensation he is owed under the contract.

41.     As a result of NORESCO's and EQT's breach of the covenant of good faith and fair dealing within the contract, Clevett has suffered substantial damages in an amount to be determined by the Court in these proceedings.

## COUNT III

(Fraudulent Misrepresentation – NORESCO/EQT)

42.     Clevett hereby reasserts and incorporates by reference the allegations contained in paragraphs 1 through 41 above, as if each were fully set forth here in its entirety.

43.     NORESCO and EQT, acting through O'Brien, intentionally misrepresented to Clevett that the EI Division of NORESCO was a valued part of NORESCO's business and would continue its operations indefinitely when, in fact, NORESCO, EQT, and O'Brien knew that the EI Division was temporary and experimental.

- 9 -

44.     NORESCO and EQT made this misrepresentation with intention of inducing Clevett to accept a management position within the EI Division and to relocate his family to Massachusetts.

45.     Clevett acted upon NORESCO's and EQT's misrepresentations by commuting from Maryland to Massachusetts on a weekly basis for 19 months, by incurring substantial un-reimbursed costs, by purchasing land and causing a house to be built in Ashland, Massachusetts, and by moving himself and his family to Massachusetts.

46.     Within 3 months of Clevett's move to Massachusetts, NORESCO and EQT dismantled the "EI experiment" and terminated Clevett's employment.

47.     On December 24, 2003, NORESCO and EQT, acting through O'Brien, intentionally misrepresented their intention to negotiate the payment of compensation owed to Clevett for termination without cause, and their intention to offer Clevett a long-term consulting agreement, and to pay Clevett an hourly fee, with the purpose of inducing Clevett to attend meetings with representatives of Colton in order to secure future work on the Colton project.

48.     Clevett acted upon NORESCO's and EQT's misrepresentation by flying to California at his own expense, Meeting with other representatives of Colton over the course of three days, and providing O'Brien with detailed and valuable information derived from the meeting.

49.     NORESCO and EQT have failed to provide Clevett with any compensation for attending the meeting in California, and have refused to communicate with Clevett regarding a consulting agreement or payment of the compensation Clevett is owed.

50.     Clevett has suffered substantial damages directly related to NORESCO's and EQT's misrepresentations in an amount to be determined by the Court in these proceedings.

## COUNT IV

(Fraudulent Misrepresentation – O'Brien)

51.     Clevett hereby reasserts and incorporates by reference the allegations contained in paragraphs 1 through 50, above, as if each were fully set forth here in its entirety.

52.     O'Brien intentionally misrepresented to Clevett that the EI Division of NORESCO was a valued part of NORESCO's business and would continue its operations indefinitely when, in fact, O'Brien knew that the EI Division was temporary and experimental.

53.     O'Brien made this misrepresentation with intention of inducing Clevett to accept a management position within the EI Division.

54.     Clevett acted upon O'Brien's misrepresentations by commuting from Maryland to Massachusetts on a weekly basis for 19 months, by purchasing land and causing a house to be built in Ashland, Massachusetts, and by moving himself and his family to Massachusetts.

55.     Within 3 months of Clevett's move to Massachusetts, NORESCO, EQT, and O'Brien dismantled the "EI experiment" and terminated Clevett's employment.

56.     On December 24, 2003, O'Brien intentionally misrepresented his intention to negotiate the payment of compensation owed to Clevett for termination without cause, and his intention to offer Clevett a long-tem consulting agreement, and to pay Clevett an hourly fee, with the purpose of inducing Clevett to attend meetings with representatives of Colton in order to secure future work for NORESCO on the Colton project.

57.     Clevett acted upon O'Brien's misrepresentation by flying to California at his own expense, meeting with representatives of Colton over the course of three days, and providing O'Brien with detailed and valuable information derived from the meetings.

58.    O'Brien has failed to provide Clevett with any compensation for attending the meeting in California, and has refused to communicate with Clevett regarding a consulting agreement or payment of the compensation Clevett is owed.

59.    Clevett has suffered substantial damages directly related to O'Brien's misrepresentations in an amount to be determined by the Court in these proceedings.

## COUNT V

### (Negligent Misrepresentation – NORESCO/EQT)

60.    Clevett hereby reasserts and incorporates by reference the allegations contained in paragraphs 1 through 59, above, as if each were fully set forth here in its entirety.

61.    NORESCO and EQT, acting through O'Brien, negligently misrepresented to Clevett that the EI Division of NORESCO was a valued part of NORESCO's business and would continue its operations indefinitely when, in fact, NORESCO, EQT and O'Brien knew that the EI Division was temporary and experimental.

62.    Clevett acted upon NORESCO's and EQT's misrepresentations by commuting from Maryland to Massachusetts on a weekly basis for 19 months, by purchasing land and causing a house to be built in Ashland, Massachusetts, and by moving himself and his family to Massachusetts.

63.    Within 3 months of Clevett's move to Massachusetts, NORESCO, EQT, and O'Brien dismantled the "EI experiment" and terminated Clevett's employment.

64.    On December 24, 2003, NORESCO and EQT, acting through O'Brien, negligently misrepresented their intention to negotiate the payment of compensation owed to Clevett for termination without cause, and their intention to offer Clevett a long-tem consulting agreement, and to pay Clevett an hourly fee.

- 12 -

65.    Clevett acted upon NORESCO's and EQT's misrepresentation by flying to California at his own expense, meeting with representatives of Colton over the course of three days, and providing O'Brien with detailed and valuable information derived from the meeting.

66.    NORESCO and EQT have failed to provide Clevett with any compensation for attending the meeting in California, and have refused to communicate with Clevett regarding a consulting agreement or payment of the compensation Clevett is owed.

67.    Clevett has suffered substantial damages directly related to NORESCO's and EQT's misrepresentations in an amount to be determined by the Court in these proceedings.

## COUNT VI

(Negligent Misrepresentation – O'Brien)

68.    Clevett hereby reasserts and incorporates by reference the allegations contained in paragraphs 1 through 67, above, as if each were fully set forth here in its entirety.

69.    O'Brien negligently misrepresented to Clevett that the EI Division of NORESCO was a valued part of EQT's business and would continue its operations indefinitely when, in fact, O'Brien knew that the EI Division was temporary and experimental.

70.    Clevett acted upon O'Brien's misrepresentations by commuting from Maryland to Massachusetts on a weekly basis for 19 months, incurring un-reimbursed relocation costs, by purchasing land and causing a house to be built in Ashland, Massachusetts, and by moving himself and his family to Massachusetts.

71.    Within 3 months of Clevett's move to Massachusetts, NORESCO, EQT, and O'Brien dismantled the "EI experiment" and terminated Clevett's employment.

72.    On December 24, 2003, O'Brien negligently misrepresented his intention to negotiate the payment of compensation owed to Clevett for termination without cause, and his intention to offer Clevett a long-tem consulting agreement, and to pay Clevett an hourly fee.

73.    Clevett acted upon O'Brien's misrepresentation by flying to California at his own expense, meeting with representatives of Colton over the course of two days, and providing O'Brien with detailed and valuable information derived from the meeting.

74.    O'Brien has failed to provide Clevett with any compensation for attending the meeting in California, and has refused to communicate with Clevett regarding a consulting agreement or payment of the compensation Clevett is owed.

75.    Clevett has suffered substantial damages directly related to O'Brien's misrepresentations in an amount to be determined by the Court in these proceedings.

## COUNT VII

(Tortious Interference With Contract – O'Brien)

76.    Clevett hereby reasserts and incorporates by reference the allegations contained in paragraphs 1 through 75, above, as if each were fully set forth here in its entirety.

77.    Clevett entered into a contract with NORESCO and EQT as described above, and Clevett fully performed his obligations under this contract.

78.    O'Brien knowingly induced NORESCO and EQT to breach their contract with Clevett by terminating his employment without cause by, inter alia, (a) misrepresenting Clevett's performance for NORESCO; (b) declining to permit Clevett to adequately staff the sales force to meet the EI Division's construction revenue goals; and (c) failing to pay Clevett the compensation owed to him under the contract.

- 14 -

79.     O'Brien acted out of malevolence and actual malice in inducing NORESCO and EQT to breach their contract with Clevett.

80.     Clevett has suffered substantial damages as a result of O'Brien's tortious interference with his contract in an amount to be determined by the Court in these proceedings.

## COUNT VIII

(Civil Conspiracy – NORESCO, EQT, and O'Brien)

81.     Clevett hereby reasserts and incorporates by reference the allegations contained in paragraphs 1 through 80, above, as if each were fully set forth here in its entirety.

82.     O'Brien and other employees of NORESCO and EQT formed an agreement to intentionally misrepresent the value and longevity of the EI Division of NORESCO to fraudulently induce Clevett to accept a management position within the department.

83.     O'Brien and other employees of NORESCO and EQT made such misrepresentations to Clevett and succeeded in inducing Clevett to rely upon them.

84.     O'Brien, NORESCO, and EQT dismantled the EI division shortly after Clevett moved to Massachusetts to manage the division.

85.     Clevett has suffered substantial damages directly related to the conspiracy between O'Brien and others in an amount to be determined by the Court in these proceedings.

## COUNT IX

(Violation of M.G.L. c. 93A, §§2, 11 – NORESCO/EQT)

86.     Clevett hereby reasserts and incorporates by reference the allegations contained in paragraphs 1 through 85, above, as if each were fully set forth here in its entirety.

87.    Clevett, NORESCO, and EQT were at all times relevant hereto engaged in trade or commerce within the meaning of M.G.L. c. 93A, §§2, 11.

88.    The conduct of NORESCO and EQT, as described above, in particular the deceptive inducement to secure Clevett's relocation and his managerial services, the subsequent refusal to pay Clevett compensation resulting from his termination without cause, and the deceptive inducement to secure Clevett's consulting services after his termination, constitute unfair and deceptive acts or practices in violation of M.G.L. c. 93A, §§2, 11.  Said acts, conduct, omissions and refusals were willingly and knowingly carried out by NORESCO and EQT in violation of M.G.L. c. 93A.

89.    NORESCO's and EQT's actions occurred primarily and substantially within the Commonwealth of Massachusetts.

90.    As a direct and proximate result of the unfair and deceptive acts or practices of NORESCO and EQT, Clevett has suffered substantial damages in an amount to be determined by the Court in these proceedings.

## COUNT X

(Violation of M.G.L. c. 93A, §§2, 11 – O'Brien)

91.    Clevett hereby reasserts and incorporates by reference the allegations contained in paragraphs 1 through 90, above, as if each were fully set forth here in its entirety.

92.    Clevett and O'Brien were at all times relevant hereto engaged in trade or commerce within the meaning of M.G.L. c. 93A, §§2, 11.

93.    The conduct of O'Brien, as described above, in particular the deceptive inducement to secure Clevett's relocation and his managerial services, the subsequent refusal to pay Clevett compensation resulting from his termination without cause, and the deceptive

inducement to secure Clevett's consulting services after his termination, constitute unfair and deceptive acts or practices in violation of M.G.L. c. 93A, §§2, 11. Said acts, conduct, omissions and refusals were willingly and knowingly carried out by O'Brien in violation of M.G.L. c. 93A.

94.     O'Brien's actions occurred primarily and substantially within the Commonwealth of Massachusetts.

95.     As a direct and proximate result of the unfair and deceptive acts or practices of O'Brien, Clevett has suffered substantial damages in an amount to be determined by the Court in these proceedings.

## PRAYER FOR RELIEF

**WHEREFORE**, Clevett respectfully requests the following relief:

(1)    That the Court enter judgment in favor of Clevett against NORESCO and EQT on

Counts I, II, III, V and VIII, and against O'Brien on Counts IV, VI, VII and VIII in an amount to

be determined by the Court, plus costs and interest;

(2)    That the Court find that NORESCO's, EQT's, and O'Brien's violations of

Chapter 93A under Counts IX and X were willful and knowing, and thereby treble any damages

awarded Clevett, and award Clevett his reasonable attorneys' fees; and

(3)    That the Court grant Clevett such further relief as the Court may deem just and

proper, including costs and attorneys' fees.

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE

Respectfully submitted,

STEPHEN H. CLEVETT

By his attorneys,

_____
Timothy P. Wickstrom (BBO # 000000)
Tashjian, Simsarian & Wickstrom, LLP
370 Main Street
Worcester, MA  01608
(508) 756-1578

_____
Thomas F. Holt, Jr. (BBO # 238830)
Steven P. Wright (BBO # 648575)
KIRKPATRICK & LOCKHART LLP
75 State Street
Boston, MA  02109-1808
(617) 261-3100

Date: June __, 2005

# EXHIBIT A



**N O R E S C O**
*Your energy solutions partner.*

February 22, 2002

Mr. Stephen H. Clevett
15705 Cranberry Lane
Silver Spring, MD. 20906

**Subject: Promotion**

Dear Stephen:

We would like to offer you the position of **Sr. Vice President – Energy Infrastructure**, effective March 4, 2002, reporting to Ted O'Brien, President. This letter will serve to outline the terms and benefits of this promotional opportunity.

As Sr. Vice President – Energy Infrastructure located in Westboro, MA your primary responsibilities will be to:

◆ Identify, develop and close on-site power and energy infrastructure projects; primarily focused on the existing sales funnel in the attached documents
◆ Develop and implement a marketing plan to support the development of additional energy infrastructure projects
◆ Assist with the development of operating procedures, manuals and marketing material
◆ Develop an M&A plan for the Energy Infrastructure Group
◆ Perform other duties as required by your manager

Terms and Benefits

• Base salary of $195,000 per year, paid on a biweekly basis;

• Twenty (20) days of vacation per year;

• Participation in the Company's Short Term Incentive Plan (STIP) at a level of 40%;

• Stock option award of 20,000 options under the 1999 Equitable Resources, Inc. Long Term Incentive Plan (LTIP), complete terms and conditions will be forwarded to you under separate cover by the Corporate Secretary;

• Monthly automobile stipend of $500;

• Financial planning benefit of $2,000, a club membership stipend of $2,000, one additional year of base salary life insurance and enhanced long-term disability are also included with this promotion;

• Mandatory execution of a Company non-compete agreement;

• Relocation assistance to include:
    • Lump sum payment of $10,781, which includes 90 days of expenses for home finding trips, final move expenses, and temporary living expenses.
    • Movement of your household goods to be scheduled and paid directly by the Company.
    • Miscellaneous relocation adjustment allowance in the amount of $16,250.

An EQUITABLE RESOURCES Company
1 Research Drive
Suite 400 C - Westborough, MA 01581
Phone: 508-614-1000 · Fax: 508-836-9988

- Reimbursement of the following closing costs related to the sale of your primary residence in Silver Spring, MD: realtor fees to a maximum of 6%; transfer taxes; mortgage repayment fees; deed preparation and mortgage satisfaction charges; attorney fees; survey fees; recording fees; radon testing; and, termite inspection. Any additional expenses in the sales contract including the payment of discount points, buyer's closing costs paid by the seller, etc., are not reimbursed by the Company.
- Relocation payments will be grossed up for tax purposes.

Stephen, we hope that these terms and benefits meet with your approval. If you have any questions please contact me. A formal acceptance of this offer of promotion would be appreciated. In this regard, I have enclosed two (2) original copies of this document for your review and acceptance. If you accept and agree with the terms outlined, please sign both original copies and return one (1) of the original copies to me.

Sincerely,

*Anne M. Nagi*

Anne M. Naqi
Director, Human Resources

cc:    Personnel Files

---

I am in agreement with the terms of this promotional opportunity as outlined in this letter dated February 22, 2002.

*Stephen H Clevett.*                                          02.24.02

**Stephen Clevett**                                          **Date**

# EXHIBIT B

# NONCOMPETE AGREEMENT

This Agreement is made as of _Oct 9_, 2002 by and between Equitable Resources, Inc., a Pennsylvania corporation (Equitable Resources, Inc. and its subsidiaries are hereinafter collectively referred to as the "Company"), and Stephen H. Clevett (the "Employee").

## WITNESSETH:

WHEREAS, in order to protect the business and goodwill of the Company, the Company desires to obtain certain non-competition covenants from the Employee and the Employee desires to agree to such covenants in exchange for the Company's agreement to pay certain severance benefits in the event that the Employee's employment with the Company is terminated in certain events; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      If the employment of the Employee with the Company is terminated by the Company for any reason other than Cause (as defined below) or if the Employee terminates his or her employment with the Company for Good Reason (as defined below), the Company shall pay the Employee, from the date of termination, in addition to any payments to which the Employee is entitled under the Company's severance pay plan, twelve (12) months of base salary at the Employee's annual base salary level in effect at the time of such termination or immediately prior to the salary reduction that serves as the basis for termination for Good Reason. Employee will also be entitled to twelve (12) months of health benefits continuation and outplacement assistance for a period not to exceed twelve (12) months.  Such base salary amount shall be paid by the Company to the Employee in one lump sum payable within thirty (30) days after the Employee's termination or resignation hereunder.  Solely for purposes of this Agreement, "Cause" shall mean (i) a conviction of a felony, a crime of moral turpitude or fraud, (ii) the Employee's willful and continuous engagement in conduct which is demonstrably and materially injurious to the Company, or (iii) the willful and continued refusal by the Employee to perform the duties of his or her position in a reasonable manner for thirty (30) days after written notice is given to the Employee by the Company specifying in reasonable detail the nature of the deficiency in the Employee's performance.  Solely for purposes of this Agreement, termination for "Good Reason" shall mean termination of employment by the Employee within ninety (90) days after (i) being demoted, or (ii) being given notice of a reduction in his or her annual base salary (other than a reduction of not more than 10% applicable to all senior officers of the Company).

2.      While the Employee is employed by the Company and for a period of 12 months after date of Employee's termination of employment with Company for any reason, the Employee shall not (i) directly or indirectly engage, whether as an employee, consultant, partner, owner, agent, stockholder, officer, director or otherwise, alone or in association with any other person or entity, that is a direct competitor of the Company in (A) the energy services industry, specifically project development, engineering, construction, operation and maintenance, of central power and/or thermal projects which are substantially similar to the size and type of projects being operated, maintained, developed, engineered or constructed by the Company during the two business quarters prior to the termination of the Employee's employment (developing and operating private power, cogeneration and central plant facilities) in the continental United States, or in markets and/or regions in which the Company was conducting

such business at the time of the termination of Employee's employment, or (B) any business activity that directly competes with any existing project of the Company or proposed project on which the Company initiated any business activity during the course of his or her employment (for purposes of this subsection (i) employment or engagement by a customer, or prospective customer at the time of the Employee's termination, of the Company to provide or manage services that are provided by the Company shall be deemed to violate this subsection (i)); (ii) directly or indirectly on his or her own behalf or on behalf of any other person or entity contact (A) any customer, or prospective customer at the time of the Employee's termination, of the Company with whom he or she had contact while employed by the Company, for the purpose of soliciting the purchase of any product or service that competes with any product or service offered by the Company or which was considered to be offered by the Company while the Employee was employed by the Company; (iii) take away or interfere, or attempt to interfere, with any custom, trade or existing contractual relations of the Company, including any business project or any contemplated business project which representatives of the Company have discussed with any potential participant in such project at the time the Employee's termination; or (iv) directly or indirectly on his or her own behalf or on behalf of any other person or entity solicit or induce, or cause any other person or entity to solicit or induce, or attempt to induce, any employee to leave the employ of or engagement by the Company or its successors, assigns, or affiliates, or to violate the terms of their contracts with the Company. Employee may purchase or otherwise acquire up to (but not more than) 1% of any class of securities of any enterprise (but without otherwise participating in the activities of such enterprise) if such securities are listed on any national securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934.

3.    The Company may terminate this Agreement by giving 12 months' prior written notice to the Employee; provided that all provisions of this Agreement shall apply if any event specified in sections 1 or 2 occurs prior to the expiration of such 12 month period.

4.    The provisions of this Agreement are severable. To the extent that any provision of this Agreement is deemed unenforceable in any court of law the parties intend that such provision be construed by such court in a manner to make it enforceable. The existence of any claim or cause of action against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to enforcement by the Company of this Agreement.

5.    The Employee acknowledges and agrees that: (i) this Agreement is necessary for the protection of the legitimate business interests of the Company; (ii) the restrictions contained in this Agreement are reasonable; (iii) the Employee has no intention of competing with the Company within the limitations set forth above; (iv) the Employee acknowledges and warrants that Employee believes that Employee will be fully able to earn an adequate livelihood for Employee and Employee's dependents if the covenant not to compete contained in this Agreement is enforced against the Employee; and (v) the Employee has received adequate and valuable consideration for entering into this Agreement.

6.    The Employee stipulates and agrees that any breach of this Agreement by the Employee will result in immediate and irreparable harm to the Company, the amount of which will be extremely difficult to ascertain, and that the Company could not be reasonably or adequately compensated by damages in an action at law. For these reasons, the Company shall have the right, without objection from the Employee, to obtain such preliminary, temporary or permanent mandatory or restraining injunctions, orders or decrees as may be necessary to protect the Company against, or on account of, any breach by the Employee of the provisions of Section

2 hereof. In the event the Company obtains any such injunction, order, decree or other relief, in law or in equity, (i) the duration of any violation of Section 2 shall be added to the 12-month restricted period specified in Section 2, and (ii) the Employee shall be responsible for reimbursing the Company for all costs associated with obtaining the relief, including reasonable attorneys' fees and expenses and costs of suit. Such right to equitable relief is in addition to the remedies the Company may have to protect its rights at law, in equity or otherwise.

7.    This Agreement (including the covenant not to compete contained in Section 2) shall be binding upon and inure to the benefit of the successors and assigns of the Company.

8.    This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. For the purpose of any suit, action or proceeding arising out of or relating to this Agreement, Employee irrevocably consents and submits to the jurisdiction and venue of any state or federal court located in Allegheny County, Pennsylvania. Employee agrees that service of the summons and complaint and all other process which may be served in any such suit, action or proceeding may be effected by mailing by registered mail a copy of such process to Employee at the addresses set forth below. Employee irrevocably waives any objection which they may now or hereafter have to the venue of any such suit, action or proceeding brought in such court and any claim that such suit, action or proceeding brought in such court has been brought in an inconvenient forum and agrees that service of process in accordance with this Section will be deemed in every respect effective and valid personal service of process upon Employee. Nothing in this Agreement will be construed to prohibit service of process by any other method permitted by law. The provisions of this Section will not limit or otherwise affect the right of the Company to institute and conduct an action in any other appropriate manner, jurisdiction or court. The Employee agrees that final judgment in such suit, action or proceeding will be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law.

9.    This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written. This Agreement may not be changed, amended, or modified, except by a written instrument signed by the parties.


IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its officers thereunto duly authorized, and the Employee has hereunto set his hand, all as of the day and year first above written.

ATTEST:                                  EQUITABLE RESOURCES, INC.


_____        By: _____


WITNESS:                                 EMPLOYEE:


_____          _____

# EXHIBIT C



An EQUITABLE RESOURCES Company

One Research Drive • Suite 400C • Westborough, MA 01581 • 508.614.1000 • 508.836.9988 fax • www.noresco.com

December 15, 2003

Stephen H. Clevett
5 Sterling Way
Ashland, MA 01721

Dear Steve:

As you know, your position with NORESCO was going to be eliminated in the near future, which would have resulted in the termination of your employment at that time. In the meantime, however, we have learned that you have been engaging in misconduct, which, among other things, violates material provisions of the Noncompete Agreement between you and Equitable Resources, Inc. and also breaches the duty of loyalty owed to the Company. Hence, be advised that your employment with NORESCO is being terminated for cause as defined in paragraph 1 of the Noncompete Agreement, effective today.

In light of the reasons for and circumstances surrounding your termination, be advised that your stock options terminate as of today.

You will receive under separate cover information regarding your rights under COBRA to continue participating in the Company's health insurance program at your own expense.

If you should have any questions, please direct them to Maryann Keaveney, Director of Human Resources. She may be reached at (508) 614-1001.

Very truly yours,

J. E. O'Brien
President

PGHLIB-1262204-Kenneth G. Mattern
December 15, 2003  11:00 AM