UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN H. CLEVETT,<br><br>    Plaintiff,<br><br>v.<br><br>EQUITABLE RESOURCES, INC.,<br>and JOSEPH E. O'BRIEN,<br><br>    Defendants. | Civil Action No. 05-40020 FDS |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO STRIKE AMENDED COMPLAINT AND JURY DEMAND OR ALTERNATIVELY, TO DISMISS COUNTS III THROUGH X OF PLAINTIFF'S AMENDED COMPLAINT AND JURY DEMAND

Defendants Equitable Resources, Inc. ("Equitable"), NORESCO, LLC ("NORESCO"), and Joseph E. O'Brien ("O'Brien") (collectively "Defendants") submit this Memorandum in support of their Motion to Strike Plaintiff's Amended Complaint And Jury Demand ("Amended Complaint") or Alternatively to Dismiss Counts III Through X of the Amended Complaint and Jury Demand of Stephen H. Clevett's ("Clevett" or "Plaintiff").

As an initial matter, Clevett's Amended Complaint should be dismissed or stricken because it is procedurally defective. Clevett's Amended Complaint merely adds a new party. A party must seek leave of Court to add another party and must also provide the potential party ten days notice before filing the motion.

If the Court is not inclined to dismiss the Amended Complaint on procedural grounds, the Court should dismiss all of the claims except for Clevett's breach of contract

claims. This case concerns a simple employment contract dispute. Clevett was terminated by NORESCO[1] for "cause" because NORESCO discovered that he was competing with it during the course of his employment. A for "cause" termination deprives Clevett of severance. Clevett now seeks severance pursuant to his employment contract and the issue presented in this case is whether there was a termination for "cause".

To create settlement leverage and avoid federal court, Clevett has crammed his Complaint with various tort and statutory claims and has named his former supervisor, O'Brien in an attempt to destroy diversity jurisdiction. The claims are misplaced, as evidenced by Clevett's failure to allege facts sufficient to state the claims.

First, Clevett has brought claims for violation of MASS. GEN. LAWS c. 93A against NORESCO and Equitable (Count IX) and O'Brien (Count X), even though it is well established that conduct arising out of an employment relationship will not support such a claim. Second, Clevett has brought a claim for intentional interference with contractual relations against O'Brien (Count VII), but fails to allege facts sufficient to state such a claim against a supervisor. Third, Clevett has brought claims for fraudulent and negligent misrepresentation against NORESCO and Equitable (Counts III, V) and O'Brien (Counts IV, VI) for oral communications made in the course of contract negotiations, even though the written agreement at issue is integrated and the statements that are allegedly deceitful are not actionable as a matter of law. Finally, Clevett has brought a claim for civil conspiracy against NORESCO, Equitable and O'Brien (Count VIII), but there is no underlying tort on which to base the claim and the only person

---

[1] Clevett worked for NORESCO, a subsidiary of Equitable. The employment agreement on which he bases his breach of contract claims was with Equitable and NORESCO.

identified as taking any action was O'Brien.  Because Clevett has failed to set forth facts

sufficient to state the claims in Count III through Count X, those Counts should be

dismissed.

### Statement of Relevant Facts as Alleged in the Amended Complaint

The following facts are alleged in the Amended Complaint.

### Clevett's Position at Equitable

Equitable, a Delaware corporation with a primary place of business in Pittsburgh,

Pennsylvania, is an integrated energy company that provides natural gas products and

energy services.  (Amended Complaint at ¶ 4.)  One of its wholly owned subsidiaries is

NORESCO.  (Id.)

In August 2001, Clevett was hired to work as NORESCO's Vice President of

Business Development.  (Id. at ¶ 8.)  He worked in NORESCO's Virginia office.  (Id.)

When he accepted employment with NORESCO, he understood and negotiated for the

promise that he would be promoted to the position of Senior Vice President of

NORESCO's Energy Infrastructure Division working out of NORESCO's Massachusetts

office.  (Id. at ¶¶ 9-10.)

In February 2002, NORESCO offered and Clevett accepted the promotion to

serve as NORESCO's Senior Vice President of the Energy Infrastructure Division.  (Id.

at ¶ 14.)  The terms and conditions of his position as Senior Vice President were set forth

in a letter agreement, which is attached to the Complaint as Exhibit A.  (Id. at ¶¶ 14-15.)

Pursuant to the letter agreement, Clevett agreed to work out of NORESCO's

Massachusetts office.  (Id. at ¶ 15 and Exhibit A thereto.)  Clevett received significant

relocation expenses to assist with his move from Virginia to Massachusetts.[2] (Exhibit A to Complaint.) The letter agreement also provided, among other things, that the parties would enter into a non-competition and severance agreement. (Id.) The letter agreement does not provide that Clevett will be employed for a specific term; thus, he remained an employee at will.

### The Non-Competition And Severance Agreement

As provided in the letter agreement, in October 2002, NORESCO (and Equitable) and Clevett entered into a non-competition and severance agreement titled "Noncompete Agreement," a copy of which is attached to the Complaint as Exhibit B. (Amended Complaint at ¶ 17 and Exhibit B thereto.) The Noncompete Agreement provides, among other things, that Clevett will receive severance equal to a year's salary and benefits if Clevett's employment is terminated for any reason other than "Cause" as defined in the agreement or if Clevett terminates his employment for "Good Reason" as defined in the agreement. (Exhibit B to Amended Complaint at ¶ 1.) The Noncompete Agreement also provides that Clevett, while employed and for twelve months after his employment, will not compete with NORESCO or Equitable or solicit NORESCO or Equitable's customers or employees. (Id. at ¶ 2.) The Noncompete Agreement contains an integration clause. (Id. at ¶ 9.) The Noncompete Agreement does not contain a term of employment, and Clevett continued to be an employee at will.

---

[2] Instead of moving immediately, he chose to commute between Virginia and Massachusetts for 19 months, and to have a house built in Massachusetts in the interim. (Amended Complaint at ¶¶ 12-13.)

## Equitable's Termination Of Clevett's Employment

Clevett served as NORESCO's Senior Vice President of the Energy Infrastructure Division for almost two years, specifically, from February/March 2002 until mid-December 2003. (Amended Complaint at ¶¶ 22-23.) As Senior Vice President of the Energy Infrastructure Division, Clevett reported to O'Brien, the President of NORESCO and a Vice President of Equitable. (Id. at ¶¶ 5, 15.)

In August 2003, O'Brien informed Clevett that the Energy Infrastructure Division was not meeting its goals, that its sales force would be reduced, and that he would jointly manage the group with Clevett. (Id. at ¶¶ 18, 19.) Three months later, O'Brien informed Clevett that Equitable had determined to discontinue all business development activities associated with the division. (Id. at ¶ 20.) Shortly thereafter, in early December 2003, Clevett was instructed to implement the reduction in the division's business development personnel. (Id. at ¶ 21.) Clevett was also informed by O'Brien that his services would no longer be needed after January 2004, and that he would remain until that time as part of the transitional group. (Id.)

In mid-December 2003, between the time that Clevett was informed that his services were no longer needed and the time that Clevett was supposed to depart from his service in the transitional group, NORESCO discovered that Clevett was violating the Noncompete Agreement and breaching his duty of loyalty to NORESCO and/or Equitable. (Id. at ¶ 23.) NORESCO terminated his employment, effective immediately, specifying that the termination was for "cause" within the meaning of the Noncompete Agreement. (Id. at ¶¶ 22-23 and Exhibit C to Complaint thereto.)

### Possible Consulting Arrangement

Within two weeks after Clevett's employment was terminated, O'Brien contacted Clevett concerning a possible consulting arrangement pursuant to which Clevett would assist NORESCO for a few months with servicing a client he had been overseeing while at NORESCO. (Id. at ¶¶ 25, 26.) Clevett informed O'Brien that he would be willing to enter a consulting arrangement if NORESCO would pay him the severance detailed in the Noncompete Agreement. (Id.) O'Brien responded that "everything was on the table." (Id.)

O'Brien subsequently rejected Clevett's proposal by e-mail, informing him that NORESCO would not enter into a consulting agreement with him. (Id. at ¶ 27.) O'Brien did ask Clevett if he could attend meetings with the client on January 21-23, 2004 which O'Brien could not attend, and indicated that if he would do so, an hourly wage and expenses would be paid. (Id.) Clevett responded by e-mail that he would attend the meetings if "(i) his participation at the meeting did not waive any of his rights to seek severance; and (ii) that NORESCO pay him expenses plus $2,500 per diem…" (Id. at ¶ 28.) O'Brien rejected the counteroffer by e-mail and informed Clevett that his services were not needed. (Id. at ¶ 29.) Clevett attended at least one of the meetings anyway. (Id. at ¶¶ 29-30.) At no time did O'Brien indicate that Equitable would pay Clevett severance pay. (Id. at ¶ 27.)

### Procedural History

Clevett filed his Complaint and Jury Demand in this action in the Massachusetts Superior Court on December 22, 2004. Defendants Equitable and O'Brien removed the action to this Court on January 28, 2005. On April 29, 2005, Defendants Equitable and

O'Brien filed and served their Motion to Dismiss Counts III through X of Plaintiff's Complaint and Jury Demand ("Motion to Dismiss"). Thereafter, on June 10, 2005, instead of serving and filing an opposition to the Motion to Dismiss, Plaintiff filed his Amended Complaint and Jury Demand, relying on Fed. R. Civ. P. 15(a) which permits a plaintiff to amend a complaint once as a matter of right before the filing of a responsive pleading. The Amended Complaint and Jury Demand does not add any counts or facts in support of the previous counts; it simply adds a party, NORESCO.

<b><u>Argument</u></b>

This case is about whether NORESCO had "cause" to terminate Clevett's employment, which determines whether Clevett is entitled to severance pursuant to the Noncompete Agreement. Clevett has tacked on numerous inapplicable tort and statutory claims.[3] As shown below, according to the allegations made by Clevett in his Amended Complaint, he is unable, as a matter of law, to succeed on these claims. Accordingly, the claims should be dismissed, and the Court should be left with the case at hand—whether there has been a breach of contract.[4]

**I.    CLEVETT FAILED TO SATISFY THE PROCEDURAL PREREQUISITES FOR AMENDING HIS COMPLAINT TO JOIN A PARTY, SUCH THAT THE AMENDED COMPLAINT SHOULD BE STRICKEN OR DISMISSED.**

Clevett amended his complaint to add a party. He did not seek leave from the Court pursuant to Fed. R. Civ. P. 15(a) or 21. Rather, he relied upon the provision of Fed. R. Civ. P. 15(a) which permits amendment "once as a matter of course at any time

---

[3] Clevett brought claims against O'Brien, a Massachusetts resident, in an attempt to destroy diversity jurisdiction. This fraudulent joinder is addressed in detail in Defendants' Notice of Removal.
[4] Under Fed. R. Civ. P. 12(b)(6), a court should dismiss a claim when it conclusively determines that, after looking only to the allegations in the Complaint and drawing all reasonable inferences in the plaintiff's favor, the plaintiff can prove no set of facts entitling it to relief. See, e.g., Johnson v. Brown & Williamson Tobacco Corp., 122 F. Supp.2d 194, 198 (D. Mass. 2000).

7

before a responsive pleading is served...".  Clevett's reliance on this provision is

misplaced.  When seeking to join a new party, a plaintiff should seek leave of court

pursuant to Fed. R. Civ. P. 21 and cannot simply amend the complaint as a matter of

right.  See, e.g., Wright & Miller, 7 Fed. Prac. & Proc. Civ.3d § 1688 (citing Age of

Majority Educational Corp. v. Preller, 512 F.2d 1241 (4th Cir. 1975); U.S. v. Hansel, 999

F. Supp. 694 (D.C.N.Y. 1998); U.S. for Use & Benefit of Tucker v. Thomas Howell

Kiewit, Inc., 149 F.R.D. 125 (D.C. Va. 1993)).  Notably, Local Rule 15.1 contemplates

that a new party will be added by motion.[5]  In any event, pursuant to Local Rule 15.1,

Clevett was required to provide NORESCO ten days notice before filing his complaint

adding it as a party.  Such notice was not provided.  See Ali v. University of

Massachusetts Med. Ctr., 140 F. Supp.2d 107, 111 (D. Mass. 2001) (plaintiff's motion to

amend his complaint to add a new party was denied because he failed to serve the motion

to the party he sought to join ten days in advance of filing the motion).

Because Clevett has failed to follow the procedural prerequisites for adding

NORESCO as a party, his Amended Complaint and Jury Demand should be dismissed or

stricken.

## II.    CLEVETT'S CLAIMS FOR VIOLATION OF MASS. GEN. LAWS c. 93A, AS CONTAINED IN COUNTS IX AND X, MUST BE DISMISSED BECAUSE THEY ARISE OUT OF AN EMPLOYMENT RELATIONSHIP.

Clevett's claims for violation of MASS. GEN. LAWS c. 93A against NORESCO and

Equitable (Count IX) and O'Brien (Count X) must be dismissed because they arise out of

---

[5] Local Rule 15.1 provides: "(A) Amendments Adding Parties.  Amendments adding parties shall be sought as soon as an attorney reasonably can be expected to have become aware of the identity of the proposed new party. (B)  Service on New Party.  A party moving to amend a pleading to add a new party shall serve, in the manner contemplated by Fed. R. Civ. P. 5(b), the motion to amend upon the proposed new party at least ten (10) days in advance of filing the motion, together with a separate document stating the date on which the motion will be filed.  A motion to amend a pleading to add a new party shall be accompanied by a certificate stating that it has been served in advance on the new party as required by this rule."

the employment relationship. It is well established that claims arising out of an employment relationship are not commercial transactions subject to MASS. GEN. LAWS c. 93A. E.g., Manning v. Zuckerman, 388 Mass. 8, 15, 444 N.E.2d 1262, 1266 (1983). As the Supreme Judicial Court stated in Manning v. Zuckerman, the Legislature, when enacting c. 93A, "did not intend the statute to cover employment contract disputes between employers and the employees who work in the employer's organization, nor to disputes between members of that organization arising out of the employment relationship." 388 Mass. at 12. The argument applies equally to claims against supervisors and officers of the organization, such as O'Brien. Id. at 14 ("disputes arising from an employment relationship between the employee and the organization that employs him, or between an employee and other members of that organization are not covered by the c. 93A remedies afforded in commercial transactions"); see also Sargent v. Tenaska, Inc., 914 F. Supp. 722, 731-732 (D. Mass. 1996) (a claim arising from the employment relationship, irrespective of when it occurs, is not a dispute between "discrete, independent business entities" and is outside the scope of c. 93A).

NORESCO and Equitable were Clevett's employer, and O'Brien was his supervisor and an officer of NORESCO and Equitable. (E.g., Amended Complaint at ¶¶ 8, 9.) There was no commercial transaction here; simply transactions that arose out of the employment relationship. Accordingly, Counts IX and X should be dismissed.

**III.    CLEVETT'S CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, CONTAINED IN COUNT VII, MUST BE DISMISSED BECAUSE HE FAILS TO ALLEGE THAT O'BRIEN "HAD A SPITEFUL, MALIGNANT PURPOSE, UNRELATED TO THE LEGITIMATE CORPORATE INTEREST" OF EQUITABLE.**

Clevett claims that O'Brien intentionally interfered with his contract with NORESCO and Equitable. However, he fails to allege facts sufficient to make out such a claim against a supervisor or officer.

To state a claim for intentional interference with contractual relations, an employee must allege that: (1) he had a contractual employment relationship; (2) the defendant knowingly induced the employer to break the relationship; (3) the defendant's interference was intentional and improper in motive or means; and (4) the employee was harmed by the defendant's actions. E.g., United Truck Leasing Co. v. Geltman, 406 Mass. 811, 812, 817, 551 N.E.2d 20, 21, 24 (1990); see also Sklar v. Beth Israel Deaconess Med. Ctr., 59 Mass. App. Ct. 550, 554, 797 N.E.2d 381, 385 (2003).

A supervisor or officer of an employer has a right to take action that can be construed as intentional and interfering with an employee's employment relationship - - i.e., giving discipline, terminating employment. Thus, to state a claim for intentional interference with contractual relations against a supervisor or officer, an employee must make a higher showing. Specifically, to show the requisite intent and improper motive or means, an employee must allege facts that the supervisor or officer, when acting, had a "spiteful, malignant purpose, unrelated to the legitimate corporate interest" of the employer and that the spiteful, malignant purpose was the controlling factor in the defendant's interference. Id.; McMillan v. Mass. Soc'y for the Prevention of Cruelty to Animals, 880 F. Supp. 900, 910 (D. Mass. 1995). See also Weber v. Cmty. Teamwork,

Inc., 434 Mass. 761, 782-783, 752 N.E.2d 700, 715-716 (2001); Boothby v. Texon, Inc.,
414 Mass. 468, 487, 608 N.E.2d 1028, 1040 (1993); Gram v. Liberty Mut. Ins. Co., 384
Mass. 659, 663-665, 429 N.E.2d 21, 24-25 (1981); Steranko v. Inforex, Inc., 5 Mass.
App. Ct. 253, 273, 362 N.E.2d 222, 235-236 (1977) ("This rule has particular force as
applied to corporate officers, since their freedom of action directed toward corporate
purposes should not be curtailed by fear of personal liability.").

     A "spiteful, malignant purpose unrelated to the legitimate corporate interest of the
employer" is "personal[] hostil[ity] or [the] harbor[ing] [of] ill will toward the plaintiff."
Sklar, 59 Mass. App. Ct. at 554 (citing O'Brien v. New Eng. Tel. & Tel. Co., 422 Mass.
686, 690, 664 N.E.2d 843, 846 (1996); Clement v. Rev-Lyn Contr. Co., 40 Mass. App.
Ct. 322, 325, 663 N.E.2d 1235, 1237 (1996)).  To prove the requisite malice, an
employee may not rely on inference from an adverse decision or a "laundry list of facts"
that could be interpreted either to support or negate the employee's claim.  Sklar, 59
Mass. App. Ct. at 555.  Rather, the employee must allege and show a "link between the
defendant's conduct and evidence of a spiteful purpose or personal hostility."  Id.

     Clevett's only attempt to satisfy the element of actual malice is a single non-
specific and conclusory allegation in Paragraph 79 that "O'Brien acted out of
malevolence and actual malice in inducing [Equitable] to breach its contract with
Clevett."  There are no allegations anywhere in the Complaint that O'Brien's actions
were unrelated to the legitimate interest of NORESCO and Equitable;[6] that O'Brien
harbored any personal malice toward Clevett; that there was ill will between Clevett and
O'Brien; or that O'Brien gained anything personally as a result of the termination of

---

[6] Notably, in the Amended Complaint, Clevett does not claim that the Energy Infrastructure Group was
meeting its goals, or deny that it was not meeting the goals.

Clevett's employment.  Compare with Ruffino v. State Street Bank and Trust, 908 F.

Supp. 1019, 1051 (D. Mass. 1995) (court denied motion to dismiss employee's claims

against supervisors where employee alleged specific facts, such as sexual harassment of

the employee, name-calling and negative comments about the employee, suggesting that

the supervisors were acting out of personal hostility or ill will as opposed to business

judgment; however, court dismissed the claim against one executive where there were no

facts that suggested anything more than poor performance of her responsibilities);

O'Brien v. New England Tel. Co., 422 Mass 686, 689-690, 664 N.E. 2d 843, 846-

847(1996) (employee stated claim against supervisor where she showed that he called her

names, verbally abused her, and acted in other hostile ways to get her removed from his

department after she had successfully grieved his attempt to transfer her in violation of

the employee handbook policies); Desrochers v. TIAX, LLC, 2003 WL 21246150 (Mass.

Super. 2003) (court denied motion to dismiss employee's claims against supervisors

where employee alleged specific facts, such as that supervisors threatened to terminate

his employment if he reported his concerns about corporate impropriety and their

involvement in corporate impropriety, suggesting that the supervisors were acting out of

personal hostility or ill will as opposed to business judgment) (attached hereto as Exhibit

A).  Clevett's vague and conclusory allegation is insufficient to save the claim from a

motion to dismiss.

Because the facts alleged, if true, will not support a claim for intentional

interference with contractual relations against O'Brien, Count VII should be dismissed.

IV.   **CLEVETT'S CLAIMS FOR INTENTIONAL AND NEGLIGENT MISREPRESENTATION, AS CONTAINED IN COUNTS III, IV, V, AND VI, MUST BE DISMISSED BECAUSE THE STATEMENTS ALLEGEDLY MADE ARE NOT ACTIONABLE AND CLEVETT COULD NOT HAVE REASONABLY RELIED UPON THEM.**

Clevett claims that O'Brien, NORESCO and Equitable made two sets of misrepresentations to him. The first set includes the statements that the Energy Infrastructure Division "was, and would continue to be, a valued part of [Equitable's] business" and "would continue its operations indefinitely." According to Clevett, these statements were made to convince him to accept the promotion to Senior Vice President of the Energy Infrastructure Division, and he relied upon them when accepting the promotion. He was allegedly harmed because after he moved to Massachusetts, he was terminated. (Amended Complaint at ¶ 13 ("In reliance on O'Brien's promise of promotion and continued assurances that the [Energy Infrastructure] Division was a valued part of [] [Equitable's] business..."), ¶¶ 43-46, ; see also Amended Complaint at ¶ 10, ¶¶ 52-55, ¶¶ 61-63, ¶¶ 69-71.) The second set includes the communications between O'Brien and Clevett about a possible consulting arrangement. According to Clevett, these statements were made to induce him to attend meetings in California. He was allegedly harmed because he did not receive compensation for attending the meetings. (Amended Complaint at ¶¶ 25-32; see also Amended Complaint at ¶¶ 47-49, ¶¶ 56-58, ¶¶ 64-66, 72-74.) As shown below, the statements upon which Clevett seeks to rely are not actionable. Further, he could not have reasonably relied upon them. Accordingly, there is no set of facts that he can prove that will support these claims, and they should be dismissed.

**A.    The First Set Of Statements Are Not Actionable, And Clevett Could Not Have Reasonably Relied Upon Them.**

To state a claim for fraudulent misrepresentation, a plaintiff must allege that: (1) the defendant made a false representation; (2) the misrepresentation was one of material fact; (3) the defendant made the misrepresentation with knowledge of its falsity; (4) the defendant made the misrepresentation for the purpose of inducing the plaintiff to act thereon; and (5) the plaintiff relied upon that misrepresentation to his or her detriment. Piantes v. Pepperidge Farm, Inc., 875 F.Supp. 929, 933 (D. Mass 1995). The plaintiff's reliance on the alleged misrepresentation must be reasonable. Robertson v. Gaston Snow Ely Bartlett, 404 Mass. 515, 523, 536 N.E.2d 344, 349 (1989), cert. denied, 493 U.S. 894, 110 S.Ct. 242 (1989).[7]

The first set of statements upon which Clevett's claims are based—that the Energy Infrastructure Division "was, and would continue to be, a valued part of [Equitable's] business" and "would continue its operations indefinitely"—are not actionable because they are neither statements of fact, nor statements of present intent. McCartin v. Westlake, 36 Mass. App. Ct. 221, 230-231 and n. 11, 630 N.E.2d 283, 288-289 (1994); Piantes v. Pepperidge Farms, Inc., 875 F. Supp. 929, 933 (D. Mass. 1995). Rather, they are statements of opinion (i.e., "valued") and future intent (i.e., "would continue to be…" and "would continue operations indefinitely"). "Ordinarily, false statements that concern matters of opinion, conditions to exist in the future, or matters promissory in nature are not actionable." Piantes, 875 F. Supp. at 233.

---

[7] Although the tort of negligent misrepresentation differs from that of fraudulent misrepresentation in that negligent misrepresentation does not require actual knowledge of the falsity of the misrepresentation, both Clevett's claims of fraudulent and negligent misrepresentations are considered jointly in this Memorandum of Law and can be dismissed on the same grounds: Plaintiff fails to allege any actionable statements and Plaintiff's reliance was unreasonable as a matter of law.

In <u>Piantes</u>, this Court rejected the contention that similar statements about the value of a business were actionable. In that case, an executive informed a prospective franchisee that the termination clause in a proposed franchise agreement would never be acted upon because the region was too profitable. Years later, the franchisor used the clause to terminate the agreement. The franchisee sued for misrepresentation, among other things. This Court rejected the claim. It found that the statement expressed an opinion as to "the economics of the situation"; the statement was not a promise that the termination clause would never be used. <u>Id.</u>

Likewise, the Massachusetts Appeals Court rejected the notion that statements such as those about the company's future value of the division could be actionable. In <u>McMartin v. Westlake</u>, franchisees alleged that franchisors and their officers made false misrepresentations that the franchise would expand in the future. The Appeals Court found that such statements amount to business plans and are not statements of present intent, and are not actionable.[8]   36 Mass. App. Ct. at 230-231 and n. 11.

In this case, even if the statements were actionable, Clevett could not have reasonably relied on them. The gist of his allegations is that he decided to accept the promotion because he believed the division would continue indefinitely, such that he would have job security, thereby making it worthwhile to move to Massachusetts. (Amended Complaint at ¶ 10, ¶ 13,  ¶¶ 43-46, ; <u>see</u> <u>also</u> Amended Complaint at ¶ 13, ¶¶ 52-55, ¶¶ 61-63, ¶¶ 69-71.)  However, Clevett's agreements with Equitable did not give him job security, and he could not reasonably rely on representations outside the agreements.

---

[8] Notably, no one could reasonably find the alleged statements to be false—Equitable valued the division enough to keep it running for the almost two years that Clevett held the position of Senior Vice President of the division.

Neither the letter agreement, nor the Noncompete Agreement contains a guarantee of a term of employment. (See Exhibits A and B to the Amended Complaint.) Rather, Clevett was an employee at will. Further, the letter agreement acknowledges that the parties will enter into a non-competition and severance agreement. (Exhibit A to Amended Complaint at p. 1 ("Terms and Benefits: …Mandatory execution of a [] Company non-compete [inserted by Clevett:] /severance agreement").) Severance unambiguously necessitates termination. The Noncompete Agreement acknowledges that he could be terminated, and provided that in certain circumstances of termination, he would receive severance pay. (Exhibit B to Amended Complaint at ¶ 1.) Finally, the Noncompete Agreement contains an integration provision that precludes consideration of oral representations to the contrary:

> This Agreement contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written. This Agreement may not be changed, amended, or modified, except by a written instrument signed by the parties.

Exhibit B to Amended Complaint at ¶ 9.

Courts have found that in circumstances such as these, employees could not reasonably rely on statements that suggested a more secure employment. For example, in Tinkham v. Jenny Craig, Inc., the Massachusetts Appeals Court rejected employees' claims that their employer was liable for making misrepresentations to them about their future job security. According to the court, any statements to the employees about future promotions could not be reasonably relied upon because the employees were employees at will according to their employment agreements. 45 Mass. App. Ct. 567, 570-571, 699 N.E.2d 1255, 1257 (1998). See also Piantes, 875 F. Supp. at 933-934 (court rejected

franchisee's claim that franchisor misrepresented that the termination clause in the franchise agreement would only be used in circumstances different from those stated in the termination clause, because the franchisee could not reasonably rely on oral statements that were contradictory to the written contract's language).

Thus, Clevett's claims based on the first set of statements must be dismissed because the statements are not actionable and Clevett could not have reasonably relied upon them.

**B.      The Second Set Of Statements Could Not Reasonably Have Been Relied Upon By Clevett.**

Assuming for the sake of argument that the second set of statements consisting of communications concerning a potential consulting arrangement are actionable, Clevett is unable as a matter of law to show that he reasonably relied upon them.  General contract principles preclude such reliance.

Clevett alleges that: O'Brien proposed that the parties enter into a consulting agreement; Clevett responded that he would consider such an arrangement if the severance issue was resolved; O'Brien later informed Clevett that Equitable would not enter into a consulting agreement at the time, but asked if Clevett would attend a meeting with the particular client for compensation; Clevett indicated that he would if certain conditions were met; O'Brien declined to agree to the conditions or to proceed with Clevett attending the meeting; and Clevett attended the meeting anyway.

Essentially, O'Brien made an offer; Clevett counter-offered; O'Brien rejected the counter-offer and made a second offer; Clevett rejected the second offer and made a second counter-offer; O'Brien rejected the second counter-offer and withdrew from negotiations; and Clevett ignored O'Brien's rejection of the second counter-offer and

proceeded as if he had accepted O'Brien's second offer. The law of contracts is clear that counteroffers such as Clevett's amount to a rejection of the original offers, and any attempted subsequent acceptance is inoperative. See Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 288, n. 6, 805 N.E.2d 957, 966 (2004) ("[u]nder fundamental principles of contract law, a counteroffer operates as a rejection of the original offer) (citing 1 WILLISTON ON CONTRACTS § 5:3, at 629 (4th ed. 1990) ("[w]hen an offer has been rejected, it ceases to exist, and a subsequent attempted acceptance is inoperative…[t]he reason that a counteroffer is operative *as a rejection* is that it is interpreted as being in effect a statement by the offeree not only that he will enter into the transaction on the terms contained in his counteroffer, but by implication that he will not assent to the terms of the original offer. Likewise, an *answer purporting to accept upon condition is not an acceptance but is in effect a counteroffer*") (emphasis added)).

Clevett, after rejecting O'Brien's offer to attend the meeting for compensation by making a counter-offer, could not reasonably rely on O'Brien's offer as a basis for acting.

Accordingly, the Court should dismiss Counts III through VI because the statements which Clevett alleges were misrepresentations are not actionable; and even if they are actionable, Clevett could not have reasonably relied upon them.

## V.     CLEVETT'S CLAIM FOR CIVIL CONSPIRACY, AS CONTAINED IN COUNT VIII, MUST BE DISMISSED BECAUSE HE FAILS TO ALLEGE FACTS SUFFICIENT TO SATISFY THE ELEMENTS OF THE CLAIM.

Clevett bases his civil conspiracy claim on the allegations that O'Brien and "other employees" formed an agreement to misrepresent the value and longevity of the Energy Infrastructure Division of NORESCO. The claim should be dismissed because Clevett is unable to prove any set of facts that satisfy the elements of the claim.

To state a claim for civil conspiracy, a plaintiff must allege that: (1) two or more individuals were involved; (2) the individuals arrived at a common design or agreement; (3) the common design or agreement was to commit a wrongful act; and (4) the conspirators engaged in some tortious activity in furtherance of the design/agreement.[9] See Finlay v. Fischbach & Moore, Inc., 1998 WL 1181689, *6 (Mass. Super. 1998) (attached hereto as Exhibit B).  Essential to this cause of action is a tortious activity by the defendants.  As shown above in Sections II through IV, Clevett has failed to set forth allegations supporting any claim of tortious activity.  See Kibbe v. Potter, 196 F.Supp.2d 48, 76 (D. Mass. 2002) (stating that "without any viable tort claim against Plaintiffs, there can be no civil conspiracy").

Second, Clevett has not sufficiently alleged that the requisite number of individuals were involved to form a conspiracy.  For a conspiracy to exist, there must be, at minimum, two actors involved; an individual defendant cannot conspire with himself. See, e.g., Finlay, 1998 WL 1181689 at *6 (stating that the elements of civil conspiracy are "a common design or agreement *between two or more people* to commit a wrongful act and some tortious act done in furtherance of the agreement) (citing, Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994) (emphasis added)).  Clevett alleges, in a conclusory manner, the existence of a conspiracy between O'Brien and "other individuals" at NORESCO and Equitable who presumably acted on behalf of

_____

[9] There is an alternative version of this tort under Massachusetts law, often referred to as "true conspiracy." It requires the plaintiff to allege (and ultimately prove) that concerted action (of two or more individuals) gave the defendants a "peculiar power of coercion" over the plaintiff, enabling the defendants to bring about results that are "different in kind from what any of them could achieve individually." See Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc., 62 F. Supp.2d 236, 244 (D. Mass. 1999).  Under this version, the exercise of this "peculiar power of coercion" is itself the wrong; no underlying, separate tortious activity is required.  Id.  Cases have continually noted that this cause of action is rare and very limited.  Therefore, in addition to Plaintiff's failure to indicate the second individual with whom O'Brien allegedly conspired, Plaintiff's failure to plead any sort of coercion precludes the Plaintiff from alleging "true conspiracy."

Equitable. (Complaint at ¶¶ 82-83.)  However, Clevett fails to identify any other individuals in his Complaint.  Clevett's failure to identify these "other individuals" with whom O'Brien allegedly conspired shows that his allegations are merely his unsubstantiated opinion and is fatal to his claim.  See Kibbe v. Potter, 196 F.Supp.2d 48, 76 (D. Mass. 2002) (stating that defendant's unsubstantiated opinion that the plaintiffs "conspired together" to defame and intimidate the defendant was insufficient to sustain a civil conspiracy cause of action); Ward v. Costello, 2002 WL 31973253, * 6 (Mass. Super. 2002) (stating that "without anything more than conclusory reasoning to substantiate his claim...Ward has no likelihood of success at trial") (attached hereto as Exhibit C).  The allegations (or lack thereof) show that O'Brien was the only person involved, acting on behalf of himself, NORESCO and Equitable.  Thus, Clevett has failed to satisfy the requirement of two actors.

Because Clevett has failed to allege sufficient facts on which to base his claim, Count VIII should be dismissed.

## Conclusion

As shown above, the Amended Complaint is procedurally defective and should be dismissed or stricken.  Alternatively, Plaintiff's various tort and statutory claims should be dismissed.  This case concerns whether NORESCO and Equitable terminated Clevett for "cause" and denied him severance in accordance with the Noncompete Agreement.  Clevett's attempt to expand the case is unavailing and should be rejected.

Respectfully submitted,

EQUITABLE RESOURCES, INC.
and JOSEPH E. O'BRIEN

By their attorneys,


_____/s/ Laurie J. Hurtt_____
Terence P. McCourt (BBO#555784)
Laurie J. Hurtt (BBO#634149)
Jeffrey M. Burns (BBO#661448)
Greenberg Traurig, LLP
One International Place
Boston, MA 02110
Tel: (617) 310-6000
Fax: (617) 310-6001

DATED:  June 27, 2005

## CERTIFICATE OF SERVICE

I, Laurie J. Hurtt, hereby certify that on the 27th day of June, 2005, I served by first-class mail and electronic filing a copy of the above to the following counsel of record:

Timothy P. Wickstrom, Esq.          Thomas F. Holt, Jr., Esq.
Tashjian, Simsarian & Wickstrom      Steven P. Wright, Esq.
370 Main Street                              Kirkpatrick & Lockhart
Worcester, MA 01608                      75 State Street
                                                    Boston, MA 02109-1808


/s/ Laurie J. Hurtt
Laurie J. Hurtt

# EXHIBIT  A

Westlaw.

Not Reported in N.E.2d                                                                     Page 1
2003 WL 21246150 (Mass.Super.)
**(Cite as: 2003 WL 21246150 (Mass.Super.))**

c

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
Roy D. DESROCHERS,
v.
TIAX, LLC et al. [FN1]

FN1. Jeffrey Worthington and Robert
McVicar (as individuals and in their
capacities as employees of TIAX, LLC).

**No. 024626.**

May 1, 2003.

*MEMORANDUM OF DECISION AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS*

NONNIE S. BURNES, Associate Justice.

**\*1** This dispute arises from the April 12, 2002
termination of the plaintiff, Roy D. Desrochers
("Desrochers"), from his employment at Arthur D.
Little, Inc. ("ADL"). Desrochers was terminated by
his supervisors, defendants Jeffrey Worthington
("Worthington") and Robert McVicar ("McVicar").
At the time Desrochers was terminated, ADL was
selling its corporate assets pursuant to bankruptcy
proceedings. On April 29, 2002, the United States
Bankruptcy Court for the District of Massachusetts
approved the sale of certain ADL assets to defendant
TIAX, LLC. On or about November 1, 2002,
Desrochers filed suit against TIAX, Worthington, and
McVicar.

In his complaint, Desrochers claims that TIAX
violated the covenant of good faith and fair dealing
and was unjustly enriched (Count I), breached
Desrochers' employment contract (Count II),
terminated Desrochers' employment in violation of
public policy (Count III), and violated the
Massachusetts Civil Rights Act (Count VIII).
Desrochers also claims that Worthington and
McVicar tortuously interfered with Desrochers'
advantageous/contractual relations (Counts IV and
V), defamed Desrochers (Counts VI and VII),
violated the Massachusetts Civil Rights Act (Count
VIII), committed a civil conspiracy (Count IX), and
intentionally inflicted emotional distress upon

Desrochers (Counts X & XI).

The matter is before the court on TIAX's motion to
dismiss as well as on Worthington and McVicar's
joint motion to dismiss. After hearing, for reasons
detailed forth below, TIAX's motion to dismiss is
*ALLOWED* and Worthington and McVicar's motion
to dismiss is *ALLOWED* in part and *DENIED* in part.

BACKGROUND
Accepting as true the factual allegations of
Desrochers' complaint and any inferences therefrom,
the material facts for purposes of the defendants'
motions to dismiss are as follows:

For approximately 17 years, Desrochers was
employed by ADL. He worked there as a scientist
and most recently as a senior manager in ADL's
Technology and Innovation Business Unit (the "T & I
Unit"). On April 12, 2002, Desrochers was
terminated from his employment with the T & I Unit.
He was fired by his supervisors, defendants
Worthington and McVicar.

ADL was a Massachusetts corporation with a
principal place of business at 8 Acorn Park,
Cambridge, Massachusetts. On February 5, 2002,
ADL filed a voluntary petition for bankruptcy under
Chapter 11 of Title 11 of the United States Code with
the United States Bankruptcy Court for the District of
Delaware. Subsequently, ADL's bankruptcy petition
was transferred to the United States Bankruptcy
Court for the District of Massachusetts, Western
Division (Case No.: 02-41045-HJB). On April 2,
2002, pursuant to bankruptcy proceedings, ADL
received several bids for the purchase of the T & I
Unit. The winning bidder was TIAX. On April 5,
2002, ADL and TIAX entered into an Asset Purchase
Agreement, whereby TIAX agreed to purchase all
right, title, and interest in certain T & I Unit assets.
The owner of TIAX, Dr. Keenan Sahin ("Dr.Sahin")
"took up an office at Acorn Park on Monday, April 8,
2002." Complaint, ¶ 18.

**\*2** On April 29, 2002, the Bankruptcy Court
approved the sale of the T & I Unit assets from ADL
to TIAX. In approving the sale of the T & I Unit, the
court held that: (1) TIAX was not a successor to
ADL; (2) TIAX was not assuming any of ADL's
debts except as set forth in the Asset Purchase
Agreement; and (3) the sale did not constitute a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
2003 WL 21246150 (Mass.Super.)
(Cite as: 2003 WL 21246150 (Mass.Super.))

consolidation, merger, or *de facto* merger between ADL and TIAX. The court further held that TIAX would assume certain liabilities outlined in the Asset Purchase Agreement upon the closing of the transaction.

While employed at ADL, Desrochers became recognized as an expert in sensory analysis and he often lectured for the Master Brewers Association of the Americas. In 2000, Desrochers observed alleged gross misbilling of a client by an ADL senior manager. Desrochers brought the misbilling to the attention of his supervisor, defendant Worthington. Worthington did not correct the problem and instead allegedly encouraged misbilling practices to continue. In that same year, Desrochers reviewed a report to a client that included a study conducted by the T & I Unit. The author of the report allegedly admitted to Desrochers that the results of the study were fabricated. In January 2001, Desrochers brought the fabrication of the study to the attention of defendants Worthington and McVicar. Worthington and McVicar took no action in response to Desrochers' allegations.

In his complaint, Desrochers states that during a discussion with Worthington and McVicar, "it became clear that [Worthington and McVicar] considered such fabrications to be 'a part of doing business' and 'appropriate in certain circumstances.' " Complaint, ¶ 11. Worthington and McVicar then directed Desrochers not to discuss his allegations of client misbilling and the alleged fabrication of a scientific study with anyone else or Desrochers would be terminated from his employment with ADL. Worthington and McVicar also "labeled" Desrochers as "a negative influence" and "divisive." Complaint, ¶ 12. On March 28, 2002, ADL issued a press release indicating that the T & I Unit had conducted "Profile Attribute Analysis" on a cholesterol-lowering beverage. The ADL manager quoted in the press release was the same person who admitted to Desrochers that the study's results were fabricated. On April 2, 2002, Worthington chastised Desrochers for suggesting improprieties and advised Desrochers to "work on sales, not witch hunts."

On April 5, 2002, the day ADL and TIAX executed the Asset Purchase Agreement, an announcement was made to all employees that the T & I Unit would continue to exist at 8 Acorn Park, all existing personnel, including management, would be retained, and that the company would be called "TIAX." On April 12, 2002, Worthington and McVicar fired Desrochers and escorted him from 8 Acorn Park. No

other employee in the T & I Unit was terminated at this time.

At the outset of his employment with ADL, Desrochers and ADL executed an Employee Agreement. During his employment, ADL maintained a Timecard Handbook and Code of Conduct, which governed the terms and conditions of Desrochers' employment with ADL. Desrochers alleges that pursuant to the April 5, 2002 Asset Purchase Agreement, TIAX assumed the duties and liabilities contained in the Employee Agreement, Timecard Handbook, and Code of Conduct. Desrochers claims that he followed the guidelines in these employment documents; he reported false labor charges and the fabrication of a scientific study. Desrochers also claims that by terminating his employment, TIAX violated the policies contained in the Employee Agreement and Code of Conduct, thereby breaching Desrochers' contract with TIAX. TIAX contends that ADL, and not TIAX, was the entity that terminated Desrochers' employment with the T & I Unit.

*3 On or about November 1, 2002, Desrochers filed a complaint against TIAX, Worthington, and McVicar. Pursuant to Mass.R.Civ.P. 12(b)(6), TIAX has moved to dismiss all counts against it. Worthington and McVicar have also jointly moved to dismiss all counts against them under Rule 12(b)(6). The defendants' motions are now before the court.

*DISCUSSION*

When evaluating the sufficiency of a complaint pursuant to Mass.R .Civ.P. 12(b)(6), the court must accept as true the pleaded factual allegations of the complaint, as well as any inferences which can be drawn therefrom in the plaintiff's favor. *Fairneny v. Savogran Co ., 422 Mass. 469, 470 (1996); Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991)*, and cases cited. "The plaintiff need only surmount a minimal hurdle to survive a motion to dismiss for failure to state a claim." *Bell v. Mazza, 394 Mass. 176, 184 (1985)*. In fact, "dismissals on the basis of pleadings, before the facts have been found, are discouraged." *Gennari v. City of Revere, 23 Mass.App.Ct. 979, 979 (1987)*, citing *Fabrizio v. City of Quincy, 9 Mass.App.Ct. 733, 734 (1980)*. Thus, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nader v.. Citron, 372 Mass. 96, 98 (1977)*, quoting *Conley v. Gibson, 355 U.S. 41, 45-46 (1957)*.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
2003 WL 21246150 (Mass.Super.)
(Cite as: 2003 WL 21246150 (Mass.Super.))

Page 3

I. *TIAX's Motion to Dismiss*

Pursuant to Mass.R.Civ.P. 12(b)(6), TIAX moves to dismiss all of Desrochers' claims (Counts I, II, III, and VIII) against it. Desrochers opposes TIAX's motion and argues that the court must treat TIAX's motion to dismiss as a motion for summary judgment because TIAX has submitted materials beyond the pleadings. Specifically, Desrochers points to the fact that TIAX has submitted the ADL bankruptcy court documents as well as the Asset Purchase Agreement and the Bill of Sale [FN2] executed between ADL and TIAX.

> FN2. TIAX has submitted a document evidencing that a Bill of Sale was executed and delivered by ADL to TIAX on May 10, 2002. This court will not consider the Bill of Sale for purposes of resolving the instant motion because it is not incorporated by reference in Desrochers' complaint. *Edwin v. Blenwood Associates, Inc.,* 9 F.Sup.2d 70, 72 (D.Mass.1998), citing *Beddall v. State Street Bank and Trust Co.,* 137 F.3d 12, 17 (1st Cir.1998).

As a general rule, a court considers only the pleadings in rendering a decision on a Rule 12(b)(6) motion to dismiss for failure to state a claim. While this court is mindful that it is required to accept as true all well-pleaded allegations of Desrochers' complaint, this court is not required to accept as true those "facts which the court could take judicial notice are not true." *Jarosz v. Palmer,* 49 Mass.App.Ct. 834, 836 (2000), aff'd, 436 Mass. 526 (2002), quoting *Hargis Canneries, Inc. v. United States,* 60 F.Sup. 729, 729 (W.D.Ark.1945). Here, TIAX has submitted (by way of affidavit) ADL's bankruptcy filings and the Asset Purchase Agreement with its motion to dismiss. First, in regard to ADL's bankruptcy filings, this court holds that it may properly take into consideration facts of which judicial notice may be taken from such bankruptcy documents. See *Jackson v. Longcope,* 394 Mass. 577, 580 n. 2 (1985) (noting that "[it] seems reasonable to take judicial notice of facts when considering a motion to dismiss under Mass.R.Civ.P. 12(b)(6)"); *Jarosz,* 49 Mass.App.Ct. at 836 (holding that the court could properly take judicial notice of court's own records in related action when considering motion to dismiss). The bankruptcy filings (the authenticity of which is not challenged) determines whether Desrochers has any actionable claims that can survive TIAX's motion to dismiss. Accordingly, this motion is not converted into a motion for summary judgment upon consideration of ADL's bankruptcy filings.

*4 Second, TIAX has submitted the Asset Purchase Agreement executed between ADL and TIAX. In determining whether the submission of the Asset Purchase Agreement transforms TIAX's motion to dismiss into a motion for summary judgment, the court is mindful that a document is not outside a complaint "when ... a complainant's factual allegations are expressly linked--and admittedly dependent upon--a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." *Edwin v. Blenwood Associates, Inc.,* 9 F.Sup.2d 70, 72 (D.Mass.1998), quoting *Beddall v. State Street Bank and Trust Co.,* 137 F.3d 12, 17 (1st Cir.1998). Here, Desrochers' complaint explicitly refers to the Asset Purchase Agreement executed between ADL and TIAX. See Complaint, ¶ 16. Furthermore, Desrochers relies upon both the timing of the execution and the content of the Asset Purchase Agreement in his attempt to substantiate his claims against TIAX. It follows that this court may consider the Asset Purchase Agreement (the authenticity of which is not challenged) in determining TIAX's motion to dismiss.

In order for Desrochers to prevail on Counts I, II, III, and VIII against TIAX, he must prove that TIAX was his employer when Worthington and McVicar terminated him on April 12, 2002. To that end, Desrochers argues that the April 5, 2002 execution of the Asset Purchase Agreement became effective on April 5, 2002, seven days before he was terminated from the T & I Unit. Desrochers also alleges that the owner of TIAX, Dr. Sahin, "took up an office at Acorn Park on Monday, April 8, 2002." Complaint, ¶ 18. As such, Desrochers contends that TIAX was his employer when he was terminated on April 12, 2002.

While the court accepts as true that Dr. Sahin "took up an office" at Acorn Park four days before Desrochers' employment was terminated, this court rejects Desrochers' claim that the Asset Purchase Agreement became effective prior to April 12, 2002. Instead, this court concludes that ADL was Desrochers' sole employer on April 12, 2002. According to the filings in the Bankruptcy Court, the bidding auction for the T & I Unit was held on April 3, 2002. The Asset Purchase Agreement between TIAX and ADL was executed on April 5, 2002. However, the sale of the assets (listed in the Asset Purchase Agreement) of the T & I Unit was not authorized and approved by the Bankruptcy Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                   Page 4
2003 WL 21246150 (Mass.Super.)
**(Cite as: 2003 WL 21246150 (Mass.Super.))**

until April 29, 2002. Thus, by taking judicial notice of ADL's Chapter 11 bankruptcy proceedings, it is clear that an employer-employee relationship between Desrochers and TIAX never arose before Desrochers' termination on April 12, 2002. Therefore, since Desrochers cannot prove any set of facts to make his claims against TIAX actionable, TIAX's motion to dismiss Counts I, II, III, and VIII must be *ALLOWED.*

II. *Worthington and McVicar's Joint Motion to Dismiss*

**\*5** In his complaint, Desrochers alleges that T & I Unit supervisors Worthington and McVicar intentionally interfered with Desrochers' contractual relationship with "his employer," intentionally inflicted emotional distress upon Desrochers, defamed him, violated the Massachusetts Civil Rights Act, and participated in a civil conspiracy against Desrochers. Pursuant to Mass.R.Civ.P. 12(b)(6), Worthington and McVicar jointly move to dismiss all of Desrochers' claims against them. [FN3] The court will address each of Desrochers' claims in turn.

> FN3. For the reasons set forth in Part I, *infra*, this court will consider the Asset Purchase Agreement and ADL's bankruptcy filings for purposes of resolving Worthington and McVicar's motion to dismiss. See *Jarosz*, 49 Mass.App.Ct. at 836; *Edwin*, 9 F.Sup .2d at 72.

A. Defamation (Counts VI and VII)

Desrochers avers that Worthington and McVicar defamed him because they "labeled" him as a "negative influence" and "divisive." In addition, Desrochers claims that his supervisors defamed him by "creating an aura of personal problems" to justify terminating him and by making false statements "to potential future employers or sources of work." To survive a motion to dismiss, Desrochers "must plead: (1) the general tenor of the libel or slander claim, along with the precise wording of at least one sentence of the alleged defamatory statements; (2) the means and approximate dates of publication; and (3) the falsity of those statements." *Dorn v. Astra USA*, 975 F.Sup. 388, 395-96 (D.Mass.1997); see *Eyal v. Helen Broadcasting Corp.*, 411 Mass. 426, 431-34 (1991); *White v. Spence*, 5 Mass.App.Ct. 679, 685-86 (1977).

Worthington and McVicar argue that Desrochers' defamation claims must fail because Desrochers has not alleged that Worthington and McVicar made false statements about him to a named third party. They also argue that their statements constitute non-actionable opinions; such statements are too vague and conclusory to constitute actionable statements of fact. For the following reasons, the court agrees with Worthington and McVicar and concludes that Desrochers has not pled an actionable defamation claim against either of his supervisors.

Assuming *arguendo* that the statements made by Worthington and McVicar are false, Desrochers must still establish that the statements were "published, i.e., communicated to at least a single individual other than the person defamed." *Ellis v. Safety Ins. Co.*, 41 Mass.App.Ct. 630, 636 (1996), citing *Brauer v. Globe Newspaper Co.*, 351 Mass. 53, 56 (1966). In regard to all three alleged defamatory statements, Desrochers has failed to name any one specific person to whom such statements were published. See *id.* Desrochers has also failed to state the means by which the three alleged statements were published as well the approximate dates of each publication.

As to the first statement, Desrochers claims that Worthington and McVicar "labeled" him a "negative influence" and "divisive." Complaint, ¶ 12. Desrochers fails to provide a factual basis for the allegation of publication of this statement; the complaint is silent as to a third party who may have heard Worthington and McVicar's alleged statement. See *Ellis*, 41 Mass.App.Ct. at 636. Desrochers also alleges that Worthington and McVicar "created an aura of personal problems." Even if the court considers this to be a statement, Desrochers fails to name any third party who may have heard it. See Complaint, ¶ 43, 46. As to the third statement, Desrochers alleges that Worthington and McVicar "made false statements to potential future employers or sources of work." Complaint, ¶ 44, 47. While Desrochers alleges that Worthington and McVicar published false statements to third parties, he fails to name even one specific third party to whom such false statements were published. Desrochers also fails to state the precise wording of at least one sentence of the "false statements" Worthington and McVicar allegedly made to such "potential future employers or sources of work." *Dorn*, 975 F.Sup. at 395-96, citing *Eyal*, 411 Mass. at 432 n. 7. Thus, because Desrochers has not pled "the elements of [his] claims with specificity," his defamation counts are not actionable. *Dorn*, 975 F.Sup. at 396; see *Ellis*, 41 Mass.App.Ct. at 636. Nevertheless, this court concludes that Desrochers should be given thirty (30) days to cure the defects of his defamation claims. If

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
2003 WL 21246150 (Mass.Super.)
(Cite as: 2003 WL 21246150 (Mass.Super.))

Page 5

Desrochers fails to plead the elements of his defamation claims with more specificity, Worthington and McVicar may renew their motion to dismiss Counts VI and VII. Accordingly, Worthington and McVicar's motion to dismiss Desrochers' defamation claims against them is *DENIED* without prejudice.

B. Violation of Massachusetts Civil Rights Act (Count VIII)

**\*6** Desrochers alleges that Worthington and McVicar violated the Massachusetts Civil Rights Act (the "MCRA"), codified by G.L.c. 12, § 11I, [FN4] by interfering with Desrochers' freedom of speech. Desrochers argues that Worthington and McVicar's conduct constitutes actionable "threats, intimidation or coercion" which resulted in Desrochers' loss of a secured contract with ADL. *Webster v. Motorola, Inc.*, 418 Mass. 425, 429-30 (1994). Worthington and McVicar move to dismiss Desrochers' MCRA claims and argue that Desrochers, as an at-will employee, had no secured contract right to lose.

> FN4. General Laws c. 12, § 11I (2002 ed.), reads in part as follows: "Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in [§ ]11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief ..."
> General Laws c. 12, § 11H (2002 ed.), to which § 11I refers, reads in part as follows: "Whenever any person or persons, whether or not acting under the law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action ..."

Desrochers argues that he was not an "at will" employee because he had an employment contract with ADL. In his complaint, Desrochers specifically avers that a contract arose from the existence of an Employee Agreement between ADL and himself, an ADL Timecard Handbook, and a Code of Conduct.

[FN5] See Complaint, ¶ 19-23. After reviewing these three documents, this court concludes that Desrochers was an "at will" employee of ADL. First, the Employee Agreement does not set forth any obligation of ADL to employ Desrochers. In fact, the Employee Agreement only sets forth the obligations of Desrochers as an employee, including the requirement "to comply with all rules, regulations, and policies of [ADL]." The Code of Conduct is an ADL manual outlining ADL's ethical and business policies. It contains no language addressing the employment status of Desrochers nor does it promise any guaranteed employment to him. Likewise, the Timecard Handbook does not speak to the employment relationship between Desrochers and ADL; it simply explains to employees how to properly fill out a time sheet. As a matter of law, Desrochers was an "at will" employee.

> FN5. Worthington and McVicar have attached (by way of affidavit) these documents to their motion to dismiss. Such attachments do not transform their motion to dismiss into a motion for summary judgment because Desrochers explicitly refers and relies upon such documents in his complaint. See *Harhen v. Brown*, 431 Mass. 838, 839-40 (2000).

"Relief under the Massachusetts Civil Rights Act may be granted where the threat, intimidation, or coercion involves 'any interference or attempted interference with any right secured by the Constitution or laws either of the United States or of the Commonwealth.' " *Webster*, 418 Mass. at 430, quoting *Folmsbee v. Tech Tool Grinding & Supply, Inc.*, 417 Mass. 388, 392 (1994). Worthington and McVicar threatened and then terminated Desrochers' "at will" position. This is not actionable conduct under the MCRA. *Webster*, 418 Mass. at 430. Thus, since it appears beyond doubt that Desrochers can prove no set of facts proving that he was anything but an "at will" employee, any interference by Worthington or McVicar did not result in a loss of a secured contract right. See *Nader*, 372 Mass. at 98. Therefore, Desrochers' MCRA claims must be dismissed against Worthington and McVicar.

C. Tortious Interference with Advantageous/Contractual Relations (Counts IV and V)

Desrochers contends that by terminating him from the T & I Unit, Worthington and McVicar intentionally interfered with Desrochers'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

advantageous employment relationship with "his employer." In his action for intentional interference with advantageous relations, Desrochers must prove that (1) he had an advantageous employment relationship; (2) Worthington and McVicar knowingly induced his employer to break that relationship; (3) Worthington and McVicar's interference, in addition to being intentional, was improper in motive or means; and (4) he was harmed by Worthington and McVicar's actions. _Weber v. Community Teamwork, Inc., 434 Mass. 761, 781 (2001)_ (citations omitted).

*7 As discussed in Part I, the Bankruptcy Court documents demonstrate that neither Desrochers nor Worthington and McVicar were employees of TIAX when Desrochers was terminated from the T & I Unit on April 12, 2002. Therefore, Desrochers never had an advantageous relationship with TIAX. Desrochers had, however, an advantageous employment relationship with ADL at the time Worthington and McVicar terminated him from the T & I Unit. Thus, "[w]here, as here, the claim is asserted against ... individual official[s] of the employer, the plaintiff is required to show, as to 'improper motive or means,' that the 'controlling factor' in the alleged interference was 'actual' malice; 'implied' malice is not sufficient." _Weber, 434 Mass. at 781_, quoting from _Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 664 (1981)_. The Supreme Judicial Court has defined the requisite "malice" in this context as "a spiteful, malignant purpose, unrelated to the legitimate corporate interest" of the employer. _Boothby v. Texon, Inc., 414 Mass. 468, 487 (1993)_. For the reasons below, the court concludes that it does not appear beyond doubt that Desrochers could not prove any set of facts establishing that Worthington and McVicar acted with actual malice in terminating his employment with ADL. See _Nader, 372 Mass. at 98_.

Worthington and McVicar would not ordinarily be held liable for tortious interference with Desrochers' advantageous relations with ADL if their actions "interfering" with those relations were a privileged part of their duties as supervisors and employees of ADL. _McMillan v. Massachusetts Soc. for Prevention of Cruelty to Animals, 880 F.Sup. 900, 910 (D.Mass.1995)_, cert. denied, _525 U.S. 1104 (1999)_. This is so because a corporation such as ADL can only act through its officers, employees, and agents. _Id._ "However, the law is clear that when a supervisor with the authority to terminate an at-will employee does so not for a legitimate business reason but rather solely because of the supervisor's personal feelings of malice, the privilege does not apply." _McMillan, 880_

_F.Sup. at 910_, citing _Steranko v. Inforex, Inc., 5 Mass.App.Ct. 253, 273 (1977)_.

Here, Desrochers alleges that in response to his concerns about client misbilling and the fabrication of a scientific study, both Worthington and McVicar directed Desrochers not to discuss his allegations with anyone else or he would be terminated from the T & I Unit. See Complaint, ¶ 11. In other words, Desrochers claims that his termination was carried out in retaliation for reporting his concerns about corporate impropriety. The threat of termination for reporting improper corporate actions, if proven, would constitute evidence of tortious interference with Desrochers' advantageous employment relations with ADL. [FN6] See _United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990)_. Thus, it is not beyond doubt, on a motion to dismiss, that Desrochers can prove no set of facts that might persuade a reasonable jury that Worthington and McVicar fired him for reasons of personal hostility or ill-will rather than business judgment. See _Nader, 372 Mass. at 98_. Accordingly, Worthington and McVicar's motion to dismiss Desrochers' claims of tortious interference with advantageous relations is _DENIED_.

> FN6. If Desrochers proves that his supervisors defamed him, such defamation can also be considered as evidence of actual malice on Desrochers' tortious interference claims. See _United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990)_ (finding that defamation can be used as evidence of actual malice).

D. Intentional Infliction of Emotional Distress (Counts X and XI)

*8 Desrochers avers that Worthington and McVicar's actions--threatening Desrochers not to discuss his allegations of client misbilling and the fabrication of a scientific study as well as terminating Desrochers--constitutes extreme and outrageous conduct. Desrochers argues that it follows that such egregious conduct gives rise to actionable claims of intentional infliction of emotional distress against Worthington and McVicar. Worthington and McVicar argue that such claims are barred by the exclusivity provision of G.L.c. 152, § 24, the Workers' Compensation Act (the "WCA").

The WCA ensures "that employees who give up their common law rights to sue their employers will not be without recourse, but will have a mechanism to be

Not Reported in N.E.2d
2003 WL 21246150 (Mass.Super.)
(Cite as: 2003 WL 21246150 (Mass.Super.))

Page 7

reimbursed for their employment-related injuries 'regardless of fault or foreseeability.' " _Brown v. Nutter, McClennen & Fish,_ 45 Mass.App.Ct. 212, 216 (1998), quoting in part, _Neff v. Commissioner of Dept. of Indus. Accs.,_ 421 Mass. 70, 75 (1995). In addition to providing the exclusive remedy against employers, the WCA also "provides the exclusive remedy against co-employees who engage in tortious conduct within the course of their employment and in furtherance of the employer's interest." _Brown,_ 45 Mass.App.Ct. at 216; see also _O'Connell v. Chasdi,_ 400 Mass. 686, 690-91 (1987); _Fusaro v. Blakely,_ 40 Mass.App.Ct. 120, 123 (1996).

In this case, there is no question that the alleged tortious conduct of Worthington and McVicar occurred within the course of Desrochers' and his supervisors' employment at ADL. Thus, the question before this court is whether it appears beyond doubt that Desrochers can prove no set of facts demonstrating that the alleged tortious conduct of Worthington and McVicar was _not_ in furtherance of ADL's interest.

Worthington and McVicar argue that their actions were taken in furtherance of executing their supervisory duties authorized by ADL. The two supervisors admit that their conduct may have been overzealous, but argue that "[h]owever distorted ... [their] understanding of the proper performance of their duties may have been, [this court] cannot say that they were acting outside the scope of their employment." _Fusaro,_ 40 Mass.App.Ct. at 124.

While it is true that in his complaint, Desrochers alleges that Worthington and McVicar considered the fabrication of the scientific study and client misbilling as "a part of doing business" and "appropriate in certain circumstances," this averment does not state that the supervisors' actions were taken in furtherance of ADL's corporate interest. See Complaint, ¶ 11. In fact, Desrochers claims that Worthington and McVicar's conduct in attempting to silence him and then terminating his employment was carried out "to advance the personal objectives of the defendants and to justify compensation to the detriment of the corporation." Plaintiff's Memorandum In Opposition to Defendants' Motion to Dismiss at p. 6. Based on the pleadings, it is not self-evident that Worthington and McVicar's alleged conduct in attempting to silence Desrochers' allegations of corporate wrongdoing and then terminating Desrochers from the T & I Unit furthered ADL's interest. See _Brown,_ 45 Mass.App.Ct. at 218. Moreover, "[o]ur case law suggests the necessity of a

fact-intensive analysis" to answer this question. _Id._ at 217. Thus, at this early stage of the proceeding, it is premature to say that Desrochers, after conducting discovery, will be unable to prove any set of facts demonstrating that Worthington and McVicar were not acting in furtherance of their employer's interest. _Brown,_ 45 Mass.App.Ct. at 218; see _Catalano v. First Essex Sav. Bank,_ 37 Mass.App.Ct. 377, 382, rev. denied, 419 Mass. 1101 (1994). The test to be used to make such a determination is objective and "assesses what the employee did and other facts in order to determine whether he acted at least in part for a job-related purpose." _Mulford v. Mangano,_ 418 Mass. 407, 412 (1994).

*9 Since the court is unable to determine whether the WCA acts as a bar to Desrochers' claims of intentional infliction of emotional distress, this court must address the sufficiency of Desrochers' emotional distress allegations. In order to survive Worthington and McVicar's motion to dismiss, Desrochers must allege that (1) Worthington and McVicar "intended to inflict emotional distress or that [they] knew or should have known that emotional distress was the likely result of [their] conduct;" (2) Worthington and McVicar's "conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community;" (3) Worthington and McVicar's actions ... were the cause of [Desrochers'] distress;" and (4) "the emotional distress [Desrochers] sustained ... was severe and of a nature that no reasonable [person] could be expected to endure it." _Agis v. Howard Johnson Co.,_ 371 Mass. 140, 144-45 (1976) (internal citations and quotations omitted).

Testing Desrochers' complaint by the rules stated above, this court holds that he makes out a cause of action and that his complaint is therefore legally sufficient. Desrochers claims to have suffered emotional distress after Worthington and McVicar threatened to terminate his employment and after the two supervisors intentionally terminated him. While many of Desrochers' allegations are not well pleaded, especially in regard to the specific emotional distress allegedly suffered by Desrochers, this court must read the complaint indulgently, _Quinn v. Walsh,_ 49 Mass.App.Ct. 696, 699 (2000), and draw all reasonable inferences in Desrochers' favor. _Nader,_ 372 Mass. at 98. After doing so, this court cannot say that no set of facts and circumstances are available for Desrochers to prove that Worthington and McVicar's "conduct was extreme and outrageous, [resulting in] a severe and traumatic effect upon the plaintiff's emotional tranquility." _Agis,_ 371 Mass. at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

145, quoting *Alcorn v. Anbro Eng'r, Inc.,* 2 Cal.3d 493, 498 (1970). Accordingly, Worthington and McVicar's motion to dismiss Counts X and XI must be *DENIED.*

E. Civil Conspiracy (Count IX)

On this count, Desrochers alleges that Worthington and McVicar conspired to accomplish an unlawful purpose, i.e., misbilling clients, publishing a false scientific study, threatening Desrochers with termination, terminating Desrochers, defaming him, and intentionally interfering with his advantageous relations with ADL. See Complaint, ¶ 51-53. In order for Desrochers to prove his claim of civil conspiracy against Worthington and McVicar, he must show that the conspiracy between them "derives from 'concerted action,' whereby liability is imposed on one individual for the tort of another." [FN7] *Kurker v. Hill,* 44 Mass.App.Ct. 184, 188 (1998), quoting *Aetna Cas. Sur. Co. v. P & B Autobody,* 43 F.3d 1546, 1564 (1st Cir.1994). Here, Desrochers claims that Worthington and McVicar provided each other "substantial assistance" in allegedly committing the torts of defamation, tortious interference, and intentional infliction of emotional distress. *Kurker,* 44 Mass.App.Ct. at 189. Since these three claims survive Worthington and McVicar's motion to dismiss, it is premature for this court to determine whether Worthington and McVicar had a "common plan to commit a tortious act where [they knew] of the plan and its purpose and [took] affirmative steps to encourage the achievement" of that plan. *Stock v. Fife,* 13 Mass.App.Ct. 75, 82 n. 10, rev. denied, 385 Mass. 1103 (1982). Therefore, Count IX of Desrochers' complaint cannot be dismissed for failure to state a claim.

> FN7. When there is no independent basis for imposition of tort liability, a plaintiff must prove a civil conspiracy by showing coercion, that is that "the wrong was in the particular combination of the defendants rather than in the tortious nature of the underlying conduct." *Kurker,* 44 Mass.App.Ct. at 188. Here, Desrochers need not demonstrate coercion because three of his tort claims survive Worthington and McVicar's motion to dismiss.

ORDER

*10 For reasons set forth in this opinion, defendant TIAX's motion to dismiss Desrochers' claims (Counts I, II, III, and VIII) is *ALLOWED.* It is hereby *ORDERED* that Desrochers' complaint against TIAX be *DISMISSED.*

In addition, defendants Worthington and McVicar's motion to dismiss is *ALLOWED* on Count VIII and *DENIED* on Counts IV, V, VI, VII, IX, X, and XI. It is hereby *ORDERED* that Count VIII of Desrochers' complaint be dismissed. It is further *ORDERED* that Desrochers has thirty (30) days to cure the defects of his defamation claims (Counts VI and VII) against defendants Worthington and McVicar. After such time, defendants Worthington and McVicar may renew their motion to dismiss Desrochers' defamation claims.

2003 WL 21246150 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT  B



Not Reported in N.E.2d
1998 WL 1181689 (Mass.Super.)
(Cite as: 1998 WL 1181689 (Mass.Super.))

Page 1

C

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
John FINLAY, et al. [FN1]

FN1. Charles Tamulonis.

v.

FISCHBACH and MOORE, INC., et al. [FN2]

FN2. John G. Molnar.

No. 971208F.

Aug. 28, 1998.

MEMORANDUM OF DECISION AND ORDER
ON DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

VOLTERRA.

INTRODUCTION

*1  Plaintiffs, John Finlay (Finlay) and Charles
Tamulonis (Tamulonis), brought this action against
their former employer, defendant Fischbach and
Moore, Inc. (Fischbach), and John G. Molnar
(Molnar), a Fischbach supervisor, after Molnar
terminated their employment with Fischbach.
Defendants now move for summary judgment against
both plaintiffs on all counts. Plaintiffs oppose the
motion. For the reasons set forth below, defendants'
motion for summary judgment is allowed in part and
denied in part.

BACKGROUND

Read in a light most favorable to plaintiffs as the
nonmoving parties, see *Finney v. Madico, Inc.,* 42
Mass.App.Ct. 46, 47, 674 N.E.2d 655 (1997), review
granted 424 Mass. 1107, 678 N.E.2d 1334 (1997), the
summary judgment record reveals the following:
Fischbach is an electrical contractor with operations
throughout the United States. Fischbach is the filed
sub-bid electrical contractor on the Massachusetts
Water Resources Authority (MWRA) Boston Harbor
Project on Deer Island. These projects include
Contract Packages 103 and 202 (CP-103 and CP-202)
which are lump-sum subcontracts. In association with
the Deer Island project, Fischbach entered into a

collective bargaining agreement (CBA) with Local
103 of the International Brotherhood of Electrical
Workers (IBEW); the CBA incorporated the Project
Labor Agreement on the Boston Harbor Project into
its terms. The CBA contained a provision, § 6.5,
stating that the employer may discharge employees
for "proper cause."

Molnar is the Project Director of the Deer Island
projects. Fischbach hired Finlay in February 1993 as
project manager for CP-202. In May 1992 Fischbach
hired Tamulonis as a journeyman. Tamulonis is a
member of Local 103 and is therefore covered by the
CBA. In the fall of 1992, Tamulonis was promoted to
general foreman on CP-103.

Tamulonis' responsibilities as general foreman
included completing company timesheets for the
electricians whom he supervised. The timesheets
noted the number of hours worked for each
electrician and the particular project on which he or
she worked.

The MWRA required all subcontractors to submit a
weekly report known as a "Work Force Utilization
Report" (WFU Report) which the MWRA used to
identify ethnicity. The WFU Report states that "[t]he
willful falsification of the above statements may
subject the Contractor or Subcontractor to civil or
criminal prosecution." Instead of completing a WFU
Report, Fischbach generally attached a copy of its
weekly internal company payroll to the WFU Report
form. The payroll attached to the WFU Report form
was referred to as a "certified payroll" as it was
signed under the pains and penalties of perjury. The
certified payroll indicated the number of hours that
each employee worked and the applicable job number
for which the employee worked. The timesheets
completed by the general foremen were the source of
the information used to generate the certified payroll.

*2  In late 1993 or early 1994, Molnar ordered
Tamulonis to falsify information on timesheets he
prepared in the course of his duties as general
foreman. Specifically, Molnar instructed Tamulonis
to allocate some of the time that his men worked on
CP-103 to different projects, either CP-202 (Finlay's
project) or CP-105. Molnar threatened to fire
Tamulonis if he were to reveal these instructions.
Tamulonis prepared the timesheets as Molnar
directed for approximately three or four months, but

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

eventually Tamulonis refused to sign some of the timesheets.

On March 22, 1994, Finlay discovered the false timesheets by noticing that there were hours being charged to CP-202 for personnel who never worked on CP-202. Over the next few days, Finlay reviewed the timesheets with another employee, Jack Walsh, and discussed the issue with another project manager, Jimmy O'Keefe. On Friday, April 1, 1994, Finlay reviewed the certified payrolls for January through March of 1994 and again observed that time worked on other projects was being charged to CP-202. On this day, Finlay confronted Tamulonis about the certified payroll and Tamulonis responded that Finlay should see Molnar about the problem.

Molnar terminated both Finlay and Tamulonis by Wednesday of the following week.

Sometime in late 1996, one of Finlay's prospective employers, Steven Dodge (Dodge) of Dodge Electric, contacted Molnar as a reference for Finlay. During a phone conversation, Molnar allegedly made several disparaging comments about Finlay including the following: Finlay was the last guy in the world Dodge would want to hire; Finlay sued F & M for wrongful termination; Finlay was incapable of handling his duties as project manager and his duties were assumed by a more experienced man; Finlay filed a worker's compensation claim and dragged F & M through the muck regarding the claim; and, Finlay went out on unemployment compensation.

### Disputed Facts

There remain material facts in dispute including: 1) whether Fischbach stood to gain anything or make any money by tampering with timesheets [FN3] and 2) the extent of William Greene's knowledge of Molnar's scheme (Greene is another Fischbach employee); and 3) promises made to Finlay regarding the duration of his employment.

> FN3. Finlay testified that despite their lump-sum contracts with the MWRA Fischbach could profit from certain change orders and claim work, which could potentially involve retrieving timesheets to determine labor costs.
> Molnar claims that he ordered the changes in the timesheets as a means to balance the materials ordered for CP-103 but used by CP-202.

### DISCUSSION

### 1. Summary Judgment Standard

Summary judgment shall be granted where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422, 456 N.E.2d 1123 (1983); *Community National Bank v. Dawes,* 369 Mass. 550, 553, 340 N.E.2d 877 (1976); Mass.R.Civ.P. 56(c). Defendants, as the moving parties, bear the burden of affirmatively demonstrating the absence of a triable issue; and further, that they are entitled to judgment as a matter of law. *Pederson v. Time,* 404 Mass. 14, 17, 532 N.E.2d 1211 (1989). If defendants establish the absence of a triable issue, plaintiffs, as the parties in opposition to the motion, must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat the motion. *Id.* With respect to any claim which defendants do not have the burden of proof at trial, they may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of plaintiffs' case or "by demonstrating that proof of that element is unlikely to be forthcoming at trial." *Flesner v. Technical Communications Corp.,* 410 Mass. 805, 809, 575 N.E.2d 1107 (1991); *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716, 575 N.E.2d 734 (1991). "[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment." *LaLonde v. Eissner,* 405 Mass. 207, 209, 539 N.E.2d 538 (1989).

### 2. Section 301 Preemption as to Tamulonis

*3 Defendants contend that several of Tamulonis' claims are preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) [FN4] because he was covered by a CBA during his employment. "It is well established that § 301 completely preempts a state law claim if the resolution of the claim necessitates analysis of, or substantially depends on the meaning of, a collective bargaining agreement." *Quesnel v. Prudential Ins. Co.,* 66 F.3d 8, 10 (1st Cir.1995), citing *Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399, 405-06, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988); *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985); *Magerer v. John Sexton & Co.,* 912 F.2d 525, 528 (1st Cir.1990). There is no dispute that Tamulonis was subject to the applicable CBA among Fischbach, the MWRA, and Local 103. Therefore, the question is whether the resolution of his claims requires analysis of, or substantially depends upon the meaning of, the CBA. *Quesnel,* 66 F.3d. at 11. "[I]n order to determine

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

whether a particular state-based cause of action is preempted by § 301, a court must analyze the specific elements of the state-based claim." *Cullen v. E.H. Friedrich Co., Inc.,* 910 F.Supp. 815, 820 (D.Mass.1995).

> FN4. Section 301 provides:
> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined by this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without respect to the citizenship of the parties.

a. Breach of Contract/Promissory Estoppel--Count II
Tamulonis
Defendants contend that Tamulonis' breach of contract claim is clearly preempted. The court agrees. Resolution of any breach of contract would necessarily require consideration of whether Tamulonis was discharged for proper cause, which implicates the Managements Rights Provision, § 6.5 of the CBA.

Tamulonis' argument that Fischbach made individual promises to him and that his claims are based on the individual promises rather than the CBA is unsupported by the record. The record conclusively shows that the terms and conditions of Tamulonis' employment were governed by the CBA at all times.

Tamulonis further argues that he had a fundamental state law right to work without being asked to commit a crime. However, the cases cited by Tamulonis are distinguishable from the circumstances here as these cases involve statutory claims not alleged by Tamulonis here. See e.g. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Blanchette v. School Committee of Westwood,* 427 Mass. 176, 692 N.E.2d 21 (1998). Moreover, resolution of this claim is not a purely factual determination because it requires interpretation of the CBA's "proper cause" provision. See *Lueck,* 471 U.S. at 211.

Tamulonis' promissory estoppel claim is likewise preempted for any promise made to Tamulonis by Fischbach would be governed by the CBA.

Finlay

*4 Finlay's deposition testimony shows that Fischbach, through William Greene, made representations to him that he was being hired for as long as there was work or about four years. Greene's deposition testimony states that no one ever told Finlay that he would be employed as long as they had work to do on the island. Thus, there is a genuine issue of material fact as to Fischbach's representations to Finlay about the anticipated duration of his employment and summary judgment is inappropriate. *Monaco v. Lombard Bros., Inc.,* 24 Mass.App.Ct. 941, 509 N.E.2d 28 (1987).

Fischbach argues that this alleged oral contract is barred by the statute of frauds. The court rejects Fischbach's argument because Massachusetts recognizes an oral contract for employment of an unlimited duration, which may be the case here, but must be determined by the trier of fact. *Sereni v. Star Sportswear Mfg. Corp.,* 24 Mass.App.Ct. 428, 434, 509 N.E.2d 1203 (1987), citing *Carnig v. Carr,* 167 Mass. 544, 46 N.E. 117 (1897).

The court also rules that summary judgment is not warranted as to Finlay's promissory estoppel theory. Finlay has produced sufficient evidence to raise a genuine dispute of material fact as to whether Fischbach made him a promise upon which he reasonably relied to his detriment. See *Cambridgeport Savings Bank v. Boersner,* 413 Mass. 432, 442, 597 N.E.2d 1017 (1992), quoting Restatement Second of Contracts, § 90. Finlay and Greene offer different accounts as to any promises made during Finlay's interview. In addition, Finlay curtailed a real estate business and his own electrical company to join Fischbach, but the extent of the detriment is factually disputed. Thus, summary judgment is denied on Finlay's promissory estoppel theory.

b. Tortious Interference with Advantageous and/or Contractual Relations--Count III
To establish a claim of intentional interference with contractual relations, each plaintiff must show: 1) he had a contract with a third party; 2) Molnar knowingly induced the third party to breach the contract; 3) Molnar's interference was improper in motive or means; and 4) plaintiffs were harmed by defendant's actions. *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 812-17, 551 N.E.2d 20 (1990); *Jenkins v. DeTucci,* 41 Mass.App.Ct. 176, 182- 84, 668 N.E.2d 1345 (1996), review denied 423 Mass. 1111, 672 N.E.2d 539 (1996).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
1998 WL 1181689 (Mass.Super.)
(Cite as: 1998 WL 1181689 (Mass.Super.))

Page 4

### Tamulonis

The determination of whether Molnar induced Fischbach to break its employment contract with Tamulonis would require the court to decide whether Fischbach was entitled to discharge Tamulonis under the CBA. *Magerer, 912 F.2d at 531.* Thus, Tamulonis' interference with contractual relations claim is preempted by § 301.

However, the claim for interference with advantageous relations is distinct from any contractual agreement between Tamulonis and Fischbach. Nolan and Sartorio, Massachusetts Practice Series, Tort Law, Vol. 37, § 98 (1989 ed.), citing *In re Scallywags, Inc., 84 B.R. 303 (Bkrtcy.D.Mass.1988).* As such, the court need not look to the CBA in resolving this claim and therefore, it is not preempted. But, "an employee's supervisor is privileged to act as he did unless he acted out of malevolence, that is, with actual malice ... malevolence is for a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Boothby v. Texon, 414 Mass. 468, 487, 608 N.E.2d 1028 (1993)* (internal quotations omitted). Molnar admits to ordering Tamulonis to keep inaccurate timesheets, but maintains that it was the simplest way in which to balance the cost between two jobs, CP-202 and CP-103. Whether Molnar's actions and intentions were related to the legitimate corporate interest, and thus privileged, is a genuine issue of material fact for the fact finder to resolve. Therefore, Tamulonis' claim for interference with advantageous relations survives summary judgment.

### Finlay

*5 Finlay has produced sufficient evidence on each element of these claims to defeat summary judgment. Therefore, defendants' motion is denied as to Finlay's claims for interference with advantageous and/or contractual relations.

### c. Wrongful Termination--Count IV
### Tamulonis

It is undisputed that Tamulonis was covered by the applicable CBA here. Therefore, the public policy exception to the employment at will doctrine does not apply to him. [FN5] *Cullen, 910 F.Supp. at 821* ("[a]llowing employees governed by a CBA to assert an independent common law claim of wrongful discharge would not be a commendable practice. It would deprive employer and union to establish a uniform and exclusive method for orderly settlement of employee grievances"), citing *Azzi v. Western Electric Co., 19 Mass.App.Ct. 406, 410, 474 N.E.2d 1166 (1985),* quoting *Republic Steel Corp. v.*

*Maddox, 379 U.S. 650, 653, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965).* Consequently, Tamulonis' claim for wrongful termination fails.

> FN5. As discussed above, the court rejects Tamulonis' argument that he had any individual contract with Fischbach independent of his rights under the CBA.

In addition, § 301 preempts this claim as its resolution depends upon an interpretation of the "proper cause" provision in the CBA. *Cullen, 910 F.Supp. at 822-23,* discussing *Quesnel, 66 F.3d at 10.* As a result, Fischbach is entitled to summary judgment as to Tamulonis' claim for wrongful termination.

### Finlay

Fischbach asserts that Finlay cannot state a claim for wrongful discharge in violation of public policy because first, there is no evidence to support his claim and secondly, because Fischbach has not violated any public policy. [FN6]

> FN6. Fischbach aptly points out that if Finlay establishes that he had a contract with Fischbach, he would not be an employee at-will, and thus, unable to recover under a wrongful discharge theory. However, the question of whether Finlay had a contract with Fischbach must be determined at trial. For purposes of this argument only, the court assumes that Finlay was an at-will employee.

"[I]n certain circumstances, an at-will employee may maintain an action against [his] former employer for wrongful discharge." *Shea v. Emmanuel College, 425 Mass. 761, 762, 682 N.E.2d 1348 (1997),* citing *Upton v. JWP Businessland, 425 Mass. 756, 757, 682 N.E.2d 1357 (1997).* Finlay must show that he was an at-will employee who was terminated for asserting a legally guaranteed right, for doing what the law requires, or for refusing to do what the law forbids. *Folmsbee v. Tech Tool, Grinding & Supply, Inc., 417 Mass. 388, 394, 630 N.E.2d 586 (1994); Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School, 404 Mass. 145, 149, 533 N.E.2d 1368 (1989).*

Here, Finlay discovered the inaccurate timesheets on March 22, 1994. Finlay discussed the issue with other employees, Jack Walsh and Jimmy O'Keefe, over the next few days. On Friday, April 1, 1994, Finlay reviewed the certified payrolls and found the same

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inaccuracies. On this same day, Finlay confronted Tamulonis about the certified payroll and Tamulonis responded that Finlay should see Molnar about the problem. Finlay testified at his deposition that from the time of the initial discovery on March 22 through his termination, he was attempting to ascertain the origin of the inaccuracies and figure out how to handle the problem.

*6 The court rejects Fischbach's contention that because Finlay had not yet spoken to his supervisors or decided what to do that his claim for wrongful discharge fails. Based upon Molnar's threats to terminate Tamulonis if he told anyone about the timesheets and based upon the close temporal proximity of the firing of Tamulonis and Finlay, a reasonable inference may be drawn that Molnar was aware that Finlay had learned about the inaccuracies and was preparing to blow the whistle on Molnar. At least in the context of this case, the court sees no meaningful distinction between an employee fired for already having blown the whistle and an employee who is perceived as about to blow the whistle.

At any rate, Finlay did discuss the problem with other Fischbach employees and project managers, albeit not supervisors. An internal complaint made about the alleged violation of criminal law states a recognized public policy exception. *Shea,* 425 Mass. at 762-63, 682 N.E.2d 1348; *Smith v. Mitre Corp.,* 949 F.Supp. 943, 950 (D.Mass.1997) ("blowing the whistle on fraud and false claims by a government contractor--even when that whistleblowing is confined within the company--is sufficiently important to command the invocation of the exception"). In this case, it is unclear whether Fischbach could financially profit by submitting the inaccurate timesheets; Fischbach's relentless argument that the contracts were fixed-price contracts appears to be a classic red herring. What is clear is that the WFU Report on it face prohibits falsification of the timesheets and warns contractors and subcontractors of criminal and civil penalties for a violation. This is adequate to invoke the exception. Accordingly, Finlay has stated a claim for wrongful termination in violation of public policy and summary judgment is denied on this claim.

d. Civil Conspiracy--Count V
The elements of civil conspiracy are a common design or agreement between two or more people to commit a wrongful act and some tortious act done in furtherance of the agreement. *Aetna Casualty Surety Company v. P & B Autobody,* 43 F.3d 1546, 1564 (1st Cir.1994); see also Restatement (Second) of

Torts, § 876 (1977). [FN7]

> FN7. There are no allegations in the complaint to support a civil conspiracy claim based on a coercion theory. *Aetna,* 43 F.3d at 1564.

Tamulonis and Finlay
Fischbach contends that resolving this claim requires determining whether Tamulonis' termination was a tortious act or breach of duty under the CBA. However, the tortious act here could be viewed as more than the ultimate termination. That is, Molnar's instructions to Tamulonis to prepare inaccurate timesheets may be the tortious act in itself. Thus, no reference to the CBA's "proper cause" provision would be necessary and there is no § 301 preemption.

Nevertheless, there is no evidence of a combination, or common design or agreement, between Molnar and anyone else at Fischbach. *Kyte v. Philip Morris, Inc.,* 408 Mass. 162, 166-67, 556 N.E.2d 1025 (1990). Tamulonis' argument that William Greene's knowledge of the situation suffices to state a claim for civil conspiracy is untenable. *Id.* at 168, 556 N.E.2d 1025. Accordingly, Fischbach is entitled to summary judgment on this claim as to both plaintiffs.

e. Defamation as to Finlay
*7 Finlay claims that Molnar and Fischbach made defamatory statements to prospective employers. The record contains a letter from a prospective employer, Steve Dodge of Dodge Electric, detailing a conversation that he had with Molnar about Finlay. During this conversation, Molnar allegedly made several derogatory remarks about Finlay. Defendants argue that they are entitled to summary judgment because Molnar's statements were either true, his opinions, or privileged and that, in any event, Finlay suffered no damage from the statements because Dodge offered him a position.

Summary judgment is favored in defamation cases. *Mulgrew v. Taunton,* 410 Mass. 631, 632, 574 N.E.2d 389 (1991). Defamation, or in this case slander per se, is the publication of a defamatory statement of or concerning the plaintiff which is false and causes damage to the plaintiff. *McAvoy v. Shufrin,* 401 Mass. 593, 597, 518 N.E.2d 513 (1988); *Bander v. Metropolitan Life Ins. Co.,* 313 Mass. 337, 348, 47 N.E.2d 595 (1943). "Statements of fact may expose their authors ... to liability for defamation, but statements of pure opinion cannot. Statements of pure opinion are constitutionally protected." *King v. Globe*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

_Newspaper Co.,_ 400 Mass. 705, 708, 512 N.E.2d 241 (1987), U.S. cert. denied 485 U.S. 940, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988), citing _Aldoupolis v. Globe Newspaper Co.,_ 398 Mass. 731, 733, 500 N.E.2d 794 (1986). "[W]hether a statement is a factual assertion or an opinion is a question of law if the statement unambiguously constitutes either fact or opinion." _King,_ 400 Mass. at 709, 512 N.E.2d 241. The court rules that Molnar's alleged statements to Dodge were either true or pure opinion. See _Aldoupolis,_ 398 Mass. at 733, 500 N.E.2d 794 and cases cited. Therefore, defendants are entitled to summary judgment on this claim. [FN8]

> FN8. I reject defendants argument that Molnar's statements were protected by a conditional privilege because Molnar unnecessarily, unreasonably, and recklessly abused the privilege during his conversation with Dodge. _Foley,_ 400 Mass. 82, 94-95, 508 N.E.2d 72 (1987).
>
> Further, I note that had this claim survived summary judgment, it is doubtful whether Finlay could show any damages. Finlay testified at his deposition that Dodge offered him a position with his company despite Molnar's statements and that he refused the position because it required extensive traveling.

**e. Tortious Misrepresentation--Count I**

As to Count I, plaintiffs must show that Fischbach or Molnar made a false representation of material fact with knowledge of its falsity for the purpose of inducing them to act thereon and that they reasonably relied upon the representation and were damaged. _Macoviak v. Chase Home Mortgage Corp.,_ 40 Mass.App.Ct. 755, 760, 667 N.E.2d 900 (1996) (citations omitted). Based on the reasonable inferences the court may draw from the record, plaintiffs have raised genuine issues of material fact to defeat defendants' summary judgment motion on this claim.

**Tamulonis and Finlay**

Tamulonis and Finlay discussed the responsibilities of their respective jobs of general foreman and project manager with Molnar and Greene in the promotion or hiring process. During these discussions, Molnar never disclosed that he expected Tamulonis to keep inaccurate timesheets as part of his responsibilities. Similarly, Molnar did not tell Finlay that he would have to refrain from whistleblowing in order to keep his job. Defendants argue that Molnar could not have knowingly made

these false omissions when plaintiffs were hired or promoted because the alleged illegal activity did not occur until much later, in 1993 and into 1994. From Molnar's deposition testimony, one could infer that Molnar had used this procedure of falsifying timesheets before in lieu of a longer and more difficult procedure of completing material transfer paperwork. This raises disputes of material fact for resolution at trial on plaintiffs' claims for tortious misrepresentation and summary judgment is therefore denied.

**4. _Garmon_ Preemption as to Tamulonis**

*8 In the alternative, defendants argue that they are entitled to summary judgment on Tamulonis' claims for wrongful termination, interference with contractual relations, and civil conspiracy based on _Garmon_ preemption. Although the court has ruled these claims are preempted by § 301, I address this argument.

"When an activity is arguably subject to § 7 or § 8 of the National Labor Relations Act, the states as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of the state interference with national labor policy is to be averted." _San Diego Unions v. Garmon,_ 359 U.S. 236, 245, 79 S.Ct. 773, 779-80, 3 L.Ed.2d 775 (1959). Only if the conduct at issue is of "peripheral concern" to federal labor law and policy or touches interests "so deeply rooted in local feeling and responsibility" are states left with the power to act. _Id.; Chaulk,_ 70 F.3d 1361 (1995), cert. denied 518 U.S. 1005, 116 S.Ct. 2525, 135 L.Ed.2d 1049 (1st Cir.1996).

Here, assuming without deciding that Tamulonis' conduct is arguably protected by § 7 or Molnar's conduct is arguably prohibited by § 8 of the National Labor Relations Act, Tamulonis' contention that his claims fall within the _Garmon_ exceptions is persuasive. In determining whether the "peripheral concern" or "local interest" exceptions apply, courts balance the state's interest in remedying the effects of the challenged conduct against both the interference with the NLRB's ability to adjudicate the controversy and the risk that the state will approve conduct that the NLRA prohibits. _Chaulk,_ 70 F.3d at 1365 (citations omitted). In applying this test, courts focus on the root of the controversy, as opposed to its label and look to the "conduct being regulated, not the formal description of governing legal standards." _Id._

In the instant case, the state has a great interest in remedying the effect of the challenged conduct, that

1998 WL 1181689 (Mass.Super.)
**(Cite as: 1998 WL 1181689 (Mass.Super.))**

being the falsification of documents submitted to a state entity. This interest would not interfere with the NLRB's ability to adjudicate the issue nor would the state condone inaccuracies on timesheets. On balance, adjudicating these claims in state court poses no threat to disrupting the uniform body of federal labor law underlying the *Garmon* preemption doctrine. Consequently, the claims of wrongful termination, intentional interference with contractual relations, and civil conspiracy are not subject to *Garmon* preemption.

ORDER

For the foregoing reasons, it is hereby ORDERED that defendants' motion for summary judgment against plaintiff Tamulonis is ALLOWED as to Breach of Contract/Promissory Estoppel (Count II), Interference with Contractual Relations (part of Count III), Wrongful Termination (Count IV), and Civil Conspiracy (Count V) and DENIED as to Tortious Misrepresentation (Count I) and Interference with Advantageous Relations (part of Count III).

**\*9** It is further ORDERED that defendants' motion for summary judgment against plaintiff Finlay is ALLOWED as to Civil Conspiracy (Count V) and Defamation (Count VI) and DENIED as to all other remaining claims (Counts I, II, III, and IV).

1998 WL 1181689 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT  C



Not Reported in N.E.2d                                                          Page 1
15 Mass.L.Rptr. 644, 2002 WL 31973253 (Mass.Super.)
**(Cite as: 2002 WL 31973253 (Mass.Super.))**

**H**

Superior Court of Massachusetts.
Lauriston WARD,
v.
William COSTELLO et al. [FN1]

FN1. Brigitte Senkler, Senkler Real Estate,
Inc., and Senkler Hunneman Real Estate,
Inc.

No. 984871J.

Dec. 17, 2002.

MEMORANDUM OF DECISION AND ORDER
UPON DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT
AND PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT ON DEFENDANT'S
COUNTERCLAIM

FRANCIS R. FECTEAU, Justice of the Superior
Court.

Introduction

*1 The instant action concerns the enforceability of a
July 2, 1998 purchase and sale agreement between
plaintiff Lauriston Ward ("Ward") and defendant
William Costello ("Costello") relative to the former's
land in Carlisle, Massachusetts. Over two years ago,
Ward's then principal argument-- that the agreement
violated public policy in contravention of G.L.c. 61,
§ 8 (Counts I and II)--was met with disapproval by
another judge of this court. See Memorandum of
Decision and Order on Cross Motions for Partial
Summary Judgment, Sosman, J., dated August 3,
2000 ("Decision"). [FN2]

FN2. The court, Sosman, J., also found in
Costello's favor with respect to his
counterclaim for declaratory relief under
G.L.c. 231A (Counterclaim Count I).

With leave of that court, the parties now have filed
further motions for summary judgment: Costello's
motion is addressed to his counterclaim for specific
performance (Counterclaim Count II) [FN3] and to
Ward's additional counts for misrepresentation and
fraud (Count III), breach of the implied covenant of
good faith and fair dealing (Count IV), breach of
fiduciary duty (Count V), civil conspiracy (Count

VI), and violation of G.L.c. 93A (Count IX); and
Ward challenges Costello's counterclaim for a G.L.c.
93A violation (Counterclaim Count IV). In addition,
defendants Brigitte Senkler ("Senkler"), Senkler Real
Estate, Inc., and Senkler Hunneman Real Estate, Inc.,
have moved for summary judgment on Ward's claims
for fraud and misrepresentation (Count III), civil
conspiracy (Count IV), breach of fiduciary obligation
(Count VII), violation of G.L.c. 93A (Count VIII),
and *respondeat superior* (Count X).

FN3. Costello appears not to be pressing for
judgment on his counterclaims for breach of
contract (Counterclaim Count III) and
violation of G.L.c. 93A (Counterclaim
Count IV).

Background
The following supplements Judge Sosman's
extensive factual summary in her Decision.

In 1960, Ward inherited a 57 acre lot on Cross
Street, Carlisle, Massachusetts. He had never worked
in the real estate business but hoped he could
"maximize his return" on the land. In the 1960s, he
began investigating the value of the property and, in
the 1970s, hired engineers to perform percolation
("perc") testing on the land. [FN4] The land
consistently "failed" the perc tests and yielded only
one buildable lot.

FN4. Perc testing, or measuring the rate at
which water seeps through the bottom of a
hole, provides an indication of a property's
development potential.

In 1981 and 1983, Ward received tax abatements
from the town because the value of his land was
"much lower" than the actual appraised value. In
1983, the assessed value of the land was
$193,000.00. In 1984, he classified the land as "forest
land" under G.L.c. 61, thereby entitling himself to the
property tax reduction benefit established by G.L.c.
61, § 3. In 1990, a company named Landvest opined
that, based on the perc tests submitted by Ward, his
property was "heavily constrained" and, hence, not
developable.

In the summer of 1997, Costello contacted Senkler, a
real estate broker with whom he did business, to
express his interest in purchasing Ward's land.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
15 Mass.L.Rptr. 644, 2002 WL 31973253 (Mass.Super.)
(Cite as: 2002 WL 31973253 (Mass.Super.))

Senkler informed Costello that the land was undevelopable and that it had a troubled soil history; however, she offered to introduce him to Ward. Senkler contacted Ward and proposed Costello's offer of $1.5 million for the land. According to Ward, Senkler, in their first conversation, "made only one remark that bears [on her role in the transaction], and that is that there would be no broker." Likewise, Costello made clear to Senkler that he was not enlisting her as his broker because he had no interest in paying a commission. Costello and Ward agreed to meet at Senkler's office on June 6, 1997.

**\*2** Senkler was not present in the conference room when Costello and Ward discussed the potential sale. When she entered the conference room to greet the two men, Ward asked, "How do you get paid?" Senkler replied that she was just introducing them and, therefore, no commission was due and payable. She further informed Ward that, notwithstanding the lack of commission, she "hoped" to obtain future listings if Costello developed the property; however, Senkler never asked Costello for the listings. Costello and Senkler never entered into an agreement for a broker's commission on the sale of the land.

At the meeting on June 6, 1997, Costello offered Ward $1.5 million for his 57 acres; and Ward was "very pleased" and "happy" with the price offered. Before the meeting with Costello, Ward felt that the land was not "percable," or developable, and, consequently, did not have sufficient market value. At no time did Ward disclose to Costello that the land yielded unsuccessful perc testing.

After the meeting, Ward wanted to review the proposed option contract and asked Senkler for a recommendation of an attorney. That contract, dated June 6, 1997, contained the following language: "[i]t is further agreed between the parties that no entity or person is acting in the capacity of a real estate broker in this matter and no commission shall be paid." Senkler recommended two attorneys, one in Acton and the other in Concord; Ward, however, wanted an attorney in Wellesley, where he resided. Senkler then recommended James Parent ("Parent"), an attorney with the firm of Parent & Godoff, who became Ward's legal representative. After his consultation with Parent, Ward signed on July 7, 1997, the proposed option agreement ("July Agreement"), under which Ward received a payment of $16,000.00, the first of four non-refundable payments, with the further understanding that Costello could investigate the land. The July Agreement contained the following clause: "[i]t is further agreed between the

parties that no entity or person is acting in the capacity of a real estate broker in this matter and no commission shall be paid."

Ward inquired of Parent about the relationship between Costello and Senkler. Parent speculated that Senkler hoped for future listings from Costello. Parent called Senkler and asked if she, indeed, was Costello's broker. Senkler told Parent that she had represented Costello in other subdivisions but had no current relationship with Costello regarding Ward's land. Senkler then sent Parent a marked-up copy of a 1988 listing she had for Costello. [FN5] Senkler never showed the document to Costello or Ward. [FN6] Costello and Senkler never discussed the terms of any listing she might obtain upon his purchase.

> FN5. Ward denies that this agreement was a rough draft and contends that it was a broker's agreement for future listings between Costello and Senkler. This bald assertion was unsupported by any facts in the record, however.

> FN6. The first time Costello saw this document was in December 1999.

In the fall of 1997, one of Costello's engineers, Joseph March ("March"), confirmed that access to the land was going to be "difficult." Costello contacted Senkler and informed her that testing had not gone well, that there were upland access issues, that additional land may be needed, and, for these reasons, that he wanted a reduction in purchase price. According to Ward, Senkler told him that Costello "investigated further" and that "further access was desirable and perhaps almost necessary." She asked for a reduction in price of $350,000.00. Ward declined the request. Senkler then arranged a meeting between Ward and Costello, which she did not attend. At the meeting, Costello told Ward that a second access would be highly advisable because the wetlands gave limited access to the property. Ward again refused to reduce the purchase price.

**\*3** Approximately two weeks later, Ward contacted Costello and agreed to a price reduction of $100,000.00. Despite having the opportunity to do so, Ward did not seek advice from either Senkler or Parent. He did not speak with Costello after their meeting, did not contact another real estate broker, did not hire an appraiser, and did not speak to anyone in the town regarding access to the wetlands before he agreed to reduce the price. In his own words, he arrived at the sale price by "intuition."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
15 Mass.L.Rptr. 644, 2002 WL 31973253 (Mass.Super.)
(Cite as: 2002 WL 31973253 (Mass.Super.))

On September 30, 1997, Costello and Ward entered into a new option agreement for the sale of Ward's fifty-seven acres of property for a total price of $1,461,000.00 ("September Agreement"). The September Agreement included the hereinbefore mentioned clause that specified that there was no real estate broker involved in the transaction.

Four months later, in January of 1998, Ward received a telephone call from Michael Anthony ("Anthony"), a real estate broker. Although Ward would not disclose the status of his land, Anthony nonetheless requested a meeting. At the encounter, Anthony informed Ward that the "price was too low" and recommended that he get a second legal opinion. Anthony further suggested that Ward consider an Internal Revenue Code Section 1031 exchange for property valued from $2.5 million to $3 million. Ward and Anthony met with Steven Lindsay, an attorney at the firm of Ropes & Gray, to determine if there was a legal theory under which Ward would not be bound by the September Agreement. Lindsay declined to represent Ward. Ward and Anthony then met with Eric Eisenberg ("Eisenberg"), an attorney at the firm of Hinckley, Allen & Snyder. From his first conversation with Eisenberg, Ward's desire was to avoid the agreement.

Fred Conroy ("Conroy"), Costello's attorney, contacted Parent because Costello was ready to execute the September Agreement and purchase Ward's land. Ward asked Eisenberg's advice as to whether to sign the final purchase and sale agreement ("P & S"), as he no longer trusted Parent. Eisenberg does not specifically recall what advice he gave; however, the relationship between Eisenberg and Ward terminated thereafter. Anthony then called Francis Balas, an attorney at the firm of Balas, Alphen & Santos, to review the P & S. Ward conceded that, at the time he signed that agreement, he knew through Anthony that comparable sales were fetching higher prices per acre; nevertheless, he signed the P & S on July 2, 1998. Just like the July and September Agreements, the P & S expressly stated that no real estate broker was involved in the transaction.

To date, Ward's land remains unsold to Costello or anyone else.

## Discussion
### I. Summary Judgment Standard

Summary judgment is appropriate when there are no genuine issues of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The party moving for summary judgment has the burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. See Community Nat'l Bank v. Dawes, 369 Mass. 550, 554 (1976). If the non-moving party in a summary judgment action, who has the burden at trial, has not proven a reasonable expectation of proving an essential element of that party's case, then summary judgment is appropriate. See Kourouvacilis v. General Motors Corp., 410 Mass. at 716. In deciding a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party. See G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991).

### II. Fraud and Misrepresentation

*4 Summary judgment is appropriate when the non-moving party fails to introduce competent evidence of an essential element of a claim. See Kourouvacilis, 410 Mass. at 716. The elements of fraud are: (1) a false representation, (2) of a matter of material fact, (3) with knowledge of its falsity, (4) for the purpose of inducing action thereon. See Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982); see also Alpine v. Friend Brothers, Inc., 244 Mass. 164, 167 (1923).

The defendants [FN7] assert that they never made false representations of material fact to Ward and, further, that all their statements are non-actionable opinions; therefore, summary judgment is appropriate as a matter of law. Ward counters that Senkler and Costello fraudulently represented the following: (1) Senkler's relationship with Costello, (2) the value of Ward's land, and (3) the fact that the perc tests "came out poorly." Ward also alleges that Costello fraudulently induced him into signing a contract for the property at a reduced price.

> FN7. "Defendants" in this context refers to Costello and Senkler. Ward contends that defendants Senkler Real Estate, Inc., and Senkler Hunneman Real Estate, Inc., are responsible for the acts or omissions of Senkler under the doctrine of respondeat superior (Count X). Therefore, any liability of the corporate defendants would be wholly derivative of and determined by any liability on Senkler's part.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
15 Mass.L.Rptr. 644, 2002 WL 31973253 (Mass.Super.)
(Cite as: 2002 WL 31973253 (Mass.Super.))

Page 4

A. Relationship Between Costello and Senkler

The defendants are entitled to summary judgment in this regard for the simple reason that Ward does not have a reasonable expectation of proving that Senkler and Costello misrepresented their relationship. See *Kourouvacilis,* 410 Mass., *supra.* In fact, all the evidence in the record points to the contrary. Throughout the course of the negotiations between Ward and Costello, Senkler maintained that she represented no one and was acting merely as a facilitator. In her first conversation with Ward, Senkler explicitly told him that she was no one's broker and only "hoped" for future listings from Costello. There is no evidence that Costello ever consented to Senkler acting as his exclusive broker; and Senkler never received a commission nor signed a broker's agreement with Costello in relation to the purchase of Ward's property. [FN8] In addition, each agreement containing Ward's signature (July Agreement, September Agreement, and P & S) clearly stated that no real estate broker is involved in the transaction. Accordingly, as Ward will be unable to prove that Senkler and Costello made a false representation, summary judgment is appropriate for the defendants in this regard.

> FN8. Failure to show mutual consent is fatal to a claim alleging breach of fiduciary duty. See *Kirkpatrick v. Boston Mutual Life Insurance Co.,* 393 Mass. 640, 645 (1985).

B. The value of Ward's Land

Senkler seeks summary judgment because she did not falsely represent the value of Ward's land. [FN9] Ward, on the other hand, claims that each statement made by Senkler concerning the value of his property gives rise to fraud and, thus, liability on her part. The court agrees with Senkler.

> FN9. Ward claims that the following scenarios are all actionable: (1) when Senkler conveyed Costello's offer of $1.5 million to Ward, he got the "impression" that the price was the fair market value; (2) Senkler failed to tell Ward that the $1.5 million was not a fair market price; (3) Senkler "convinced" Ward to accept the offer from Costello because she "touted" Costello as "very successful"; and (4), after Ward agreed to a price reduction, Senkler called Ward to congratulate him.

Property value estimates or, false statements concerning market value are opinions, judgment, or "seller's talk," none of which is actionable. See *Yerid v. Mason,* 341 Mass. 527, 530 (1960); *Gaucher v. Solomon,* 279 Mass. 296, 299 (1932); *Schwanbeck v. Federal Mogul Corp.,* 31 Mass.App.Ct. 390, 410 (1991). Furthermore, the statements made by Senkler to Ward regarding the value of his property do not lead to a reasonable inference that Senkler knowingly communicated a false material fact. See *Gaucher v. Solomon,* 279 Mass., *supra.* At the time she expressed the value of Ward's land, Senkler knew that the perc test results performed by Ward throughout the 1960s, 1970s, and 1980s were unsuccessful. Additionally, in her initial conversation with Costello, Senkler cautioned him that the land was undevelopable and had a troubled soil history. Based on these facts, it is unreasonable to infer that in 1997 Senkler knew the price offered was below market value without engaging in pure speculation.

*5 Moreover, at the time he received the offer, Ward was "very pleased" and "happy." Based on the unsuccessful attempts to develop the land, he assumed that $1.5 million was a fair price. It is reasonable to infer that, since Ward's frequent testing yielded unfavorable results and he received tax abatements from the town by claiming that "the value of the land [was] much lower than otherwise," Ward himself did not believe the land to be worth very much. He provides only bare assertions that Senkler falsely represented the value of his property. Absent evidence to the contrary, his mere contentions are insufficient to show a likelihood of success at trial; and, thus, summary judgment is proper.

C. Results of the Testing and Fraudulent Inducement

The defendants aver that summary judgment is proper on this score because Ward did not provide evidence supporting his allegations of fraud and fraud in the inducement concerning the results of the testing on the property. Ward, in turn, alleges that a genuine issue of material fact exists as to the test results because (1) March, Costello's engineer, claimed that the testing had gone rather well; (2) Ward, in his second amended complaint, asserted that Senkler and Costello said the "testing came out poorly"; (3) Costello told Ward that there were access problems and that he needed to reduce the price; and (4) Ward thought the deal would terminate had he not reduced the price. The defendants' reasoning once again prevails here.

The elements required to prove fraud in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
15 Mass.L.Rptr. 644, 2002 WL 31973253 (Mass.Super.)
(Cite as: 2002 WL 31973253 (Mass.Super.))

Page 5

inducement are: (1) a misrepresentation of material fact, (2) made to induce action, (3) and reasonable reliance on the false statement to the detriment of the actor. See *Commerce Bank & Trust Co. v. Hayeck*, 46 Mass.App .Ct. 687 at 692 (1999), citing *Hogan v. Riemer*, 35 Mass.App.Ct. 360, 365 (1993). "Reliance is an element of actionable fraud." *Nei v. Burley*, 388 Mass. 307, 311 (1983), citing *Kilroy v. Barron*, 326 Mass. 464, 465 (1950).

Ward refused to reduce the price when Senkler called him and allegedly informed him that the results came out poorly. At his meeting with Costello, Ward refused to reduce the price again after hearing Costello's reasons first-hand as to why a price reduction was warranted. Finally, two weeks after Ward and Costello met, Ward contacted Costello and agreed to a $100,000.00 price reduction, which was $250,000.00 less than Costello's original request. During the two weeks of deliberation, Ward did not contact Senkler or Parent, even though he understood he could, did not consult the test results, and did not hire an appraiser; and there is no indication that he spoke with March about his findings made in fall 1997. [FN10] In the end, he made the decision based on "intuition," not reasonable reliance.

> FN10. Ward also claims that Costello breached the implied covenant of good faith and fair dealing and induced him into a price reduction. However, the facts do not support his contention that Costello misrepresented the test results or that he wanted a reduction in price. It was Ward who agreed to the price reduction after two weeks of consideration. There is no evidence that Costello acted in bad faith, lied to, or did not deal fairly with Ward; therefore, summary judgment is proper. See *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 474 (1991).

Given that reliance is an essential element of fraud, it is unreasonable for Ward, having the opportunity to consult test results and speak with his attorney, allegedly to have relied on the purported statements by Costello and Senkler to make his decision to reduce the purchase price. See *Nei v. Burley*, 388 Mass. at 311 (seller and broker knew of seasonal stream and did not tell buyer; but buyer saw a report of the tests, met with the land surveyor, and then signed the purchase and sale agreement; buyer's failure to ask the land surveyor about the tests demonstrated that she did not rely on any representation of the defendants). As matter of law,

Ward's reliance on the statements was unsound, given his ample opportunity to view the results and to consult with professionals who specialize in real estate.

*6 Furthermore, the evidence in the record supports the conclusion that Senkler's statement about the testing constituted a mere opinion. Senkler spoke with Costello who, with first-hand information about the results, informed her that he needed to purchase additional land because of the negative information contained in the results; and she conveyed Costello's position to Ward. Senkler did not investigate the results and did not question their validity. In addition, Senkler knew of the troubled soil history relating to the property. It is reasonable to infer that Senkler believed that the tests done by Costello yielded results similar to those over the previous thirty years. For all these reasons, the representation made by Costello, passed on to Ward via Senkler, would not subject them to liability. Accordingly, summary judgment is appropriate for the defendants in this instance.

### III. Civil Conspiracy

Ward complains that Costello and Senkler misrepresented the latter's "true role" in the transaction and together breached the implied covenant of good faith and fair dealing, thereby engaging in a civil conspiracy. The defendants counter that summary judgment is justified because the undisputed facts fail to establish the required elements amounting to a civil conspiracy. See *Kurker v. Hill*, 44 Mass.App.Ct. 184, 188-89 (1998) (holding that Massachusetts provides two ways to find civil conspiracy: the first one requires coercion, and the other depends on proof of underlying tortious acts in which two or more persons acted in concert and in furtherance of a common design or agreement). They contend that the facts supporting coercion and common plan or agreement are conspicuously absent from the record.

"The doctrine [of civil conspiracy] appears to be reserved for application to facts which manifest a common plan to commit a tortious act where the participant knew of the plan and its purpose and took affirmative steps to encourage the achievement of the result." *Stock v. Fife*, 13 Mass.App.Ct. 75, 82 n. 10 (1982). Ward's assertion that Senkler and Costello are guilty of civil conspiracy is grounded in ambiguous inferences unsupported by the record. The facts do not indicate that Costello and Senkler intentionally planned to deceive Ward. Moreover, the evidence

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                                                                                          Page 6
15 Mass.L.Rptr. 644, 2002 WL 31973253 (Mass.Super.)
**(Cite as: 2002 WL 31973253 (Mass.Super.))**

does not support Ward's allegation of conspiracy since Costello never promised Senkler compensation if the price was accepted, never offered her the potential listings if the sale succeeded, and never entered into an agreement with her for commissions regarding Ward's property. Without anything more than conclusory reasoning to substantiate his claim for civil conspiracy, Ward has no likelihood of success at trial; and, therefore, summary judgment in the defendants' favor is warranted. See *Kourouvacilis v. General Motors Corp.*, 410 Mass. at 711.

IV. Breach of Fiduciary Duty

Ward contends that there are material facts in dispute regarding the defendants' relationship to him; and, thus, summary judgment on his claim for breach of fiduciary duty is inappropriate. The defendants respond that summary judgment is proper because they were not agents for Ward and, therefore, no fiduciary duty exists. The defendants are correct.

*7 The elements of breach of fiduciary duty are: (1) existence of a duty that is fiduciary in nature based upon the relationship of the parties, (2) breach of that duty, (3) damages, and (4) a causal connection between breach of the duty and the damages. See *Hanover Ins. Company v. Sutton*, 46 Mass.App.Ct. 153, 164 (1999). In order for a party to be a fiduciary, there must be mutual consent. See *Kirkpatrick v. Boston Mutual Life Ins. Co.*, 393 Mass. at 645; *Theos & Sons Inc. v. Mack Trucks, Inc.*, 431 Mass. 736, 742 (2000). The Restatement (Second) of Agency, § 15, specifically states, "[a]n agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." Furthermore, comment b adds: "[t]he agency relation exists only if the agent consents to it. A person may, by his sole act, create a power in another to act on his account, but since agency is a fiduciary relation, it can exist only if the other accepts power." Restatement (Second) of Agency § 15, cmt. b.

There is not a scintilla of evidence that Costello ever acted as Ward's agent or fiduciary; and neither defendant consented to a fiduciary relationship with Ward. [FN11] Additionally, Ward never asked Senkler to represent him, never paid her a commission, never listed his property with her, never had her show the property to Costello or any other buyer, and never gave confidential information to her. Similarly, Senkler did not ask Ward to be his agent, did not request that he sign a broker's agreement, and did not act on his behalf. An agency

relationship was not created simply because Senkler introduced Ward to Costello and sporadically assisted both of them in their negotiations.

> FN11. The court rejects Ward's further argument that Costello's fiduciary duty arises from Addendum A in the First Option Contract, paragraph C, and agrees with Costello that the two men engaged in an arm's length transaction and that the purpose of paragraph C was to benefit Costello, not to create an "agency relationship."

Furthermore, Ward admits that, during their first conversation, Senkler told him there would be no broker involved in the sale. At a meeting on June 6, 1997, Senkler again advised him that she was not his real estate broker; and no brokerage contract was ever entered into. The July Agreement and its successor, the September Agreement, included the following clause: "(G) It is further agreed between the parties that no entity or person is acting in the capacity of a real estate broker in this matter and no commission shall be paid." Additionally, the P & S entered into on July 2, 1998 contained similar language: "Broker's fee: there is no real estate broker." The undisputed facts demonstrate an absence of mutual consent, no existence of a fiduciary duty, and sufficient grounds for judgment as a matter of law in favor of the defendants on this count.

V. Violation of G.L.c. 93A Against Senkler and Costello

Ward argues that the "various wrongs" of Costello and Senkler, in conspiracy with each other, give rise to a violation of G.L.c. 93A. [FN12] He bases his claim on the identical set of allegations supporting his other claims. However, given that the court has found the defendants not liable of those wrongs as aforesaid, summary judgment for the defendants is proper. [FN13]

> FN12. The various wrongs which Ward relies on are: (1) fraud, (2) breach of implied covenant of good faith and fair dealing, and (3) violation of the regulation designed to protect public welfare.

> FN13. Ward's reliance upon the case of *Jet Line Services, Inc. v. American Employers Ins. Co.*, 404 Mass. 706, 716 (1989), for the proposition that a violation of c. 93A is an independent cause of action is inapposite.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
15 Mass.L.Rptr. 644, 2002 WL 31973253 (Mass.Super.)
(Cite as: 2002 WL 31973253 (Mass.Super.))

## VI. Counterclaim for Violation of G.L.c. 93A. § 11

**\*8** Costello filed a counterclaim against Ward for violation of G.L.c. 93A, § 11, alleging that the latter used unfair or deceptive acts or practices in trade or commerce. He maintains that Ward, a private individual who executed an agreement for the sale of real estate in a business context, can be sued for a violation of the statute. He further contends that the inquiry into whether a private individual is a participant in a "business context" is a factual one to be decided by a factfinder. Ward moves for summary judgment on this count, arguing that he is a consumer, not a businessman, engaged in a private transaction and, as such, falls outside the scope of Chapter 93A as a matter of law.

Chapter 93A makes unlawful "unfair methods of competition" and "unfair or deceptive acts and practices in the conduct of any trade or commerce." G.L.c. 93A, § 2. The Supreme Judicial Court found that the applicability of G.L.c. 93A is subject to a "dual inquiry." See _Szalla v. Locke,_ 421 Mass. 448, 451-52 (1995). First, the court assesses whether the interaction is commercial in nature and then evaluates whether the parties both engaged in "trade or commerce" and acted in a "business context." _Id._ citing G.L.c. 93A, § 11. This question requires a factually sensitive analysis that is determined on a case-by-case basis. See _Linkage Corp. v. Trustees of Boston University,_ 425 Mass. 1, 26 (1997).

Relying upon _Lantner v. Carson,_ 374 Mass. 606, 608 (1978), Ward claims that his property was inherited and, thus, that the sale of the family property is strictly a private transaction. Like the plaintiff in _Lantner,_ he submits that he is not engaged in the real estate business but, rather, is clearly a consumer involved in a private, nonprofessional transaction. However, the Supreme Judicial Court has held that G.L.c. 93A, § 11 does not require that a commercial transaction take place only in the ordinary course of a person's business or occupation before its participants may be subject to liability. See _Begelfer v. Najarian,_ 381 Mass. 177, 191 (1980). What is required is that the isolated transaction take place in a "business context." See _id._ Therefore, depending on whether the isolated transaction took place in a business context, Ward could be liable under c. 93A. [FN14]

> FN14. The question of whether a private individual's participation in an isolated transaction takes place in a business context is for a factfinder to decide after analyzing several relevant factors. See _Begelfer v._

_Najarian,_ 381 Mass. at 191. The following factors are considered: (1) the nature of the transaction, (2) the character of the parties involved, (3) the activities engaged in by the parties, (4) whether similar transactions have been undertaken in the past, (5) whether the transaction is motivated by business or personal reasons (as in the sale of a home), and (6) whether the participant played an active part in the transaction. _Id._

The evidence establishes that Ward sold his property to Costello for financial gain, attempted numerous times to set aside the agreement by consulting attorneys, claimed that the land was undervalued each time he sought out a consultation, and actively participated in negotiating the agreements with Costello and in setting aside the final P & S. Whether the sale of Ward's land was done in a business context is a question of fact for a factfinder and, therefore, not amenable to summary judgment.

## VII. Specific Performance

Costello seeks specific performance of the P & S, in which Ward agreed to sell his 57 acre property to Costello in exchange for $1,451,000.00. Ward argues that Costello is not entitled to specific performance because Costello breached the parties' contract, fraudulently induced him into signing agreement at a reduced price, and has "unclean hands." He also asserts that enforcement of the agreement is unconscionable because the sale price grossly undervalued the market price.

**\*9** It is well settled in this Commonwealth that real property is unique and that money damages usually are inadequate to remedy a loss of an interest in land. _McCarthy v. Tobin,_ 429 Mass. 84, 89 (1999), citing _Greenfield Country Estates Tenants Ass'n., Inc. v. Deep._ 423 Mass. 81, 88 (1996). "Specific performance is a proper remedy to enforce a valid option to purchase real property." _Greenfield Country Estates Tenants Ass'n., Inc.,_ 423 Mass. at 89. A judge has considerable discretion with respect to granting specific performance in disputes involving the conveyance of land. See _Raynor v. Russell,_ 353 Mass. 366, 367 (1967). Specific performance, an equitable remedy, should not be granted in those special circumstances where it would impose an undue hardship on one party or allow the other to obtain an inequitable advantage. See _Greenfield Country Estates Tenants Ass'n., Inc. v. Deep,_ 423 Mass. at 90 (citations omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
15 Mass.L.Rptr. 644, 2002 WL 31973253 (Mass.Super.)
**(Cite as: 2002 WL 31973253 (Mass.Super.))**

Page 8

The evidence in the record supports the conclusion that Costello and Ward have an enforceable contract and that Costello is ready, willing, and able to perform. Ward, on the other hand, has failed to adduce sufficient facts to prove that he was deceived and tricked into signing the final agreement or that Costello and Senkler conspired against or misled him. On the contrary, he agreed to the selling price after due deliberation and extensive consultation with several attorneys and real estate brokers. Thus, there is a complete lack of evidence that Costello comes before this court with "unclean hands." Moreover, the only party to suffer a hardship in this case is Costello, who has been deprived of his rightful ownership of this land for many years. Under the circumstances, the court finds that the remedy of specific performance of the P & S to be appropriate.

### ORDER

For all the foregoing reasons, it is hereby ORDERED that:

1. Plaintiff Ward's motion for summary judgment as to Costello's counterclaim for violation of G.L.c. 93A (Counterclaim Count IV) be *DENIED;*

2. Defendant Costello's motion for summary judgment as to Counts III (misrepresentation and fraud), IV (breach of implied covenant of good faith and fair dealing), V (breach of fiduciary duty), VI (civil conspiracy), and IX (G.L.c. 93A violations) of the complaint and as to Count II of his counterclaim (specific performance) be *ALLOWED;* and

3. The motion for summary judgment of defendants Senkler; Senkler Real Estate, Inc.; and Senkler Hunneman Real Estate, Inc. as to Counts III (misrepresentation and fraud), VI (civil conspiracy), VII (breach of fiduciary obligation), VIII (G.L.c. 93A violations), and X (*respondeat superior*) of the complaint be *ALLOWED.*

15 Mass.L.Rptr. 644, 2002 WL 31973253 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.