UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN H. CLEVETT, )<br>)<br>    Plaintiff )<br>)<br>v. )<br>)<br>NORESCO, LLC, )<br>EQUITABLE RESOURCES, INC., and )<br>JOSEPH E. O'BRIEN )<br>)<br>    Defendants. )<br>) | Civil Action No. 05-40020 FDS |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE AMENDED COMPLAINT AND JURY DEMAND AND MOTION TO DISMISS COUNTS III THROUGH X OF PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff, Stephen H. Clevett ("Clevett"), hereby respectfully opposes defendants', NORESCO, LLC ("NORESCO"), Equitable Resources, Inc. ("EQT"), and Joseph E. O'Brien ("O'Brien") (collectively, "defendants") Motion to Strike Amended Complaint and Jury Demand ("defendants' Motion to Strike") and Motion to Dismiss Counts III through X of Clevett's Complaint ("defendants' Motion to Dismiss").  As argued below, defendants' Motion to Strike is not only without merit but at base is simply an attempt to make Clevett jump through procedural hoops to add a party that defendants acknowledge is critical to the adjudication of this matter. Further, defendants' Motion to Dismiss mistakenly attempts to paint this action as a "simple employment contract dispute" in an effort to narrow Clevett's claims.  As argued below, Clevett's Amended Complaint alleges conduct on the part of the defendants that goes far beyond a simple employment contract dispute, including allegations tied to defendants' conduct that occurred <u>after</u> Clevett's employment relationship with the defendants.  Simply put, Clevett's complaint states a cause of action under each of the counts that are alleged therein, and for this

reason, under Fed. R. Civ. P. 12(b)(6), defendants' Motion to Dismiss must be denied in its entirety.

## PROCEDURAL BACKGROUND

On November 30, 2004, Clevett commenced a civil action in Worcester Superior Court styled <u>Stephen H. Clevett v. Equitable Resources, Inc. and Joseph E. O'Brien</u>, Civil Action No. 2004-02334-B, by filing a Complaint and Jury Demand (the "Complaint"). The Complaint, which contained ninety-four (94) paragraphs and was seventeen (17) pages long, set forth ten (10) counts against EQT, and O'Brien arising out of defendants' unlawful termination of Clevett's employment, after fraudulently inducing Clevett to accept such employment; and defendants' subsequent refusal to pay Clevett severance and other monies owed to him pursuant to the parties' agreement.

As set forth in the Complaint, Clevett asserted the following causes of action: (1) breach of contract against EQT (Count I); (2) breach of the covenant of good faith and fair dealing against EQT (Count II); (3) fraudulent misrepresentation against EQT (Count III); (4) fraudulent misrepresentation against O'Brien (Count IV); (5) negligent misrepresentation against EQT (Count V); (6) negligent misrepresentation against O'Brien (Count VI); (7) tortious interference with contract against O'Brien (Count VII); (8) civil conspiracy against EQT and O'Brien; (9) violation of Mass. Gen. Laws ch. 93A §§2 and 11 against EQT (Count IX); and (10) violation of Mass. Gen. Laws ch. 93A §§2 and 11 against O'Brien (Counts X).

On January 31, 2005, defendants filed a Notice of Removal, which petitioned this Court to remove the instant action to federal court on the grounds that O'Brien was "fraudulently joined;" that is, named as a defendant in this action to defeat complete diversity despite the fact that Clevett allegedly is unable to state a claim against O'Brien. On February 17, 2005, Clevett filed a Motion to Remand the action back to state court. As of the date of this opposition, the Court has yet to rule on Clevett's Motion to Remand.

On April 29, 2005, EQT and O'Brien filed and served their Motion to Dismiss Counts III through X of Plaintiff's Complaint and Jury Demand. On June 10, 2005, and as permitted as of right without leave of court under Fed. R. Civ. P. 15(a), Clevett filed and served his Amended Complaint and Jury Demand (the "Amended Complaint"). Prior to serving the Amended Complaint, which added NORESCO as a party to the action, Clevett's counsel notified EQT's and O'Brien's counsel that Clevett would be filing the Amended Complaint adding NORESCO as a party on the grounds that NORESCO, which is a wholly owned subsidiary of EQT, should have been named as a party to this action in the original complaint. Outside of the addition of NORESCO as a party and as a defendant to all claims alleged against EQT, the Amended Complaint is substantially the same as the Complaint. In addition, defendant's Motion to Dismiss is directed at the Amended Complaint.

## FACTUAL BACKGROUND

In brief, and as elaborated further herein, this is a civil action arising out of defendants' unlawful termination of Clevett's employment, after fraudulently inducing Clevett to accept such employment, and without "cause" as defined by the parties' agreement. See Amended Complaint. In addition, this action concerns defendants refusal to pay Clevett severance and other monies owed to him pursuant to the parties' agreement and pursuant to an independent consulting arrangement set up less than one week after Clevett's employment was terminated. See id.

## ARGUMENT

**I.    DEFENDANTS' MOTION TO STRIKE IS ENTIRELY WITHOUT MERIT**

Defendants have moved to strike the Amended Complaint on the grounds that Clevett allegedly failed to comply with the procedural prerequisites to add NORESCO as a party to this action. Clevett was entitled to amend the Complaint once as of right and without leave of court

because defendants' have not filed a responsive pleading in this action.  Under Fed R. Civ. P. 15(a), a party may amend "once as a matter of course at any time before a responsive pleading is served."  Because EQT's and O'Brien's initial motion to dismiss did not constitute a responsive pleading, see Dartmouth Review v. Dartmouth College, 889 F.2d 13, 22 (1st Cir.1989), Clevett was not required to seek leave of Court to amend the complaint to add NORESCO.  See Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 59 n.8 (1st Cir.1990).

As an initial position, defendants' argue that because the Amended Complaint added a party, Clevett was required to file a motion to join a party under Fed. R. Civ. P. 21, which governs the misjoinder and non-joinder of parties.  Perhaps recognizing that Fed. R. Civ. P. 21 is inapplicable to the instant case, defendants next invoke Local Rule 15.1, which specifically addresses the procedural requirements for adding a party by motion, and includes a requirement that the moving party serve a motion on the party to be added ten days prior to the filing of the motion.  Upon closer examination of the procedural posture of this matter, however, it is clear that neither rule is applicable to the instant case.  First, Fed. R. Civ. P. 21 is clearly trumped by the more specific Local Rule 15.1.  Second, both Fed. R. Civ. P. 21 and Local Rule 15.1 apply to a situation where a plaintiff may only amend his complaint by motion.  Specifically, Fed. R. Civ. P. 21 provides in pertinent part that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."  Fed. R. Civ. P. 21 (emphasis added.)  Similarly, Local Rule 15.1(B) provides that "[a] party moving to amend a pleading to add a party shall serve, in the manner contemplated by Fed. R. Civ. P. 5(b), the motion to amend upon the proposed new party at least ten days in advance of filing the motion …"  Local Rule 15.1(B) (emphasis added.)  Here, under Fed. R. Civ. P. 15(a), Clevett was entitled to amend the Complaint as of right, and accordingly, there was no need of a

motion. As such, Fed. R. Civ. P. 21 and Local Rule 15.1 are inapplicable and therefore do not provide a basis for striking Clevett's complaint.

Further, the sole case that defendants rely on to interpret the application of Local Rule 15.1 is inapposite. In that case, <u>Ali v. University of Massachusetts Medical Center</u>, 140 F. Supp. 2d 107 (D. Mass. 2001), the plaintiff sought to amend his complaint a third time to add an additional party. Under Fed. R. Civ. 15, the plaintiff was required to do so by motion and therefore was required to comply with the procedural mandates of Local Rule 15.1. <u>See id.</u> at 111. The plaintiff in that matter failed to comply with Local Rule 15.1, and as a result, the court denied his motion to amend. <u>See id.</u> Conversely, in this action Clevett has amended his complaint for a <u>first</u> time, which, under Fed. R. Civ. P. 15(a), means that Clevett did not need to file and serve a motion seeking leave of court to amend the Complaint.

Last, and perhaps most importantly, defendants here are seeking to elevate procedure over the merits of the case. In the event that the Court finds that Clevett should have complied with Local Rule 15.1, Clevett will simply file a motion to amend the Complaint, and subsequently will add NORESCO as a party to the action. Notably, defendants do not claim that NORESCO is not a proper party to this action, nor could they based on the allegations contained in the Amended Complaint. Further, even though Clevett did not comply with the written requirements of Local Rule 15.1, defendants (including NORESCO, which is represented by the same counsel EQT and O'Brien) were made aware by at least one phone call in advance that Clevett would be filing an amended complaint adding NORESCO as a party. As such, defendants, and NORESCO in particular, were in no way prejudiced by Clevett's purported failure to comply with Local Rule 15.1. Under these circumstances, defendants' Motion to Strike should be denied.

## II. DEFENDANTS' MOTION TO DISMISS MUST BE DENIED

Motions to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim are generally viewed with disfavor by the federal judiciary because of its strong policy of determining cases on their merits. Drunker v. Sullivan, 334 F. Supp. 861, 863 (D. Mass. 1971). In reviewing such a motion, a court must accept the allegations of the complaint as true, "drawing all reasonable inferences in favor of the plaintiff." Albright v. Oliver, 510 U.S. 266, 268 (1994). "[I]f under any theory, the allegations are sufficient to state a cause of action in accordance with the law," a motion to dismiss must be denied. Vartanian v. Monsanto Co., 14 F.3d 697, 700 (1st Cir. 1994).

As demonstrated by reference to the Amended Complaint, and the appropriate legal standards, the Amended Complaint easily passes muster under the motion to dismiss standard. First, Clevett's claims for violation of Mass. Gen. Laws c. 93A ("Chapter 93A") are based on more than just his employment relationship with defendants. Indeed, as clearly stated in the Amended Complaint, defendants' unlawful conduct toward Clevett occurred not only during the course of his employment, but after his employment relationship ended. Second, Clevett's claim for intentional interference with contractual relations sufficiently alleges that O'Brien's actions were motivated by actual malice and were unrelated to a corporate or business interest. Third, Clevett's claims for fraudulent and negligent misrepresentation survive because Clevett reasonably relied on defendants' representations. Last, Count VIII of the Amended Complaint, which alleges civil conspiracy against defendants, rises and falls with Clevett's ability to maintain those causes of action that support tortious activity. Because the Complaint adequately alleges tortious activity (and sufficiently alleges a civil conspiracy claim at the motion to dismiss stage), defendants' attempts to dismiss Clevett's motion to dismiss must be denied.

A. **CLEVETT HAS ALLEGED CLAIMS UNDER CHAPTER 93A BASED ON CONDUCT OUTSIDE OF HIS EMPLOYMENT RELATIONSHIP WITH EQT AND NORESCO**

Throughout their Motion to Dismiss, defendants' attempt to define this matter as a "simple employment contract dispute" in an effort to whittle away at Clevett's causes of action. See Defendants' Memo. at 2. With respect to Chapter 93A, this argument is particularly powerful because the general rule is that employment disputes do not give rise to liability under the statute. Defendants' argument, however, completely ignores the allegations in the Amended Complaint concerning defendants' conduct which occurred after Clevett's employment relationship with EQT/NORESCO was terminated, which provides an independent basis for liability under Chapter 93A. Specifically, less than one week after Clevett's employment was terminated, O'Brien requested that Clevett work under a "consulting agreement" with defendants' on the Colton project. See Amended Complaint, ¶¶25-32. Clevett performed work under this agreement and provided information that was specifically requested by O'Brien following completion of such work, and defendants never paid Clevett for his services under the agreement. See id. Because this work was performed by Clevett as an independent contractor, defendants' conduct supports a claim under Chapter 93A. See Schinkel v. Maxi-Holding, Inc., 30 Mass. App. Ct. 41, 49 (1991) (declining to dismiss Chapter 93A claim arising out of independent consulting agreement entered into between former employee and employer).

B. **COUNT VII OF THE AMENDED COMPLAINT SETS FORTH A CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AGAINST O'BRIEN**

Defendants' argument that Clevett has failed to allege that O'Brien has a spiteful and malignant purpose unrelated to a legitimate corporate interest, and therefore cannot maintain his tortious interference with contractual relations cause of action, is entirely without merit. Although under Massachusetts law "a supervisor or a manager enjoys a qualified privilege from liability when performing actions within the scope of his or her normal employment duties, the

privilege does not shield an employee whose actions are intentional and improper in motive or means." Ruffino v. State Street Bank & Trust Co., 908 F. Supp. 1019, 1050 (D. Mass. 1995) (internal citations omitted) (denying summary judgment on employee's tortious interference with contractual relations against supervisor). Translating this standard to Clevett's tortious interference with contract claim against O'Brien, a court would need to determine whether O'Brien's actions rise to the level of "actual malice." See id.

At this stage of the case, it is the defendants who need to prove that Clevett has no possibility of stating a claim against O'Brien, and O'Brien has the specific burden of establishing the existence of the qualified privilege upon which he relies as a defense. Williams v. B&K Medical Systems, Inc., 49 Mass. App. Ct. 563, 574 (2002). Defendants simply cannot meet this high burden. First Clevett's Amended Complaint contains more than simply a conclusory reference to malice. Specifically, in addition to an allegation of actual malice, see Complaint at ¶79, the Amended Complaint contains highly detailed allegations demonstrating that O'Brien, *inter alia*, intentionally, (1) induced Clevett to relocate his family to Massachusetts, see id., ¶9; (2) diminished Clevett's duties with EQT without cause, see id. at ¶18; (3) terminated Clevett's employment allegedly for cause, but with no explanation, thereby depriving Clevett of the benefits of his employment contract, see id. at ¶¶22-24; (4) attempted to rehire Clevett as a consultant less than one week after terminating his employment; see id. at ¶¶25-28; and (5) withdrew his offer of the aforesaid consulting position without notice after inducing Clevett to spend time and his own money at EQT's expense, see id. at ¶¶25-32. Looking to the allegations of the Amended Complaint alone, Clevett has sufficiently alleged facts whereby an inference could be drawn that O'Brien acted with actual malice and outside of any corporate or business interest in terminating Clevett's employment. See, e.g., Rufino, 908 F. Supp. at 1050-51; O'Brien v. New England Telephone & Telegraph Co., 422 Mass. 686, 687 (1986) (finding

that jury could reasonably have found that supervisor maliciously interfered with employee's contractual rights).

Moreover, the determination of whether O'Brien acted with actual malice, is a "question that is consummately fact-bound" and is best left for a fact-finder. See Ruffino, 908 F. Supp. at 1051. Put another way, whether O'Brien acted with actual malice would be determined, at earliest, at the motion for summary judgment stage, or more likely still, at trial. At this juncture Clevett has not had an opportunity to conduct discovery, and, therefore has not had an opportunity to demonstrate that O'Brien's conduct was unrelated to a legitimate corporate or business purpose. Under these circumstances, where the Amended Complaint alleges facts sufficient to support Clevett's tortious interference with contractual relations claim, defendants' motion to dismiss must be denied.

      **C.    THE AMENDED COMPLAINT SUFFICIENTLY STATES CLAIMS FOR FRAUDULENT AND NEGLIGENT MISREPRESENTATION AGAINST DEFENDANTS**

In order to state a claim for fraudulent misrepresentation, a plaintiff must allege that the "defendant made a false representation of a material fact with knowledge of its falsity, that the defendant made the statement for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon that statement to his or her detriment." Bolen v. Paragon Plastics, Inc., 754 F. Supp. 221, 226 (D. Mass. 1990). The only difference for a negligent misrepresentation claim is that plaintiff need not demonstrate that the defendant had actual knowledge of the falsity of the representation. See Masso v. United Parcel Service of America, Inc., 884 F. Supp. 610, 615 (D. Mass. 1995).

Defendants correctly note that the misrepresentations at issue in this matter can be broken into two categories. The first category includes defendants' representations to Clevett to induce him to accept employment with NORESCO/EQT, to transfer to Massachusetts, and to eventually move his family to Massachusetts. See Amended Complaint at ¶¶8-15. Specifically, these

- 9 -

representations and the facts germane to Clevett's claim, all of which are set forth in full detail in the Amended Complaint, can be summarized as follows:

- Prior to being hired as a Vice President of Business Development out of NORESCO's branch office in Vienna, Virginia in August 2001, O'Brien, who was Clevett's supervisor, orally promised Clevett that he would be promoted to Senior Vice President of the Energy Infrastructure Division (the "EI Division"), by the end of December 2001. See Amended Complaint at ¶¶8-9.

- "O'Brien informed Clevett that this proposed promotion would require Clevett to permanently move from Maryland to Massachusetts, and reassured Clevett that the EI Division was, and would continue to be, a valued part of NORESCO's business." Id. at ¶10.

- "Despite his promises, O'Brien and NORESCO did not formally offer Clevett the promised promotion until February 22, 2002." Id. at ¶11.

- "As a result of O'Brien's delay in effecting the promotion, in January 2002 Clevett was forced to re-enroll his daughter in school in Maryland in order to reserve a placement for the 2002-2003 school year." Id. at ¶12.

- "In reliance on O'Brien's promise of promotion and continued assurances that the EI Division was a valued part of the NORESCO's business, Clevett: (i) commuted between Maryland and Massachusetts on weekly basis from February 2002 to September 2003, (ii) made a significant deposit to have a new home constructed in Ashland, Massachusetts in February 2003; (iii) moved his family to Ashland in September 2003." Id. at ¶13.

For each of the statements at issue, Clevett has alleged that these statements were made intentionally or in the alternative, were made negligently, and that Clevett reasonably relied on defendants' statements. Id. at ¶¶ 42-75.

The second category of representations concerns statements made by O'Brien to Clevett in order to induce Clevett to attend a business meeting in California as an independent consultant for NORESCO/EQT. Id. at ¶¶ 25-32. Importantly, Clevett in fact attended this business meeting, incurred expenses in so doing and, provided information regarding the meetings to defendants at their request, all without receiving compensation for his services. Id. The second

category of representations and the facts germane to Clevett's claim, all of which are set forth in full detail in the Amended Complaint, can be summarized as follows:

- On December 19, 2003, or less than one week after the termination letter was sent to Clevett, "O'Brien requested that Clevett meet with O'Brien and representatives of the City of Colton, California ("Colton"), to discuss an ongoing project that NORESCO was performing for Colton (the "Colton project")." Id. at ¶ 25.

- "On December 24, 2003, O'Brien and Clevett met to discuss the possibility of NORESCO retaining Clevett as a consultant for the Colton project. At this meeting O'Brien proposed that Clevett enter into a consulting agreement to work on the Colton project through May or June of 2004. Clevett responded that he would be willing to enter into such an agreement but requested that NORESCO resolve the issues related to his severance pay due under the Noncompete Agreement. In response, O'Brien replied that 'everything was on the table.'" Id. at ¶ 26.

- "On Tuesday, January 20, 2004, at approximately noon, Clevett received an e-mail from O'Brien that failed to mention the issue of Clevett's severance pay, and stated NORESCO would not enter into a long-term consulting agreement at that time. O'Brien offered, however, to pay Clevett's expenses and an hourly wage if Clevett would attend meetings in Colton on January 21 – 23, 2004 that O'Brien could not attend." Id. at ¶ 27.

- "At approximately 6:00 p.m. on the same day, Clevett responded by e-mail and agreed to participate in the meetings, without a long-term consulting agreement or resolution of his severance pay, subject to the conditions that (i) his participation at the meeting did not waive any of his rights to seek severance; and (ii) that NORESCO pay him expenses plus $2,500 per diem for the two and one-half-day trip." Id. at ¶ 28.

- "O'Brien did not respond to Clevett until approximately 7:30 p.m. on January 21, which was after Clevett had already departed for California in order to arrive for the initial meeting with representatives of Colton at mid-day on January 21, 2004. O'Brien's e-mail stated that he did not agree to Clevett's terms and that Clevett would not be receiving any compensation or expense recovery for his trip, nor could Clevett represent NORESCO at the meeting." Id. at ¶ 29.

- On January 30, 2004, despite his rejection of Clevett's terms, O'Brien e-mailed Clevett asking for details regarding the meeting with Colton. Clevett responded to O'Brien's e-mail with a lengthy description of the meeting, including a detailed overview, a "capital rack-up," and a report on the analysis methodology employed by the City of Colton's partner on the Colton project." Id. at ¶ 30.

- "As of February 25, Clevett had not received a reply from O'Brien, so Clevett sent an invoice for $8,104.49 which included all of his expenses from the trip to Colton plus $2,500 per diem." Id. at ¶ 31.

- "Clevett has not been paid for his meetings with Colton and has not been paid any severance or stock options owed by EQT and/or NORESCO." Id. at ¶ 32.

For each of the statements included within the second category, Clevett has alleged that the statements were made intentionally or in the alternative, were made negligently, and that Clevett reasonably relied on defendants' statements. Id. at ¶¶ 42-75.

### 1.  The First Category of Representations Are Actionable And Were Reasonably Relied Upon By Clevett

Defendants take issue with Clevett's fraudulent and negligent misrepresentation claims based on purported unreasonableness of Clevett's reliance on the representations at issue. As an initial proposition, the reasonableness of a plaintiff's reliance is a question that normally is left to the factfinder and therefore is not appropriate for consideration at the motion to dismiss stage. Further, defendants' argument that the misrepresentations at issue concern future intent (i.e., that the Energy Infrastructure Division "was, and would continue to be, a valued part of [EQT's] business," and "would continue operations indefinitely.") and are therefore not actionable ignores the relevant circumstances presented by this case. While it is true that "false representations about the future" are generally not actionable, Massachusetts law "recognizes an exception 'where the parties to the transaction are not on equal footing but where one has or is in position where he should have superior knowledge concerning the matters to which the representations relate." Masso, 884 F. Supp. at 616 quoting Cellucci v. Sun Oil Co., 2 Mass. App. Ct. 722 (1974). Here, Clevett was clearly not on equal footing with defendants, who without question possessed superior knowledge of EQT's and NORESCO's short term (and long term) business plans. Moreover, when a supervisor makes a misrepresentation concerning a plaintiff-employee's continued employment and that supervisor has control over that plaintiff-employee's continued employment, the fact that the misrepresentation at issue concerns future intent does not act as a bar to the plaintiff-employee's claims. See Masso, 884 F. Supp. at 616

(denying motion to dismiss when implied representation concerned employee's future employment and representation made by employee's direct supervisor); Doody v. John Sexton & Co., 411 F.2d 1119, 1121 (1st Cir. 1969) (affirming trial court decision in favor of employee concerning misrepresentation of defendant supervisor who promised employee continued employment under certain conditions and reneged on promises).

In addition, the cases relied upon by defendants are easily distinguishable. For example, the principle case relied upon by defendants, Piantes v. Pepperidge Farms, Inc., 875 F. Supp. 929, 933 (D. Mass. 1995), involved a representation by a franchisor to a prospective franchisee that the termination clause in a proposed franchise agreement would never be acted on because the region was too profitable. After a relationship of almost twenty-five years, however, the franchisor exercised the termination clause. Id. In dismissing the franchisee's misrepresentation claim, the court found that the statement made twenty-five years earlier could not "reasonably be interpreted as an absolute promise never to terminate the franchise agreement." Id. Here, in contrast, the relationship at issue is one between an employee and an employer, where defendants had knowledge of NORESCO's short term and long term business plans and had direct and absolute control of deciding whether to continue Clevett's employment. Moreover, in this case Clevett did not expect lifelong employment, but having "commuted between Maryland and Massachusetts on a weekly basis from February 2002 to September 2003," and having "moved his family to Ashland in September 2003," it was entirely reasonable for Clevett to rely on defendants' representations and to believe that he would be employed by defendants for more than two years and that his employment would not be terminated three months after he had moved his family to Massachusetts. See Amended Complaint at ¶13.

    **2.  The Second Category of Representations Are Actionable And Were Reasonably Relied Upon By Clevett**

Defendants attempt to disclaim liability for the second category of representations on the grounds that the parties' negotiations had not ripened into a contract based on the fact that Clevett proceeded to California before defendants had accepted the terms of Clevett's last counteroffer.[1]  Although Clevett strenuously disputes defendants' categorization of the negotiations and the status of any agreement between the parties, even assuming <u>arguendo</u> that defendants are correct, it is unclear how the status of the contractual negotiations affects Clevett's misrepresentation claim.  Regardless of whether all of the terms to an agreement were in place prior to Clevett's departure for California, Clevett in fact traveled to California and attended a meeting at his own expense and at defendants' behest.  <u>See</u> <u>id.</u> at ¶29.  Furthermore, after the meeting, defendants requested a lengthy description of the meeting and a "capital rackup" and report on the proposed methodology and analysis of the Colton project.  <u>See</u> <u>id.</u> at ¶30.  At the very least, Clevett is entitled to costs associated with this meeting under his misrepresentation claim, as he would be under a quantum meruit or promissory estoppel theory.  Accordingly, defendants' attempts to dismiss Clevett's intentional and negligent misrepresentation claims must be denied.

### D. THE AMENDED COMPLAINT ALLEGES THE REQUISITE ELEMENTS OF A CLAIM FOR CIVIL CONSPIRACY

Defendants argue that Clevett has failed to sufficiently allege facts to support his civil conspiracy claim on the grounds that (1) "Clevett has failed to set forth allegations supporting any claim of tortious activity," and (2) that "Clevett has not sufficiently alleged that the requisite number of individuals were involved to form a conspiracy."  Defendants' Memo. at 19.  As

---

[1]  Defendants' account of Clevett's and O'Brien's negotiations conveniently does not discuss the fact that O'Brien did not reject Clevett's last counteroffer (which was substantially the same as O'Brien's prior counteroffer) <u>until</u> after Clevett had departed for and arrived in California.  <u>See</u> Amended Complaint at ¶29.  In addition, defendants ignore the fact that their later conduct evidences an acceptance of Clevett's counteroffer or, at the very least, a ratification of that agreement.

argued above, it is Clevett's position that the Amended Complaint contains allegations that are sufficient to support all of Clevett's claims concerning defendants' tortious conduct.

Further, defendants' argument that Clevett's allegations that O'Brien and "other individuals" at NORESCO and EQT formed a conspiracy is insufficient is inappropriate given the procedural posture of the case. Notably, Clevett has yet to conduct discovery to determine the identity of the co-conspirators and the specifics of the conspiracy. As such, it is inappropriate to expect the Amended Complaint to allege each and every detail of the conspiracy at this early stage of the litigation. Indeed, the very cases cited by defendants support Clevett's position because in each of those cases the court waited until the case had reached the summary judgment stage before passing on the merits of plaintiffs' civil conspiracy claims. See Finley v. Fischbach & Moore, Inc., 1998 WL 1181689, *6 (Super Ct. Aug. 28, 1998) (reviewing evidence at summary judgment prior to ruling on civil conspiracy claim); Kibbe v. Porter, 196 F. Supp. 2d 48, 76 (D. Mass. 2002) (same); Ward v. Costello, 2002 WL 31973253, *6 (Mass. Super. Dec. 17, 2002) (same). Here, Clevett should be afforded the same opportunity to discover material facts that may support his claim. Accordingly, defendants' motion to dismiss Clevett's civil conspiracy claims must be denied.

## CONCLUSION

For the reasons argued above, the Court should deny defendants' Motion to Strike and defendants' Motion to Dismiss.

> STEPHEN H. CLEVETT
>
> By his attorneys,
>
> /s/ Timothy P. Wickstrom
> Timothy P. Wickstrom  (BBO # 541953)
> TASHJIAN, SIMSARIAN & WICKSTROM
> 370 Main Street
> Worcester, MA  01608
> (508) 234-4551
>
> /s/ Steven P. Wright
> Thomas F. Holt, Jr. (BBO # 238830)
> Steven P. Wright (BBO # 648575)
> KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
> 75 State Street
> Boston, MA  02109-1808
> (617) 261-3100

July 11, 2005

## CERTIFICATE OF SERVICE

I, Steven P. Wright hereby certify that a true copy of the above document was served electronically on July 11, 2005 upon all counsel of record.

> /s/ Steven P. Wright
> Steven P. Wright