UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STEPHEN H. CLEVETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 05-40020-FDS |
| ) | |
| EQUITABLE RESOURCES, INC. ) | |
| and JOSEPH E. O'BRIEN, ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION TO REMAND

**SAYLOR, J.**

This case presents an issue of alleged fraudulent joinder to defeat diversity jurisdiction. The complaint was originally filed in Worcester Superior Court, and was removed to this Court by defendants on the basis of alleged diversity of citizenship. Plaintiff Stephen Clevett has moved to remand the case to state court on grounds of lack of diversity. Although Clevett and defendant Equitable Resources, Inc. ("EQT"), his former employer, are citizens of diverse states, both Clevett and defendant Joseph O'Brien, his former supervisor, are citizens of Massachusetts.

Defendants contend, however, that the joinder of O'Brien is fraudulent because it is has been effected exclusively to destroy diversity of citizenship. More particularly, defendants assert that, because Clevett cannot state any claim against O'Brien individually, O'Brien's citizenship should be disregarded for purposes of determining federal jurisdiction.

**I.   Factual Background**

    **A.   Allegations of the Complaint**

The following are the facts as alleged in the complaint.

EQT is a Delaware corporation with a principal place of business in Pittsburgh, Pennsylvania. EQT is an integrated energy company that offers natural-gas products and energy services to wholesale and retail customers. NORESCO is a wholly owned subsidiary of EQT with a principal place of business in Westborough, Massachusetts. At all relevant times, O'Brien was President of NORESCO and Vice President of EQT, and a citizen of Massachusetts.

In August 2001, EQT hired Clevett as Vice President of Business Development in NORESCO's branch office in Vienna, Virginia. At that time, O'Brien, who was Clevett's supervisor, promised Clevett that he would be promoted to Senior Vice President of the Energy Infrastructure Division (the "EI Division") by the end of December 2001. O'Brien informed Clevett that he would have to relocate from Maryland to Massachusetts. O'Brien also assured Clevett that the EI Division was, and would continue to be, a valued part of EQT's business.

EQT did not formally offer Clevett the promised promotion until February 2002, five months after he was hired. In the meantime, Clevett re-enrolled his daughter in school in Maryland in order to reserve a placement for the 2002-03 school year. By letter dated February 22, 2002, EQT formally offered Clevett the promotion to Senior Vice President–Energy Infrastructure, reporting to O'Brien. Clevett signed the letter and returned it to EQT.

The February 22 letter outlined the terms and benefits of Clevett's promotion. In his new position, Clevett's primary responsibilities were to (1) identify, develop, and close on-site power and energy infrastructure projects; (2) develop and implement a marketing plan to support the development of additional energy infrastructure projects; (3) assist with the development of operating procedures, manuals, and marketing material; (4) develop an "M&A plan" for the Energy Infrastructure Group; and (5) perform other duties as required by his manager. In

2

addition to a $195,000 annual salary and other perquisites, Clevett received the right to participate in the company's Short Term Incentive Plan at a level of 40% and a stock-option award of 20,000 options under the Long Term Incentive Plan. Clevett was also required to execute a document entitled "Noncompete Agreement."

In June 2002 and May 2003, Clevett received letters detailing his award of stock options. Clevett signed the letters and agreed to participate in the stock-option plan.

The Noncompete Agreement, which is dated October 9, 2002, contained a covenant whereby Clevett promised for the duration of his employment and for a period of 12 months thereafter not to engage in certain specified activities in competition with EQT and its subsidiaries. The Noncompete Agreement also provided that, depending upon the circumstances surrounding the termination of his employment, Clevett would be entitled to severance benefits. In particular, Paragraph 1 of the Noncompete Agreement provided:

> If the employment of [Clevett] with [EQT] is terminated for any reason other than Cause . . . or if [Clevett] terminates his . . . employment with [EQT] for Good Reason . . . , [EQT] shall pay [Clevett] from the date of termination, in addition to any payments to which [Clevett] is entitled under [EQT's] severance pay plan, twelve (12) months of base salary at [Clevett's] annual base salary level in effect at the time of such termination or immediately prior to the salary reduction that serves as the basis for termination for Good Reason. . . . Such base salary amount shall be paid by [EQT] to [Clevett] in one lump sum payable within thirty (30) days after [Clevett's] termination or resignation hereunder.

Paragraph 1 went on to define both "Cause" and "Good Reason," as those terms are used above. "Cause" was defined to mean:

> (i) a conviction of a felony, crime of moral turpitude or fraud, (ii) [Clevett's] willful and continuous engagement in conduct which is demonstrably and materially injurious to the Company, or (iii) the willful and continued refusal by [Clevett] to perform the duties of his . . . position in a reasonable manner for thirty (30) days after written notice is given to [Clevett] by [EQT] specifying in reasonable detail the nature of the

3

deficiency in [Clevett's] performance.

"Good Reason" was defined to mean "termination of employment by [Clevett] within ninety (90) days after (i) being demoted, or (ii) being given notice of a reduction in his . . . annual base salary (other than a reduction of not more than 10% applicable to all senior officers of [EQT])." Clevett was also entitled to continued health benefits and 12 months of outplacement assistance.

In reliance on O'Brien's assurances that the EI Division was a valued part of EQT's business, Clevett commuted to Massachusetts from Maryland for about a year and a half; made a significant deposit on a new home in Ashland, Massachusetts; and moved his family to Ashland.

In August 2003, O'Brien notified Clevett that the EI Division was not meeting its goals for the year and that, in the future, he and Clevett would "jointly manage" the group. Under the new arrangement, Clevett was to manage business-development duties only, and O'Brien would manage all construction activities. O'Brien stated that the group's operations-and-maintenance function "basically ran itself." Previously, Clevett had spent a significant amount of his time managing both construction and operations-and-maintenance activities because each area was critical to NORESCO. Specifically, a major project in construction was experiencing difficulties, and Clevett was managing the sales process of significant troubled international assets held by NORESCO. According to Clevett, the reorganization diminished his duties and therefore allowed him to "terminate the Noncompete Agreement" for "Good Reason."

In August 2003, O'Brien also notified Clevett that NORESCO had decided that the EI Division required only two sales personnel to meet its goal of $50 million in construction revenue for 2003. This staffing strategy, which was formulated without any input from Clevett, conflicted with a business plan Clevett had prepared and presented to O'Brien in March 2003.

4

In November 2003, O'Brien informed Clevett that EQT was seriously considering terminating what O'Brien referred to for the first time as the "EI experiment." Later that month, O'Brien told Clevett that EQT had decided to terminate all business-development activities associated with the EI Division. On December 3, 2003, O'Brien ordered Clevett to terminate the employment of all of the EI Division's business-development personnel and informed Clevett that he would be employed until the end of January 2004 as part of a transition group.

On December 9, 2003, less than two months before Clevett was scheduled to be terminated with full severance pay and benefits, O'Brien met with him and informed him that his employment was being terminated. On December 15, 2003, O'Brien sent a termination letter to Clevett that provided in part as follows:

> As you know, your position with NORESCO was going to be eliminated in the near future, which would have resulted in the termination of your employment at that time. In the meantime, however, we have learned that you have been engaging in misconduct, which among other things, violates material provisions of the Noncompete Agreement between you and [EQT] and also breaches the duty of loyalty owed to the Company. Hence, be advised that your employment with NORESCO is being terminated for cause as defined in paragraph 1 of the Noncompete Agreement, effective today.

The letter also stated that, "in light of the reasons for and circumstances surrounding" Clevett's termination, his stock options were terminated that day. The letter did not, however, explain what actions constituted Clevett's "misconduct" or what actions amounted to Cause.

On December 23, O'Brien and Clevett met to discuss the possibility of EQT's retaining Clevett as a consultant for a project in Colton, California. At this meeting, O'Brien allegedly proposed that Clevett enter into a consulting agreement to work on the Colton project through May or June 2004. Clevett was willing to enter into such an agreement but asked EQT to resolve

5

issues related to his severance pay believed to be due under the Noncompete Agreement. In response, O'Brien allegedly replied that "everything was on the table."

At approximately noon on January 20, 2004, Clevett received an e-mail from O'Brien stating that NORESCO would not enter into a long-term consulting agreement with him at that time; the e-mail did not mention Clevett's severance pay. According to Clevett, however, O'Brien offered to pay Clevett's expenses and an hourly wage if he would attend meetings in Colton on January 21-23, 2004, that O'Brien could not attend. At approximately 6:00 p.m. on the same day, Clevett responded by e-mail and agreed to participate in the meetings, without a long-term consulting agreement or resolution of his severance pay, subject to the conditions that his participation at the meeting did not waive his rights to seek severance and that he be paid expenses plus $2,500 per diem for the two-and-one-half-day trip.

O'Brien did not respond until approximately 7:30 p.m. on January 21, after Clevett had already departed for California. O'Brien's e-mail rejected Clevett's terms and stated that Clevett could not represent NORESCO at the meeting and would not be receiving any compensation or expenses for his trip. According to O'Brien, Clevett traveled to California without his participation and absent his final approval.

On January 30, 2004, despite his rejection of Clevett's terms, O'Brien e-mailed Clevett asking for details regarding the meeting with Colton. Clevett responded to O'Brien's e-mail with a lengthy description of the meeting, including a detailed overview and a report on the analysis methodology employed by Colton's partner on the project.

As of February 25, 2004, Clevett had not received a reply from O'Brien, so Clevett sent an invoice for $8,104.49, which included all of his expenses from his trip to Colton plus $2,500

per diem.  To date, Clevett has not been paid for his meetings with Colton and has not been paid any severance or stock options allegedly owed by EQT.

**B.     O'Brien Affidavit**

According to an affidavit submitted by O'Brien in opposition to the motion to remand, O'Brien was informed in early December 2003 that Clevett had made statements in the presence of other employees about his efforts to get some of NORESCO's clients to terminate their contracts for the purpose of taking that business away.  O'Brien learned that Clevett had solicited at least one NORESCO employee to join him as an employee once he had secured a position with another company.  O'Brien felt that those types of activities were disloyal to NORESCO and EQT and violated the Noncompete Agreement.

During the same time frame, according to O'Brien, certain e-mail messages that Clevett had either sent or received were brought to O'Brien's attention.  From O'Brien's point of view, those e-mail messages confirmed that Clevett was engaging in conduct that could be injurious to NORESCO and EQT; was disloyal to NORESCO and EQT; was contrary to Clevett's contractual obligations regarding noncompetition; and constituted breaches of his basic obligation to comply with company policies.

According to O'Brien, he told Clevett on December 9 that he was being terminated because of the discovery of activities by him that were harmful to the company.  O'Brien asked Clevett to gather his personal belongings and to leave the building.

Shortly after Clevett's employment was terminated, a representative from Colton, California, for which EQT was engaged in a project, indicated to O'Brien that Colton would like Clevett to have a continuing role in that business relationship.  Although O'Brien did not think

that Clevett was suitable to continue as an officer of NORESCO, he contacted Clevett to explore a possible consulting arrangement related to the Colton project. On December 19, O'Brien asked Clevett to meet with him and representatives of Colton.

At some point, O'Brien determined that a consulting arrangement between NORESCO and Clevett would not be productive. O'Brien had concluded that Colton sought Clevett's continued involvement to cultivate a relationship between Colton and a third party, not necessarily NORESCO.

## II.   Procedural Background

On November 30, 2004, Clevett commenced this action in the Worcester Superior Court. The complaint sets forth ten counts against EQT and O'Brien arising out of the alleged unlawful termination of Clevett's employment and the subsequent failure to pay severance and other monies owed to him: breach of contract against EQT; breach of the covenant of good faith and fair dealing against EQT; fraudulent misrepresentation against EQT and O'Brien; negligent misrepresentation against EQT and O'Brien; tortious interference with contract against O'Brien; civil conspiracy against EQT and O'Brien; and violations of Mass. Gen. Laws ch. 93A, §§ 2 and 11 against EQT and O'Brien.

With respect to the claim of tortious interference with contract against O'Brien, Clevett alleges that O'Brien "acted out of malevolence and actual malice in inducing EQT to breach its contract with Clevett." Specifically, Clevett alleges that O'Brien knowingly induced EQT to breach its contract with Clevett by terminating his employment without cause by, among other things, misrepresenting Clevett's performance for NORESCO, declining to permit Clevett to adequately staff the sales force to meet the EI Division's construction-revenue goals, and failing

to pay Clevett the compensation owed to him by contract.

On January 31, 2005, defendants removed the case to this Court on the grounds that O'Brien was "fraudulently joined," that is, named as a defendant in this action to defeat diversity. Put simply, O'Brien and Clevett are both citizens of Massachusetts; EQT is a citizen of Pennsylvania; and the amount in controversy exceeds $75,000. If O'Brien's citizenship is disregarded, then this Court would have diversity jurisdiction under 28 U.S.C. § 1332(a).

On February 28, 2005, Clevett filed the present motion to remand. Subsequently, defendants filed a motion to dismiss, Clevett filed an amended complaint, and defendants moved to strike the amended complaint. The motion to remand, the motion to dismiss, and the motion to strike are all currently pending before the Court.

### III.   Analysis

#### A.   Standard for Motion to Remand and Fraudulent Joinder

The Court must remand a removed action to the state court "[i]f at any time before final judgment it appears that the [Court] lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). The Court must resolve any doubts regarding the propriety of removal in favor of remand. *In re Mass. Diet Drug Litigation*, 338 F. Supp. 2d 198, 202 (D. Mass. 2004).

The fact that the plaintiff and a defendant are citizens of the same state will not prevent removal if the plaintiff fraudulently joined the non-diverse defendant to defeat diversity. *Coughlin v. Nationwide Mut. Ins. Co.*, 776 F. Supp. 626, 628 (D. Mass. 1991). Nevertheless, "[a] defendant who seeks to remove a case from state court, asserting fraudulent joinder of a defendant, has the burden to prove by clear and convincing evidence either that there has been an outright fraud committed in the plaintiff's pleadings or that there is no reasonable basis in law and

fact for the plaintiff's claim against the putative fraudulently joined defendant." *In re Mass. Diet Drug Litigation*, 338 F. Supp. 2d at 202 (citing *Mills v. Allegiance Healthcare Corp.*, 178 F. Supp. 2d 1, 4-6 (D. Mass. 2001)); *see also In re New Eng. Mut. Life Ins. Co. Sales Practice Litigation*, 324 F. Supp. 2d 288, 298 (D. Mass. 2004); *Fabiano Shoe Co., Inc. v. Black Diamond Equip., Ltd.*, 41 F. Supp. 2d 70, 71 (D. Mass. 1999) ("Joinder is considered fraudulent when there is no possibility that the plaintiff can prove a cause of action against the nondiverse defendant. The burden of establishing that joinder is fraudulent is . . . a heavy one.").

Here, to defeat remand, defendants must show that there is no reasonable possibility that Clevett can prove a cause of action against O'Brien. *See Fabiano Shoe Co.*, 41 F. Supp. 2d at 71. Clevett "need not have a winning case against" O'Brien, *id.* at 72, but must have more than a "mere theoretical possibility of recovery," *Mills*, 178 F. Supp. 2d at 5.

### B.      Whether O'Brien Has Been Fraudulently Joined

Defendants do not contend that there has been an "outright fraud" committed in Clevett's pleadings; rather, they maintain that there is no reasonable basis in law and fact for any of Clevett's various claims against O'Brien. To make that determination, the Court must consider the substantive law of Massachusetts with respect to supervisor liability in connection with the various claims Clevett has asserted against O'Brien. The Court will focus on Clevett's claim for tortious interference because the resolution of that issue involves a relatively well-developed body of case law, and because it is only necessary for present purposes to establish that Clevett has at least one claim against O'Brien with a reasonable basis in law and fact.

To state a claim for tortious interference with contract, a plaintiff must allege "(1) he had an existing contract with a third party, (2) the defendant knew that fact, (3) the defendant induced

10

the other person to break the contract, and (4) damage was incurred." 37 Joseph R. Nolan & Laurie J. Sartorio, *Massachusetts Practice, Tort Law* § 97 (2d ed.).

It is axiomatic that an employee may not sue his employer for interfering with its own contract. *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 76 (1st Cir. 2001). "Despite the employer's immunity, however, a supervisor may be personally liable if he tortiously interferes with a subordinate's employment relationship." *Id.* Thus, if a supervisor's actions in discharging an employee are within the scope of his or her supervisory duties and in furtherance of the employer's legitimate interests, the supervisor is merely the agent of the employer and is entitled to a qualified privilege as to claims for tortious interference. *Id.* If, however, the supervisor acted with actual malice, and such malice "was the controlling factor in the supervisor's interference," the privilege may be overcome. *Id.* That is because "Massachusetts treats proof of actual malice as a proxy for proof that a supervisor was not acting on the employer's behalf, and deems such proof sufficient to overcome the qualified privilege." *Id.*

As to malice, Clevett has alleged that "O'Brien acted out of malevolence and actual malice in inducing EQT to breach its contract with [him]." Defendants claim that Clevett's allegation of malice is inadequate because it is conclusory—that is, it is not based upon specific facts that give rise to an inference of malice. However, "[a]llegations of interference with contractual relations do not require any heightened level of particularity, and the element of malice itself is listed in Rule 9(b) as an example of a state of mind which may be [pleaded] generally, rather than with particularity." *Charles River Data Sys., Inc. v. Oracle Complex Sys. Corp.*, 788 F. Supp. 54, 60 (D. Mass. 1991) (applying federal rules).[1] As such, Clevett's allegation of malice is adequately

---

[1] That portion of Rule 9(b) is identical under Massachusetts law and federal law.

pleaded. *See id.*; *see also* Mass. R. Civ. P. 8(a).

The cases cited by defendants do not advance their position, as all were decided on a developed evidentiary record. *See McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals*, 880 F. Supp. 900, 910 (D. Mass. 1995) (summary judgment); *Weber v. Community Teamwork, Inc.*, 434 Mass. 761, 782-83 (2001) (bench trial); *Boothby v. Textron, Inc.*, 414 Mass. 468, 487 (1993) (directed verdict); *Gram v. Liberty Mut. Ins. Co.*, 384 Mass. 659, 663-65 (1981) (same); *Steranko v. Inforex, Inc.*, 5 Mass. App. Ct. 253, 273 (1977) (bench trial). The issue here is not whether Clevett has a winning case, but rather whether there is a reasonable possibility that Clevett can state a cause of action. *See Fabiano Shoe Co.*, 41 F. Supp. 2d at 71-72.

Furthermore, this case is easily distinguishable from the reported cases of this district finding fraudulent joinder where there was no possibility, or only a theoretical possibility, that plaintiff could recover against the non-diverse defendant. In both *Coughlin* and *Carey v. Board of Governors of Kernwood Country Club*, 337 F. Supp. 2d 339 (D. Mass. 2004), there was *no possibility* that the plaintiff could state a claim against the non-diverse defendant. In *Coughlin*, the complaint did not allege that the non-diverse defendant failed to meet any of her legal obligations and did not seek any relief from her. 776 F. Supp. at 629. In *Carey*, the claims asserted against the non-diverse defendant were barred by the Massachusetts workers'-compensation laws. 337 F. Supp. 2d at 343. Similarly, in *Mills*, a products-liability case, the facts showed that the non-diverse defendant could not possibly have supplied the injury-producing product, and the Court declined to adopt a theory of liability (market-share liability) that had not been upheld by any Massachusetts appellate court. *Mills*, 178 F. Supp. at 7-9.

Finally, the Court notes that O'Brien has submitted an affidavit attesting to his purported lack of malice against Clevett and EQT's legitimate corporate interest in terminating Clevett's employment. O'Brien's affidavit, however, does not compel a different result. As Judge O'Toole of this District explained in *In re Mass. Diet Drug Litigation*:

> For present purposes, my role is not to act as a fact-finder and conclusively resolve these disputed issues. Rather in considering the pending motion[] to remand and [defendants'] fraudulent joinder argument, I must determine whether there is any reasonable basis, on the record before me, for the plaintiff['s] contention . . . .

338 F. Supp. 2d at 206. To go further would convert this remand motion into a mini-trial on the merits, which the Court declines to do.

In sum, the Court concludes that Clevett's claim of tortious interference against O'Brien is properly pleaded and has a reasonable basis in law and fact, at least as alleged, and defendants have not shown by clear and convincing evidence that O'Brien was fraudulently joined. As a consequence, this Court lacks subject-matter jurisdiction over this case and the matter will be remanded to the Worcester Superior Court.

**IV.     Conclusion**

For the reasons stated above, plaintiff's motion to remand is GRANTED, and this case is REMANDED to Worcester Superior Court.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: July 20, 2005